UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|                          |   |                          |
|--------------------------|---|--------------------------|
| UNITED STATES OF AMERICA, | ) | Case No. 23-CR-00026-002 |
|                          | ) |                          |
| Plaintiff,               | ) | February 12, 2024        |
|                          | ) |                          |
| vs.                      | ) | Allentown, PA            |
|                          | ) |                          |
| PHILLIP GILLARD,         | ) |                          |
|                          | ) |                          |
| Defendant.               | ) |                          |

TRANSCRIPT OF CRIMINAL JURY TRIAL DAY 3
BEFORE THE HONORABLE JOHN M. GALLAGHER
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government:      EVERETT WITHERELL, AUSA
                         ROBERT SCHOPF, AUSA
                         UNITED STATES ATTORNEY'S OFFICE
                         615 Chestnut Street
                         Suite 1250
                         Philadelphia, PA 19106

For the Defendant:       PHILLIP GILLARD, PRO SE

ECR OPERATOR:            CHRISTINE C. STEIN

Transcription Service:   HUNT REPORTING COMPANY
                         15210 Dino Drive
                         Suite E
                         Burtonsville, MD 20866
                         410-766-HUNT (4868)
                         1-800-950-DEPO (3376)

Proceedings recorded by electronic sound recording.  Transcript produced by computer-aided transcription service.

```
                         I N D E X

                                                   PAGE
PRELIMINARY INSTRUCTIONS:                          43

OPENING STATEMENTS:                                PAGE
For the Government                                 67
For the Defendant                                  75

                                                   VOIR
WITNESSES:            DIRECT  CROSS  REDIRECT  RECROSS  DIRE
For the Government:
William Becker          79     178     190       204
Victor Rodriguez       209     214
Benjamin Hallowell     215
```

```
EXHIBITS:  DESCRIPTION                              ID.   EVID.
For the Government:
G-101      Photo of Diane Gillard                          84
G-4010     Overhead map of 2900 block of Tulip             89
           Street
G-103      Photo of Sharif Jackson                         92
G-108      Photo of Raphael Sanchez                        92
G-104      Photo of Cesar Maldonado                        93
G-106      Photo of Phillip Gillard                        93
G-105      Photo of Terrence Maxwell                       94
G-3301     Pole camera video of Memphis and Ann            96
           Streets on 6/2/2022
G-3302     Pole camera video of Memphis and Ann            96
           Streets on 6/2/2022
G-703      Photo of black bag contents belonging          107
           to Defendant T. Maxwell
G-P1       Taurus firearm recovered from                  109
           Defendant T. Maxwell on 6/2/2022
G-1501     Screenshot of text message sent to             115
           Defendant A. Whitehead from CI Smurf
           on 8/10/2022
G-P2       A ghost gun with no serial number              125
           recovered from Defendant A.
           Whitehead's residence - 2940 Tulip
           Street
G-P3       Second gun recovered from Defendant            126
           A. Whitehead's residence - 2940 Tulip
           Street
G-P4       Third gun recovered from Defendant A.          127
           Whitehead's residence - 2940 Tulip
           Street
G-P5       Fourth gun recovered from Defendant            128
           A. Whitehead's residence - 2940 Tulip Street
```

I N D E X (CONT)

| EXHIBITS: | DESCRIPTION | ID. | EVID. |
|---|---|---|---|
| For the Government: | | | |
| G-1584 | Photos of Philadelphia PD property receipts and search warrant for 2970 Tulip Street | | 135 |
| G-2880 | FBI property receipt | | 146 |
| G-2881 | Philadelphia PD property receipt for items recovered from Defendant C. Maldonado's residence - 2268 E. Monmouth Street | | 147 |
| G-P7 | One of three firearms recovered from Defendant C. Maldonado's residence - 2268 E. Monmouth Street | | 149 |
| G-P6 | One of three firearms recovered from Defendant C. Maldonado's residence - 2268 E. Monmouth Street | | 148 |
| G-P8 | One of three firearms recovered from Defendant C. Maldonado's residence - 2268 E. Monmouth Street | | 149 |
| G-2681 | FD-395 FBI form for Defendant P. Gillard | | 152 |
| G-2682 | FD-26 FBI form for Defendant P. Gillard | | 154 |
| G-3201 | Chart indicating the various cell phone devices seized during the investigation | | 157 |
| G-3102 | Screenshot of Instagram account of Defendant P. Gillard with moniker Doo Gottierr | | 161 |
| G-1502 | Photo of front of residence Defendant A. Whitehead's - 2940 Tulip Street | | 119 |
| G-1503 | Photo of inside front door of Defendant A. Whitehead's residence - 2940 Tulip Street | | 119 |
| G-1504 | Photo of light blue cloth shopping bag, firearm on the ground, firearm in the bag - of Defendant A. Whitehead's residence - 2940 Tulip Street | | 119 |
| G-1505 | Photo of three firearms, remaining contents of light blue cloth shopping bag - of Defendant A. Whitehead's residence - 2940 Tulip Street | | 119 |
| G-1506 | Photo of bedroom, a plate, drug packaging material inside of a shoebox on the bed - Defendant A. Whitehead's residence - 2940 Tulip Street | | 120 |

I N D E X (CONT)

| EXHIBITS: | DESCRIPTION | ID. | EVID. |
|---|---|---|---|
| For the Government: | | | |
| G-1509 | Photo of bedroom, additional packaging material inside of a shoebox - Defendant A. Whitehead's residence - 2940 Tulip Street | | 120 |
| G-1510 | Close-up photo of same shoebox with more drug packaging inside of it - Defendant A. Whitehead's residence - 2940 Tulip Street | | 120 |
| G-1511 | Additional close-up photo of same shoebox with more drug packaging inside of it - Defendant A. Whitehead's residence - 2940 Tulip Street | | 120 |
| G-1515 | Photo of living room area, fireplace, blue flip-top containers containing crack cocaine, various narcotics, packaging material - Defendant A. Whitehead's residence - 2940 Tulip Street | | 120 |
| G-1516 | Photo of plate with razor blades - Defendant A. Whitehead's residence - 2940 Tulip Street | | 121 |
| G-1519 | Photo of couch with storage compartment containing gun magazine and ammunition - Defendant A. Whitehead's residence - 2940 Tulip Street | | 121 |
| G-1520 | Photo of front door of residence, TV, TV stand, small amount of crack cocaine -- Defendant A. Whitehead's residence - 2940 Tulip Street | | 121 |
| G-1521 | Close-up photo of crack cocaine behind the TV -- Defendant A. Whitehead's residence - 2940 Tulip Street | | 121 |
| G-1524 | Photo of blue flip-top containers -- Defendant A. Whitehead's residence - 2940 Tulip Street | | 121 |
| G-1527 | Photo of boxes of ammunition on top of the fireplace mantel -- Defendant A. Whitehead's residence - 2940 Tulip Street | | 121 |
| G-1528 | Additional photo of ammunition -- Defendant A. Whitehead's residence - 2940 Tulip Street | | 121 |

I N D E X (CONT)

| EXHIBITS: | DESCRIPTION | ID. | EVID. |
|---|---|---|---|
| For the Government: | | | |
| G-1534 | Photo of black Nike backpack seen previously during a controlled purchase operation -- Defendant A. Whitehead's residence - 2940 Tulip Street | | 122 |
| G-1536 | Photo of an extended magazine found inside of black Nike backpack - Defendant A. Whitehead's residence - 2940 Tulip Street | | 122 |
| G-1544 | Photo of firearm recovered in Defendant A. Whitehead's residence - 2940 Tulip Street | | 122 |
| G-1546 | Photo of firearm and magazine -- Defendant A. Whitehead's residence - 2940 Tulip Street | | 122 |
| G-1547 | Photo of second firearm, magazine, and ammunition -- Defendant A. Whitehead's residence - 2940 Tulip Street | | 123 |
| G-1551 | Photo of third firearm with obliterated serial number -- Defendant A. Whitehead's residence - 2940 Tulip Street | | 123 |
| G-1559 | Photo of crack cocaine on an FBI scale - recovered from Defendant A. Whitehead's residence - 2940 Tulip Street | | 123 |
| G-1561 | Photo of additional crack cocaine from Defendant A. Whitehead's residence - 2940 Tulip Street | | 123 |
| G-1568 | Close-up photo of blue flip-top containers with small amount of crack cocaine -- Defendant A. Whitehead's residence - 2940 Tulip Street | | 124 |
| G-1570 | U.S. currency recovered, debit card with Mr. Whitehead's name -- Defendant A. Whitehead's residence - 2940 Tulip Street | | 124 |
| G-1578 | Photo of a firearms box, and a magazine with ammunition -- Defendant A. Whitehead's residence - 2940 Tulip Street | | 124 |
| G-1580 | Photo of a digital scale found on a bed -- Defendant A. Whitehead's residence - 2940 Tulip Street | | 124 |

I N D E X (CONT)

| EXHIBITS: | DESCRIPTION | ID. | EVID. |
|---|---|---|---|
| For the Government: | | | |
| G-2806 | Photo of front door of Defendant C. Maldonado's residence - 2268 E. Monmouth Street | | 142 |
| G-2817 | Photo of Defendant C. Maldonado's bedroom - 2268 E. Monmouth Street | | 142 |
| G-2825 | Close up photo of a drawer on the floor, firearm with extended magazine, U.S. currency wrapped in rubber bands - Defendant C. Maldonado's residence - 2268 E. Monmouth Street | | 143 |
| G-2826 | Photo of an additional firearm recovered at Defendant A. Whitehead's residence - 2940 Tulip Street | | 143 |
| G-2828 | Photo of an additional firearm, mason jar with baggies containing an off-white, almost purplish powder -- recovered from Defendant C. Maldonado's residence - 2268 E. Monmouth Street | | 143 |
| G-2831 | Photo of a glass jar containing a purple powder, fentanyl, and a firearm - recovered from Defendant C. Maldonado's residence - 2268 E. Monmouth Street | | 143 |
| G-2832 | Photo of a glass jar containing a purple powder, fentanyl, and a firearm - recovered from Defendant C. Maldonado's residence - 2268 E. Monmouth Street | | 143 |
| G-2836 | Photo of blue glassine insert bags, each containing a dose of fentanyl, money wrapped in rubber bands, money rolled up into small rolls, box of sandwich style bags -- recovered from Defendant C. Maldonado's residence - 2268 E. Monmouth Street | | 144 |
| G-2839 | Photo of black grocery bag with prepackaged blue glassine inserts containing a dose of fentanyl -- recovered from Defendant C. Maldonado's residence - 2268 E. Monmouth Street | 144 | |

I N D E X (CONT)

| EXHIBITS: | DESCRIPTION | ID. | EVID. |
|---|---|---|---|
| For the Government: | | | |
| G-2841 | Photo of three cell phones -- recovered from Defendant C. Maldonado's residence - 2268 E. Monmouth Street | 145 | |
| G-2842 | Photo of a firearms box, additional straps and a magazine -- recovered from Defendant C. Maldonado's residence - 2268 E. Monmouth Street | | 145 |
| G-2843 | Close up photo of a firearms box, additional straps and a magazine -- recovered from Defendant C. Maldonado's residence - 2268 E. Monmouth Street | | 145 |
| G-2846 | Photo of a black bag, firearm magazines, firearms box -- recovered from Defendant C. Maldonado's residence - 2268 E. Monmouth Street | | 145 |
| G-3202 | Phone attribution chart | | 160 |
| G-1002 | Surveillance videos | | 195 |
| G-1003 | Surveillance videos | | 195 |
| G-1006 | Surveillance videos | | 195 |
| G-828 | Surveillance video | | 210 |
| G-830 | Surveillance video | | 213 |
| G-312 | Surveillance videos | | 218 |
| G-313 | Surveillance videos | | 218 |
| G-314 | Surveillance videos | | 218 |
| G-315 | Surveillance videos | | 218 |
| G-316 | Surveillance videos | | 218 |
| G-317 | Surveillance videos | | 218 |
| G-1112 | Surveillance videos | | 223 |
| G-1114 | Surveillance videos | | 223 |
| G-1115 | Surveillance videos | | 223 |
| G-1126 | Surveillance videos | | 223 |
| For the Defendant: | | | |
| D-1 | Surveillance video | | 180 |
| D-2 | Surveillance video | | 185 |

Colloquy

THE CLERK:  All rise.  United States District Court for the Eastern District of Pennsylvania is now in session. Judge John M. Gallagher presiding.

THE COURT:  Good morning, everybody.  Welcome to Allentown.  Please make yourselves comfortable.  A lot of binders here.

We're here this morning on the matter of the United States of America vs. Phillip Gillard.  That's a criminal docket, 23-26-2.

The Court recognizes and welcomes Assistant United States Attorney Everett Witherell and Robert Schopf. Gentlemen, how are you?

MR. EVERETT WITHERELL:  Good, Your Honor.

MR. ROBERT SCHOPF:  Your Honor, good morning.

MR. WITHERELL:  Good morning.

THE COURT:  We also recognize and welcome FBI S.A. Becker.  How are you, Mr. Becker?

MR. WILLIAM BECKER:  Good morning.

THE COURT:  Good to see you again.

And at opposing table, defendant Phillip Gillard. Good morning, sir.

MR. PHILLIP GILLARD:  Good morning.

THE COURT:  And standby counsel, Glennis Clark.

MR. GLENNIS CLARK:  Good morning, Your Honor.

THE COURT:  Mr. Clark, good to see you.

Colloquy

MR. CLARK:  Well, good -- always, Judge.  Always.

THE COURT:  Always, sir.

Having selected a jury on Thursday and Friday of this past week, we intend to commence with our trial this morning. After we have our own conversation here, we'll bring in the jury and we'll swear them in, and then I'll provide them with the preliminary instructions.  We previously shared those intended instructions with the parties last week, including a summary -- the case summary that each side agreed was appropriate.  And then, I also passed out -- and we'll talk about that in a minute -- a related tweak as to instructions, and I'm seeking the input of the parties on that.

So then after they get their preliminary instructions, we'll move on to the opening statements and the presentation of evidence, and trial will be underway.  It kind of takes on a life of its own and we just hold on as it speeds down the track.

There are a handful of things that I want to raise briefly with you before we bring in the jury.  I'm also open to discuss whatever the parties want to bring to my attention.

Ms. Stein tells me that by shortly after 9 this morning, all of our jurors were present and accounted for.  I know we discussed last week -- I don't know, I don't recollect if it got on the record -- but you'll recall that we already switched out one of the jurors.  Alternate Number 1 replaced

Colloquy

Juror Number 2, who had a medical emergency.  Fortunately, she's fine, but she could not serve.  So she's now back home with her family, and we're here in Allentown.  And you're here -- you're all here with me.  So who got the better end of that deal, do you think?

Folks, first on the preliminary instructions -- a couple questions I have.  Obviously, we're giving them an overview; we're giving them some legal instructions.  And as you know, the brunt of that comes on the back end of the case.  But we try to give them some instructions that -- give them some guardrails for when they're taking in the evidence during the case.

My first question -- and I did pass around some language on this -- is how specific we have to be up front with the controlled substances that are being charged, because the superseding indictment refers to numerous different controlled substances, and then also how specific we should be on the quantities that are in play here, and that ultimately the jury will have to determine?

The second thing is related to the bifurcated count of 922(g), the felon in possession.  And so I have a few more things I want to discuss, but if we can take them in order, that would be great.  What about the preliminary jury instructions that -- again, either the 922(g) or the, you know -- how we should introduce the drugs that ultimately will

Colloquy

be before them when they deliberate?

MR. WITHERELL:  So Your Honor, just looking at your instructions, you do not delineate whether or not it's charging to (b)(1)(A) or (b)(1)(B) at this moment in time, so I don't think it's necessary to talk about quantities of narcotics.

THE COURT:  Okay.

MR. WITHERELL:  I'll leave it to the Court's discretion if you want to list the narcotics, but I think at this point we can take out any mention of quantity.  You're obviously going to get more specific --

THE COURT:  Absolutely.

MR. WITHERELL:  -- when dealing with specific -- so if the Court would like to say narcotics or, if the Court wishes to discuss just the -- the names of them, I think that is less cumbersome for the jury to take in at this time.  Hearing things like 50 grams or more at this early stage really doesn't do anything.

THE COURT:  We're trying to illuminate them, and that might be a little bit too much; that might be drinking from a fire hose for them.  And obviously we will -- and we'll spend time during and after the presentation of evidence making sure they have everything they need, but --

So Mr. Gillard, what I'm asking the Government -- and it aligns with my initial gut reaction -- is when we are explaining to the jury, before the opening statements, what the

Colloquy

charged crimes are here --

MR. GILLARD:  Um-hum.

THE COURT:  -- as you know, as you've heard throughout not just last week, but the many times that we've been together, there's some specific drugs and drug amounts that the Government must prove in order to establish the specific charges that the grand jury returned in the superseding indictment.

I give a preliminary instruction at the beginning. I'm leaning now towards just telling them what drugs are involved and not the required quantities that the Government must prove.  They will get that during the case, and most specifically at the end, and there's -- different laws require the Government to prove minimum quantities -- it might be 100 grams of fentanyl or another specific quantity they have to hit, and if they don't -- if they don't prove that, they haven't met that element.

But I don't want to get them too worried about the specific quantities as of yet.  And so my intention is to just tell them which drugs are at play, and then we'll get to the quantities.  What do you think of that?

MR. GILLARD:  I'm still a little confused about this stuff right here.  I just got it, so I don't even --

THE COURT:  We can go to your issues when we're done with mine, okay?

Colloquy

MR. GILLARD:  Okay.

THE COURT:  I promise, all right?  But I get to go first.

MR. GILLARD:  Um-hum.

THE COURT:  Sound fair?

MR. GILLARD:  Yeah.

THE COURT:  All right.  So are you okay with us being a little more general in the description up front?

MR. GILLARD:  Yeah.

THE COURT:  Okay.  All right.  You look good today.

MR. GILLARD:  Thank you.

THE COURT:  Yeah.  Are you feeling good?

MR. GILLARD:  I'm all right.

THE COURT:  All right.  Okay.  All right.

Well, it's good to see you anyway, but we'll come back to you.

MR. GILLARD:  All right.

THE COURT:  You know I -- you know I won't --

MR. GILLARD:  Um-hum.

THE COURT:  -- I won't ignore your concerns, you know, we'll definitely talk about them.  All right.

So what about the second piece, on the 924(g) -- 924(c) -- obviously, you know, there's multiple elements.  Only one of them is the forbidden element prior to the bifurcation. But I'll be candid, I'm not exactly sure whether we present any

Colloquy

of the elements in the front end or we just, you know, as far as firearms, we only deal with the 924(c).

MR. WITHERELL:  My understanding, Judge, is that we would only present the case as if it was possessing a firearm for a drug trafficking crime --

THE COURT:  Okay.

MR. WITHERELL:  -- or we would present -- and of course, in doing so -- during our case-in-chief -- we'll bring out the element of interstate nexus, just so we don't have to recall the witness.  But I don't think that we need to discuss the elements of that charge at any point during the bifurcated trial.  I think that's correct.

THE COURT:  Okay.  Okay.  So Mr. Gillard, what I'm asking -- as you know, we've discussed on several occasions that there's going to be two parts to this trial.  The second part -- we're not going to get to the charge of felon in possession of a firearm, because we don't want the jury to hear that you have a prior felony conviction while they're hearing the bulk of the charges, the felony drug distribution charges.

They will still hear about the firearms because --

MR. GILLARD:  Right.

THE COURT:  -- one of the counts is possession of a firearm in furtherance of a drug trafficking crime.

MR. GILLARD:  Um-hum.

THE COURT:  But so we're not going to instruct the

Colloquy

jury either in the preliminary instructions or in the final instructions until after the first -- I won't even say the first half, the first part of the bifurcated trial, which is going to be -- if I was to guess, is going to be -- 95 percent of the trial is going to be prior to bifurcation, okay?  Does that make sense?

MR. GILLARD:  Yes, sir.

THE COURT:  All right.  All right.  Thank you.

I know we're just starting the trial, but the end always comes quickly.  I'm not so sure that's going to happen in this case.  But I do want to ask the Government if you would please -- you timely provided us with proposed final jury instructions -- in fact, the only party present who provided such instructions was the Government.  But these were provided before a number of events took place, before the landscape changed in this case.

There was a number of guilty pleas between then and now, and there were certain rulings by the Court that would impact the final jury instructions, including -- such as the 609 ruling, where we precluded the affirmative use of the defendant's prior convictions as fodder for challenging his veracity.  What other rulings -- well, the bifurcation ruling, which wasn't opposed, but -- so anyway, the point is there's been a number of changes.

It would be super helpful if the Government could

Colloquy

revise their proposed final instruction, share that with me and of course, with Mr. Gillard. I think it'll tighten it up a bit. And we've noted this before, with very little -- little to no exception, the Government's proposals are all from the Third Circuit model instructions, which is always a good way to go.

Of course, if Mr. Gillard has any proposals for jury instructions, or any feedback on what the Government has, even at this late hour, I'd welcome to hear from Mr. Gillard on that.

So you're all over that, Mr. Witherell?

MR. WITHERELL: Yes, Your Honor.

THE COURT: All right.

MR. WITHERELL: We will begin that process immediately after court. We'll get that to you in a very timely fashion so Mr. Gillard can see it prior to anything. We'll also provide a -- and I just want the Court to put this in the back of your mind -- certain jury instructions concerning forfeiture, which we'll provide for the Court. And again, that can be dealt with at the end of it. But the defendant is entitled to a jury trial for forfeiture, if it does not stipulate to it at the end of the trial.

THE COURT: Yeah. That's interesting. And again, we can talk more about it later and how that plays out in the bifurcated instructions as well. All right. Thank you.

Colloquy

More of a housekeeping matter.  Are there transcripts that are going to accompany the recordings?

MR. WITHERELL:  There are, Judge.  Those transcripts have been provided.  We had motions on them.  The transcripts have been synced to the CI videos so they would just be electronic.

THE COURT:  That was my next question.  We'll actually see it?

MR. WITHERELL:  We'll actually see it.

THE COURT:  Okay.

MR. WITHERELL:  I would note, Judge -- and this is a question that'll come through Agent Becker.  We have gotten rid of the dead air, so we're not sitting there listening to the CI driving.  So it will black out and it will come back up when we hear communication and follow the transcript, so we're not here for three weeks as opposed to what might be two.

THE COURT:  Why, do you have plans?

MR. WITHERELL:  Not anymore, Judge.

THE COURT:  We ask all the jurors if they have plans, but we never ask ourselves, Counsel.  Okay, now.  Understood.  There are -- and you know this, but during trial, when there's transcripts or transcription, there's jury instructions that I'll, you know -- I'll provide to the jury at the appropriate time.  You know, there's things that come up during trial, expert testimony, et cetera.  We'll give the instructions at

Colloquy

the appropriate time.

I also shared, this morning, an instruction that is modeled off of 2.27 -- and I'm not saying it's completely apples to apples, but the subject matter is we have -- we litigated -- Mr. Gillard has challenged, and I think has maintained his argument, that he did not consent to the search of the phone. And there was a challenge to that, and I overruled that challenge, and it was my determination that that evidence is admissible.

It seems even since that ruling, he has maintained his position that was -- he did not consent, and that was not his signature. And I don't know if that's something that he's going to, you know, raise during the course of this trial. Of course, he doesn't have to raise anything, but if he does decide to raise it, then I think an instruction might be appropriate or even necessary because, again, it's the jury doesn't -- the jury is not told how I ruled. And ultimately, even though I ruled in the Government's favor, that they can rule to the contrary and say that there was not a voluntary consent.

MR. WITHERELL: May I, Judge?

THE COURT: Yeah, please.

MR. WITHERELL: And I received this this morning. Is 2.27 dealing with voluntary statements?

THE COURT: It is.

Colloquy

MR. WITHERELL:  Okay.  So Judge, I think there's a distinction there.

THE COURT:  Talk to me.

MR. WITHERELL:  I am well aware of the law that says the jury determines whether or not a statement was voluntarily given, and only after they determine whether a statement was voluntarily given can they accept the statement for any evidence that they glean for it.  That prohibition does not exist for Fourth Amendment claims.  And I would just appreciate some time to provide the Court with some --

THE COURT:  Please do.  It would be super helpful to me.

MR. WITHERELL:  Yeah.

THE COURT:  And take a look at -- I could not find any cases supporting this theory -- not opposing it, but supporting this theory that there should be an instruction.  But if you look at the commentary to 2.27, it doesn't seem that it limits itself to the Fifth Amendment.  It --

MR. WITHERELL:  I will, Judge.  I don't know --

THE COURT:  -- or Sixth.

MR. WITHERELL:  My understanding is that a Fourth Amendment claim of whether or not an individual was -- they are not permitted to relitigate a claim in violation of the Fourth Amendment.  For example, the jury wouldn't be asked if a car stop was therefore legal, and only after they determined it

Colloquy

was, could they determine any evidence found inside of a car stop.  And I think it falls into that line.

I understand that consent is verbally given, but there is a distinction between a confession -- and I think that's what 2.27 is speaking about -- and a Fourth Amendment claim decided by the Court.  I'd just appreciate the time to look into it, and --

THE COURT:  No, and I appreciate you taking the time, especially with everything that's going on.  But you know, when you're preparing and -- right up to the last minute, things pop up, and this was something that popped up in my own head in the last couple of days.  So yeah, please do look into it.

I don't think what you're saying -- and if you're correct, let's just assume that you are correct -- that doesn't prevent Mr. Gillard from arguing whatever he wants as to that signature --

MR. WITHERELL:  Oh, not at all.  He'd be free to do it.

THE COURT:  -- or whether or not he consented to it.

MR. WITHERELL:  I just don't think a -- I don't think the jury needs to determine whether or not it was -- the consent was given or not.  Mr. Gillard can make whatever claims he wishes to make about it.

THE COURT:  Or impose their own type of fruits of the poisonous tree remedy.

Colloquy

MR. WITHERELL:  I just think that -- I just don't think those are questions that we pose to the jury.

THE COURT:  What you said -- what you're saying makes a lot of sense.  If you can show me that the law aligns, I'm all ears -- eyes.

MR. WITHERELL:  Will do, Judge.

THE COURT:  Okay?

MR. WITHERELL:  Yep.

THE COURT:  All right.  Thank you.

I think the final matter -- and then, I'll turn it over to the parties -- that I guess we could have raised first, because I think it's probably first on everyone's mind, is the weather forecast.

The latest I heard, and it's been changing in the last day or two, but not for the better, is that we could be getting between a half a foot and a foot of snow locally here.  And just doing a quick look at our jury chart, it looks as if we have jurors from seven of the nine counties.  So I mean, that's covering some real estate, you know.  There's going to be some -- it increases the likelihood that someone's going to have a weather-related issue.

So look, we don't have to make any decisions now, but we need to keep this in mind.  We need to talk about it.  And I think, to a significant extent, we need to be respectful of the jurors' own choices.  And obviously, I'm not discounting that

Colloquy

witnesses have to come a long distance as well.  But like we said, you know, like we said Friday, safety is first and then -- and timeliness is second.

Of course, in this case jury duty took two days instead of one, and then we have a holiday in the middle of it as well.  And then, of course, we have a -- no matter what the groundhog said, we have, maybe, our first real snowstorm in years.  So Mr. Witherell, I don't know if that follows you everywhere you go, that type of good luck, or if you're just sharing it with us.

MR. WITHERELL:  So Your Honor, if I just -- the only point -- the Government has witness issues, but we have built in enough leeway into this trial that we can handle anything, we think.  The point that we have is, we have a bus full of witnesses coming from the Philadelphia lab tomorrow.  So timing -- knowing what we're going to do earlier is beneficial to us, so we can rearrange witnesses.

So whatever the Court decides, and I don't know when -- it's easier to us to manipulate our trial schedule if we know it, but -- earlier.  So if by --

THE COURT:  Understood.

MR. WITHERELL:  -- if by lunch we can make a determination, whatever the court's going to do, we can then rearrange scheduling.

THE COURT:  I think what -- maybe what we'll do is --

Colloquy

and taking your lead -- we'll ask the jury when they break for lunch to come back to us after their lunch -- and you know, that'll be three or four hours from now, it'll be a little closer to the storm arriving, and see what their intentions are.  We do have several that are --

Christine, how many are staying at the hotel?

THE CLERK:  So far, I know of three.

THE COURT:  Three so far are staying at the hotel. But we had a couple more that were eligible, beyond thirty miles -- actually even beyond fifty miles -- that I think, at least today, are commuting.  So I mean, we've got to hear them out.

MR. WITHERELL:  Yeah.  Yeah, and I just feel, Judge, that with the pending storm, I don't -- I just don't foresee us operating tomorrow if we're getting six to ten inches, I just --

THE COURT:  I'm with you.  I'm with you.

MR. WITHERELL:  So and if that's the case, if we can just make that call sooner rather than later, the Government can then take our lunch break to call witnesses and try to -- but I'll -- that's all I have.

THE COURT:  I appreciate it.  No, it's just something we have to be mindful of.

So Mr. Gillard, is there anything that you want to discuss about anything I've discussed this morning, or anything

Colloquy

you want to share with me?

MR. GILLARD: Yes. My assistant came to see me last night. He came to see me last night at the prison, and we had a little misunderstanding about this -- the transcripts and the Government stuff that -- that I was supposed to receive. He came up there with something that I already knew about, or whatever the case may be, but I still didn't receive the stuff that I was supposed to receive.

Now today I'm receiving it, and it's like, well, how much time do I have to look at it? So I -- I don't know what to say. Y'all -- y'all talking about a storm. I'm talking about me getting to see what's in here, that's in this case, that refers to me. I don't --

THE COURT: So Mr. Gillard, are you claiming that this stuff was never provided by the Government?

MR. GILLARD: Yes. Yes, I am. It wasn't.

THE COURT: All right.

Let me ask the Government about that. Do you have a different --

MR. GILLARD: And --

THE COURT: -- position?

MR. WITHERELL: Yes, Your Honor. So to -- this has all been provided in discovery. And second, the Government then provided an exhibit list and exhibits -- I want to say over a month ago -- to counsel, to the Court, to the defendant

Colloquy

at the FDC.

I know, Mr. Gillard, you haven't looked in those, but those are -- those were provided in discovery. Those are Production 1, Production 2, Production 3, just in exhibit format with an exhibit sticker on it.

Indeed, even though those are provided in discovery, the Government then provides them again when sending the Government exhibit list. I know Your Honor, in its court order, had exhibits due -- I want to say months ago. And we provided them. There may have been one or two that swapped in and swapped out, but nothing -- I think -- I know that everything here has been previously provided to the defendant.

THE COURT: And let me ask -- and correct me if I'm wrong, Attorney Witherell -- didn't the Government also voluntarily meet --

MR. WITHERELL: Oh, yeah.

THE COURT: -- with Mr. Gillard in recent weeks and also display exhibits?

MR. WITHERELL: We did, Your Honor, and thank you for raising that. Mr. Gillard was saying that he didn't have the electronic access to cell phones, which is true because part of the court's protective order, even back in the beginning of the case -- we were not sending cell phone records and the pole camera to the FDC based upon how large they were. We sent them directly to defense attorneys.

Colloquy

Mr. Gillard indicated he did not -- had not seen them, so Agent Becker, myself, as well as AUSA Schopf, had visited Mr. Gillard on two occasions, showing him what we believed were some evidence that he had not seen and wanted to make sure he had access to it and had seen it.

MR. GILLARD:  I didn't -- I didn't receive them. Like, I didn't get them.  They just came up there and showed it to me, and then tried to offer me a deal with the -- with that.

THE COURT:  Well, Mr. Gillard, these exhibits, as -- the exhibits and the discovery, as I recollect from the months-long history of this case, were initially provided to your first attorney, who you were dissatisfied with and released, and then to your second attorney, who you were dissatisfied with, and then you released.

And then upon your request to go pro se, one of the encouragements I made to try to change your mind was these types of access issues were going to be very difficult, or at least more difficult, to resolve if you were representing yourself, because you're in custody.  And I shared that with you.  And then, you know, you don't have to be a fortune teller -- I mean, these types of things happen.

Now, I know that Attorney Clark, who accepted the appointment as standby counsel, has been gathering information for you, has been talking to witnesses for you.  But the Government -- and I think I left out, besides providing these

Colloquy

things to counsel, Government has indicated -- again, repeatedly -- that these have also been provided through the Federal Detention Center as well and were available for your review there.  I'm not sure what else the Government --

MR. GILLARD:  Yeah.

THE COURT:  -- can do.

MR. GILLARD:  Your Honor, these new exhibits that they -- they're bringing in.  These new.

THE COURT:  Well, they're --

MR. GILLARD:  I got -- I got -- I got the first part of the discovery.  Later on, then -- what, a year later -- they bringing some new exhibits.  I never seen them exhibits.  I -- they was never brought up.

THE COURT:  Are these new exhibits, or are these --

MR. GILLARD:  They --

THE COURT:  -- exhibits that were culled from discovery that had been previously provided?  See, there's discovery and then there's exhibits.  And typically exhibits come from the discovery.  Is that this situation?

MR. GILLARD:  But I have the -- I have the discovery. It was stuff -- it was information held out of the discovery. The stuff they showed me isn't in the discovery I got.

THE COURT:  Well, if you had something specific -- because you have, on past occasions we've been together, contended that certain things weren't provided, and then the

Colloquy

Government's told you exactly which batch of discovery they were provided in.

MR. GILLARD: I can't control --

THE COURT: And they've yet to be stumped on that.

MR. GILLARD: So -- so by me representing myself -- not trying to be smart or nothing -- so that mean don't -- no rules of -- none of the law, it don't go for me. Like --

THE COURT: What law -- Government's saying they provided --

MR. GILLARD: Like he bringing -- he bringing paperwork here today. That's enough for me to say can I have a mistrial, because I don't even got this stuff -- I can't -- I don't have a chance to look at it. That's the Brady versus Maryland.

THE COURT: No, it's not Brady. But you did have an opportunity, and the Government has provided what's in here in your discovery previously --

MR. GILLARD: No, I --

THE COURT: -- this and a lot more. A lot more. And that's where the -- in most instances that's where evidence -- exhibits come from. So they're saying you didn't -- they provided this, and they have on multiple occasions identified dates and batches --

MR. GILLARD: I don't have none of this. I don't have none -- Your Honor, I don't have that stuff. The phone

Colloquy

information -- I don't have none of that stuff.  I never had none of that stuff.  It never was in the discovery.  They brought that up to me at the last minute, thinking that showing me that was going to make me take a deal.  They offered a deal after that.  I turned it down.  That's -- I don't have that stuff.  So now, I ask for that stuff.

THE COURT:  Mr. Witherell, it seems that Mr. Gillard's focusing specifically -- his argument's specifically focused on the telephone records.  I know this has come up prior -- including the last time we were together, last week -- but would you please tell us --

MR. WITHERELL:  Sure.  Sure.

THE COURT:  -- what the circumstances are with those records?

MR. WITHERELL:  And Judge, I could -- I just want to make sure I'm getting this right.  Mr. Gillard is speaking about several things.  Phone records were turned over in Production 5.  Thousands of pages of phone records were turned over in Production 5.

I think Mr. Gillard's referring to his particular download of his phone.  His phone was turned over to his attorney, both Vernon Chestnut as well as Christian Hoey.  And again, we didn't send the download of the phone to the FDC because the FDC doesn't accept full downloads of phones based upon various other photos that are not evidentiary in value.

Colloquy

So we sent those to both counsels. When we met with Mr. Gillard, he said he hadn't seen them, so we went and showed him the exhibits we would use from his exact phone.

Moreover, I think he's referring to some summary charts that were not provided in discovery but were provided when the Government sent its Government exhibit list at the Court's discretion several months ago. And those are a series of summary charts that delineate the thousands of pages of phone records into various charts. We sent those over with the Government exhibits when they were ordered by the Court. And I think that's what he's referring to.

Before him now, just so the record is clear, are three binders filled with numerous exhibits. These exhibits are pulled from the discovery, and then they are given an exhibit list -- an exhibit number. And in fact, in many of them you can see the USA Bates stamp in the corner of many of these exhibits, showing where it was in the specific discovery.

So if there's something specific, I can deal with it, Judge. But if we're talking about phone records -- they were given prior to Production 5, but then, in order to ease all the Government counsel that were here, I made a Production 5 which just contained phone records, so they would know where to go and look when they were dealing with that.

Phones were turned over to all counsel. We went and showed Mr. Gillard his phone, at least the exhibits we wanted

Colloquy

to use, and the summary charts were provided to prior counsel, to current standby counsel, and Mr. Gillard at the FDC.

THE COURT: So the --

MR. GILLARD: I --

THE COURT: -- the one specific that you've raised so far this morning, Mr. Gillard, the telephone records -- did you hear Mr. Witherell? It's consistent what he's told -- with what he's told us as recently as last Thursday or Friday.

MR. GILLARD: I -- I -- I understand what you're saying, but I'm -- I'm -- I got the CDs. I got fourteen -- fourteen production discs. The phone records -- my phone records -- isn't on none of them. It isn't on -- it isn't on there. It's not on there. I didn't see none of that stuff until he brought it up, which was back -- the stuff that he showed me was out of my phone from 2021. Now, my concerns with it was, if these -- if you want to use these exhibits, did you introduce these exhibits into the grand jury?

THE COURT: That's a different argument, sir. That's --

MR. GILLARD: See?

THE COURT: -- that's a legal argument. And if I'm understanding it, I'm not convinced it's a winning argument. But what I'm hearing is, you're claiming that you were not produced documents, and specifically telephone records, and Mr. Witherell has --

Colloquy

MR. GILLARD:  Yes.  I have --

THE COURT:  -- other than filming himself turning them over at these at these junctures in the months in the past, I don't know --

MR. GILLARD:  So you mean to tell me it's okay to bring this stuff here today and slap it on the desk and tell me, here go the rest of the -- here go the hard copy of the evidence, and I didn't even get to look at them or nothing. That's a fair trial?

THE COURT:  Are you telling me that that you don't understand when I say you already had these things, that they're not using everything they gave you, but these things came out of what they gave you.

MR. GILLARD:  Okay, Your Honor.

THE COURT:  That's what they're saying.  How is that incorrect?

MR. GILLARD:  I mean, y'all right.  I'm wrong.  Y'all right.  Y'all know the law.  Y'all right.

THE COURT:  All right.  Mr. Gillard, if that's all you have for it, then we're going to move on.

MR. GILLARD:  Okay.

THE COURT:  I mean, if that's what your response is, we're going to move on.  We have a jury here whose time is valuable.

All right.  Anything else from the parties?

Colloquy

MR. WITHERELL:  Just very briefly, Judge.  I just want to -- procedurally, I don't think we've ever -- I've talked to some of the marshals, but I just want to know what the Court plans for us, directing witnesses, opening statements, where would you like us to stand?

THE COURT:  And thank you for bringing that up.  And I have discussed it internally as well with the marshals.  And it's going to be a goose and gander situation.  Everyone's going to do their -- welcome to stand, but you're going to do it from counsel table, okay?

MR. WITHERELL:  That being said, Judge, my plan is when -- Agent Becker is going to be the case agent, of course -- he's also going to be handling the computer when other witnesses are there.  When Agent Becker, who's going to do a majority of the testifying here, S.A. Walsh, who is -- just stepped outside -- will be -- he's also a witness, Judge.  But we're going to need him to do the computer, so with the Court's permission, we plan to have him not sit at counsel table, but sit in the back.

THE COURT:  That's fine.  And I know you were talking about Agent Becker or somebody else, maybe, display certain exhibits.  And as I mentioned, as long as -- if you don't mind, I'd like to make him available to Mr. Gillard if he wants to display things to the jury as well.  And you've also indicated to us and to Mr. Gillard that you'd call up exhibits on the

Colloquy

screens --

MR. WITHERELL:  Exactly.

THE COURT:  -- for him?

MR. WITHERELL:  We can call up the exhibits for Mr. Gillard.  While Agent Becker is testifying, I think with the court's permission, of course, I'll have Agent Walsh be the hand model, for lack of a better term.

THE COURT:  Right.

MR. WITHERELL:  And you -- and I brought this up to your deputy, but I always bring it up to a Court when I bring firearms into your courtroom.  They've been made safe by the Federal Bureau of Investigation as well as the United States Marshals Service.  We have them with us.  I believe there are eleven firearms.  I just want the Court to be aware of that.

THE COURT:  And as long as the marshals know, and they're fine with it, then I'm fine with it.  But on a related issue, Mr. Witherell, we have to minimize the amount of face time that those firearms get with the jury.  I know you asked, and I agreed, that they could be shown in the opening statements based on the representation that they will be admitted at the trial, but the befores and after thats they should be out of sight, even just cover it up in some way.

MR. WITHERELL:  We'll have them cover it up, Judge. We don't actually plan on using them any more for our opening statements.  Mr. Schopf does plan on using two videos from the

Colloquy

phone that Mr. Gillard has objected to.  We have shown those videos to him.  The argument that -- whatever argument he plans on making at trial, the Government believes that they will be admissible at trial.

THE COURT:  Okay.  Very well.  Thinking more on these exhibits that Mr. Gillard has raised -- we'll see what comes with tomorrow, but I'll have to ask the marshals -- are these something that he'd be able to retain in the event where -- or perhaps Mr. Clark can -- and I know we're asking a lot of Mr. Clark, but -- can retain these in case there's a down day tomorrow?

And I don't -- I don't know what they are -- and again, I'm not saying this because I discredit what the Government's represented consistently, that these have been provided and that these are just culled from discovery that's been provided on multiple occasions, but if there -- particularly if there is going to be some downtime, perhaps there's a way we could allow Mr. Gillard to hold on to these.

I don't know, I know there's -- you know, there's security limitations from our side, from the jail side.  But I guess what I'm saying is, is there some way, either through Mr. Clark, or more directly with Mr. Gillard, that he'd be able to retain any of these documents?  And for instance, the binders have big metal clips in them.

THE MARSHAL:  While he's in our custody, it's not an

Colloquy

issue.  When he goes back to the prison -- I would entertain bringing them over, I don't know --

THE COURT:  You might be bringing them back.

THE MARSHAL:  -- if they won't allow them up, I could tell counsel to -- to come recollect them.  That way, they're not just in a property bag somewhere.

THE COURT:  Mr. Clark, you have any thoughts on that?

MR. CLARK:  I do not, Judge.  Whatever the Court thinks is appropriate is fine.  I'm willing to go to the prison, but I'm not going to get yelled at when I go to the prison.  So I'll go and sit with Mr. -- he knows I'll talk reasonably with him and show him what I have, but he's --

MR. GILLARD:  Yeah.  He can handle it.

MR. CLARK:  -- when I gave him the discovery, he says, I already have this.  So we had a very short meeting yesterday.

I don't mean no disrespect, other than to say -- I'm willing, able, but this is what happens.  We get a summary, Judge, from the Government, and it has a chart.  It doesn't have a -- well, because of my experience, I guess -- I've been doing this about forty years -- then I look at the chart, and the Government says, we've got video and we've got audio, and all of this is going to come in on this.  But it gives a summary of what they claim implicates Mr. Gillard.  So I said, they're going to play that to the jury.  They're going to testify to it, every step, as to what they think they saw.  You

Colloquy

get a chance to cross-examine them about it.  That's trial.

THE COURT:  Forty years, Mr. Clark?

MR. CLARK:  Yeah.

THE COURT:  What, did you start when you were five?

MR. CLARK:  I'm a legend.  No.

THE COURT:  You look far too young.

MR. CLARK:  Yeah.

THE COURT:  I think I've known you for thirty of those years.

MR. CLARK:  That's scary.

THE COURT:  Well, understood.  And again, I'm just saying -- and it seems to be a particular concern, not the only concern, of Mr. Gillard, but perhaps the jail will be more receptive if they weren't in binders, if they -- and I mean, it's a lot of papers.

MR. GILLARD:  Yeah.

THE COURT:  It's probably equivalent of --

MR. GILLARD:  I know they aren't going to let me have it.

THE COURT:  Even without the binders, like in a folder or something like that?

MR. GILLARD:  Yeah.  Then -- then that's different. But I would prefer, let Mr. Clark take them.

THE COURT:  Mr. Clark.  All right.

MR. CLARK:  Sure.

Colloquy

THE COURT:  All right.

MR. CLARK:  I'll do that, Judge. But I have to --

THE COURT:  All right.  I know you will.

MR. CLARK:  -- I have to say this -- I mean, if you get his phone records and you see his phone records, which I looked at them, but I couldn't do much with the phone records because I needed to know which phone are those -- which ones are those phone records they want to use in this case.  So I had to ask Mr. Witherell about that, and they are -- Mr. Witherell's got several years of his phone records.

MR. CLARK:  That --

THE COURT:  Some cases have more --

MR. CLARK:  We wouldn't be able to get through those phone records tomorrow.

THE COURT:  Some cases have more evidence than others, don't they?

MR. CLARK:  Yeah.  But we wouldn't be able -- I don't think we'd get through these phone records.

MR. WITHERELL:  And Judge, just since the phone records seem to be -- to make it easy on everybody, the Government has created summary charts that -- we ID them in our motions -- I mean, our pre-trial filings, because these are voluminous.  And so we have made summary charts to help correspond to certain phone records.  We've provided those for counsel.  Those are what we anticipate going in, not the

Colloquy

thousands of pages of phone records.  But that's -- I can provide the -- I provided them to the defense attorney.  I have provided them to Mr. Gillard.  I don't know what else the Government can do.

THE COURT:  You provided them in total, and you provided them in the summary that you're proposing to use.

MR. WITHERELL:  That's correct, Judge.

THE COURT:  Okay.  By the way, that brings to mind a point we discussed briefly last week, on -- are you looking -- are you seeking -- I know there's two ways you could do it, is demonstrative, or an actual exhibit, for a summary.

MR. WITHERELL:  And Judge, you mentioned that, and I looked into it, and there are some charts that are summary charts and there are some that are for voluminous records.  And so these are kind of a hybrid of both.

THE COURT:  Okay.

MR. WITHERELL:  I will -- the first two summary charts will go in through the first witness.  They are clearly exhibits because they're based on just voluminous records that are just summarized.

At the end of our presentation of evidence, S.A. Becker will take the stand again and talk about individual sales, and we plan on putting up some summary charts at that point.  Those are a hybrid, Judge, where it has the voluminous records put in there, but it also summarizes the evidence.  And

Colloquy

so if the Court wishes to use them just for demonstrative, I understand. I believe the case law suggests that the Court should just give a limited instruction and they can be received into evidence as well, but that will be later on in the week.

THE COURT: All right. I'll prepare any trial instructions to include both versions of the --

MR. WITHERELL: Thank you, Judge.

THE COURT: -- of the model instruction on summaries. And then we'll go with whatever is appropriate when the time comes.

All right. Are we ready? Are we ready? Both sides? All right. Getting affirmative responses here.

All right. Ms. Stein?

(Pause)

MR. WITHERELL: Your Honor, how long are your preliminary instructions?

THE COURT: Roughly fifteen minutes.

MR. WITHERELL: Fifteen minutes.

(Counsel confer)

MR. WITHERELL: Okay. We've rearranged Agt. Becker so that an opening statement can be given from over here.

THE COURT: Yeah. And look, I know it's awkward and maybe something you're not used to, but since Mr. Gillard's going to be confined to his table, Government is going to have to do the same.

Colloquy

MR. SCHOPF: And I think you said this, Judge, but I can stand, correct?

THE COURT: Of course. Of course. If I said no, you'd really be jumping out of your skin, right?

Rough estimate on the length of the opening? You started this. You asked first how long my instructions would be.

MR. SCHOPF: About ten to twelve minutes, Judge.

THE COURT: Okay. Mr. Gillard, do you intend to make an opening statement once the Government is --

MR. GILLARD: Yes.

THE COURT: Okay. Very well.

THE CLERK: All rise.

(Jury enters)

THE COURT: Good morning, ladies and gentlemen. Welcome to Allentown. Please make yourselves comfortable. It's nice to see you all this morning. I hope your trips into Allentown, perhaps for the first time ever, were uneventful ones. We're super grateful you were all on time, and I'm sorry we kept you waiting a little bit.

It's not unusual at the outset of a trial that the parties and the Court have to iron out some final wrinkles, and that's what's happened, so -- but please, when I told you last week that we are very mindful of your time -- even when we make you wait, like this morning, I promise you, it's all business.

Colloquy

But we will strive to minimize that throughout the entire case.

In a short while, Ms. Stein will formally swear you in as jurors on the case. And then we'll bring the -- then we'll begin the trial in earnest. But first, as I'm sure you might have noticed, there's already been a slight change in the composition of your panels just since Friday afternoon. One of your fellow jurors had a medical emergency. Thankfully she's fine, but she had to be replaced by our first alternate. So Alternate Number 1 is now Juror Number 2, for those of you keeping score.

The second thing that I want to note, and maybe even foremost on everyone's mind, is the weather. And like you, I'm sure, we're keeping an eye on it as well. The forecast has been changing over the last days and hours, and not towards sunshine -- it's been heading in the other direction. Plus, we have jurors from six or seven different counties, so some of your homes may be more impacted than others, and we're mindful of that.

We're going to keep an eye on it. We ask you -- we'll ask you, and Ms. Stein will follow up with you, but perhaps at lunchtime, which will get us a few more hours closer to the -- you know, when the storm is supposed to be here, we want to know what you think. If it were necessary, we wouldn't sit tomorrow. Obviously, I know you want to get started, do your job, your duty in this case, and return to your lives. But as

Preliminary Instructions

we said on Friday, safety comes first.  So we will be --to a significant degree, our decision will be impacted by how you all feel, so -- all right?

So I do want you to put that out of your mind and save it for breaks and lunch.  And remember, you can't talk about the case during breaks and lunch, so if nothing else, Mother Nature gave us something to fill that gap.  So we'll come back to you and we'll ask you again.  And again, we'll err on the side of safety.

So at this point, Ms. Stein, I'm going to ask you to swear in the jurors, and we'll follow that with my initial preliminary instructions.

THE CLERK:  Please rise.  Raise your right hand.

JURY SWORN

THE CLERK:  Thank you.  Please be seated.

THE COURT:  All right.  Ladies and gentlemen, now that you've been sworn, let me tell you what your role is as jurors in this case.

As we discussed, under our system of justice, the role of the jury is to find the facts of the case based on the evidence presented in the trial and nothing else.  You must decide the facts solely from the evidence that you receive in this courtroom.

From that evidence -- again, what you hear and see here in the courtroom -- you will decide what the facts are,

Preliminary Instructions

and then you will apply those facts to the law as I give it to you in my instructions.  Instructions that I've given you already, but instructions like this morning, instructions throughout the trial, and then a more lengthy delivery of instructions at the close of evidence and before you deliberate.  That's how you will reach your verdict.

Whatever your verdict is, it will have to be unanimous.  All of you will have to agree on the verdict or there will be no verdict.  In the jury room, you will discuss the case among yourself, but ultimately, each of you will have to make up his or her own mind.  Therefore you have a responsibility which you cannot avoid, and you should do your best throughout the trial to fulfill this responsibility.

I play no role in the finding of the facts.  You should not take anything I may say or do during the trial as indicating what I think of the evidence, or about what your verdict should be.  My role is to make whatever legal decisions have to be made during the course of the trial, and explain to you the legal principles that must guide you in your decisions.

You must apply my instructions about the law.  Each of the instructions is important.  You must not substitute your own notion or opinion about what the law is, or what the law ought to be.  You must follow the law that I give to you, whether you agree with it or not.

Ladies and gentlemen, I know you will, but you must

Preliminary Instructions

perform these duties fairly and impartially.  Do not allow sympathy, prejudice, fear, or public opinion to influence you. You should also not be influenced by any person's race, color, religion, national ancestry, gender, or position in life or in the community.  Again, you must decide the facts only from the evidence presented to you in this trial and then apply to those facts the law as I instruct you on it.

Here are some important rules about your conduct as jurors.  First, keep an open mind.  Do not make up your mind about the verdict until you have heard all of the evidence, and I have given final instructions about the law at the end of the trial, and you have discussed the case with your fellow jurors during the deliberations.

Two, do not discuss the case amongst yourselves until the end of the trial, when you retire to the jury room to deliberate.  You need to allow each juror the opportunity to keep an open mind throughout the entire trial.  During the trial, you may talk with your fellow jurors about anything else of a personal nature or of common interest -- we mentioned the weather, that's a fair topic -- just not about the case.

Third, during the trial you should not speak to any of the parties, the lawyers, or the witnesses involved in the case, not even to pass the day -- not even about the weather, to be safe.  If any lawyer, party, or witness does not speak to you when you pass in the hall, or ride the elevator, or

Preliminary Instructions

whenever you might see them, remember it's because they're not supposed to talk or visit with you, okay?  They're not being rude, they're following my instructions.

Do not talk with anyone else or listen to others talk about this case until the trial is ended and you've been discharged as jurors.  It's important not only that you do justice in this case, but that you give the appearance of justice.  So if anyone should try to talk to you about the case during the trial, please report that to me through my courtroom deputy, Ms. Stein, and do that right away.  Do not discuss the situation with any other juror, just let us know.

Do not discuss the case with anyone outside the courtroom or at home, including your family and friends.  You may tell your family and friends you've been selected as a juror in a case, and you may tell them how long the trial is expected to last.  But you also should tell them that the judge instructed you not to talk any more about the case, and that they should not talk to you about it.

The reason for that, folks, is sometimes someone else's thoughts or opinions can influence you.  Your thinking should be influenced only by what you learn in the courtroom. Until the trial is over and your verdict is announced.  Do not watch or listen to any television or radio news programs or reports about the case, or do not read any news, or internet stories, or articles about the case, or about anyone involved

Preliminary Instructions

in it.

Do not use a computer, cellular phone, other electronic devices, or tools of technology while in the courtroom or during deliberations.  These devices may be used during breaks or recesses for personal uses but may not be used to obtain or disclose information about this case.

So you may not communicate with anyone about the case on your cell phone, through email, through BlackBerry, if anyone still uses that, through iPhone, through text messaging, or on Twitter, through any blog or website, through any internet chat room, or by way of any other social networking sites including Google, Facebook, Myspace, LinkedIn and YouTube.  You just may not use any similar technology as social media, even if I didn't mention them.

Do not do any research or make any investigation in this case on your own about matters related to the case or even this type of case.  This means, for example, you must not visit the scenes you hear about.  You must not conduct experiments.  You may not consult reference works or dictionaries.  You may not search the internet.  You may not search websites or blogs for additional information.  You may not use a computer or a cell phone, or other electronic device, or other tools of technology, or any other method to obtain information about this case, this type of case, the parties in this case, or anyone or anything involved in this case.

Case 2:23-cr-00026-JMG    Document 403    Filed 02/05/25    Page 48 of 243    48

Preliminary Instructions

Please, please do not try to find out information from any source outside the confines of this courtroom. You must decide this case based only on the evidence presented in the courtroom and my instructions about the law, it would simply be improper for you to try to supplement that information on your own.

And finally, you should not concern yourselves with, or consider, the possible punishments that might be imposed if you return a verdict of guilty.

During the trial, it may be necessary for me to talk with the parties out of your hearing. I mentioned an example of that was this morning. Sometimes we'll do that while you're in the jury room, and perhaps we'll have a bench or a sidebar conference up here. I am -- my practice is to be very limited in having such conferences, but if it happens, please be patient.

We also ask you that if I'm speaking privately with the parties, if you're able to overhear any of that, let me know, because we're taking steps so you don't hear those conversations, not because we're keeping anything from you, but again, because it's not evidence. So if you do overhear us, let Ms. Stein know.

I know you might be curious what we're discussing, and again, we're not trying to keep any important information from you. It could be things like we're discussing the law, or

Preliminary Instructions

objections to evidence, and my job -- one of my roles is to make sure that the evidence is presented to you correctly under the rules that govern the presentation of evidence.  Again, we will do -- and I will do -- everything I can to keep the number and length of these types of conferences to a minimum so we can maximize your time.

I may not always grant a request for a conference.  If I'm asked to have one, and I don't -- and I choose not to, don't read anything into that.  It has nothing to do with your evaluation of the evidence or what your verdict should be.

Ladies and gentlemen, at the end of the trial, you must make your decision based on what you remember of the evidence.  You will not have a written transcript of the testimony to review, so you must pay close attention to the testimony as it's given.

If you wish, you may take notes to help you remember what witnesses said.  Ms. Stein will arrange -- if she has not already done so -- she will arrange for pens, pencils, and paper.  If you do take notes, please keep them to yourself until the end of the trial, when you and your fellow jurors go to the jury room to decide the case.

Here are some other specific points to keep in mind about note-taking.  Note-taking is permitted, but it is not required.  You are not required to take notes.  How many notes you want to take, if any, is entirely up to you.

Preliminary Instructions

Please make sure that note-taking does not distract you from your tasks as jurors. You must listen to all the testimony of each witness. You also need to decide whether and how much to believe of each witness' testimony. This will require you to watch the appearance, behavior, and manner of each witness while he or she is testifying. You cannot write down everything that is said, and there is always a fear that a juror will focus so much on the note-taking that he or she will miss the opportunity to make important observations.

Your notes are memory aids. They're not evidence. They're not a written record or a written transcript of the trial. Whether or not you do take notes, you will need to rely on your own memory of what was said. The notes are only meant to assist your memory, you should not be overly influenced by notes.

In your deliberations, do not give any more or less weight to the views of a fellow juror just because that juror did take notes or did not take notes.

Do not assume that just because something is in someone's notes that it necessarily took place in court. It is just as easy to write something down incorrectly as it is to hear or remember it incorrectly. Notes are not entitled to any greater weight than each juror's independent memory of the evidence. You should rely on your individual and collective memories when you deliberate and reach your verdict.

Preliminary Instructions

You should not take your notes away from court.  At the end of the day, my staff -- likely Ms. Stein -- will collect the notes and lock them away, until the next day when we begin trial again.  My staff is responsible for making sure that no one looks at your notes -- no one.  Not me -- no one.  Immediately after you finish your deliberations in this case, and I accept your verdict, Ms. Stein will collect and destroy your notes to protect the secrecy of your deliberations.

During the case, only the parties and myself are allowed to ask questions of witnesses.  Jurors are not permitted to ask questions of witnesses.

If you're unable to hear a witness, or counsel, please raise your hand and we'll make sure we correct the situation.

The trial will proceed from here in the following manner.  First, the parties will have an opportunity to make opening statements to you.  The prosecutor may make an opening statement right at the beginning of the case.

The defendant may make an opening statement after the prosecutor's opening statement, or the defendant may postpone the making of an opening statement until the Government finishes the presentation of its evidence.  The defendant is not required to make an opening statement.

Ladies and gentlemen, an opening statement is simply an outline to help you understand what each party expects the evidence to show.  What is said in the opening statement is not

Preliminary Instructions

itself evidence.

After opening statements, the Government will introduce the evidence that it thinks proves the charges stated in the superseding indictment.  The Government will present witnesses and exhibits, and the defendant may cross-examine those witnesses.  The Government may also offer documents and other exhibits into evidence.

After the Government has presented its case, the defendant may present evidence, but he is not required to do so.  As I have already told you, and as I will tell you many times throughout the trial, the Government always has the burden, or the obligation, to prove each and every element of the offenses charged beyond a reasonable doubt.

The defendant is presumed to be innocent of the charges.  The law never imposes on the defendant in a criminal case, the burden of proving his innocence by calling any witnesses, producing any exhibits, or introducing any evidence.

After all of the evidence has been presented, the parties will have the opportunity to present closing arguments. Closing arguments are designed to present to you the parties' theories about what the evidence has shown, and what conclusions may be drawn from the evidence.  What is said in the closing arguments is not evidence, just as what is said in the opening statements is not evidence.

After you have heard the closing arguments, I will

give you, orally, the final instructions concerning the law that you must apply to the evidence presented during the trial. As I'm doing now, I may also give you instructions on certain aspects of the law throughout the trial, as well as at the end of the trial.

After my final instructions on the law, you will retire to the jury room to consider your verdict. Your deliberations are secret. You will not be required to explain your verdict to anyone. Your verdict must be unanimous. All twelve of the jurors will have to agree to the verdict.

You must keep your mind open during this trial. Do not make up your mind about any of the questions in this case until you have heard each piece of evidence and all of the law which you must apply to that evidence. So in other words, you will wait until you begin your deliberations.

Ladies and gentlemen, in this case, following your deliberations and verdict, it is possible you will receive additional information and be again asked to return a verdict on a much shorter and much more narrow component of the case.

We've said several times already, and you'll continue to hear, that you must make your decision, in this case based only on the evidence that you see and hear in this courtroom. So do not let rumors, suspicions, or anything else that you may see or hear outside of court influence your decision in any way.

Preliminary Instructions

The evidence from which you are to find the facts consists of the following:  first, the testimony of the witnesses; second, documents and other things received as exhibits in evidence; and third, any fact or testimony that is stipulated to by the parties -- that is, any evidence or facts that the parties formally agree to as proven.

The following are not evidence:  one, statements and arguments of the lawyers for the parties in the case; two, questions by the lawyers and questions that I might ask.  You must not assume that a fact is true just because one of the lawyers or I asked a question about it.  It is the witnesses' answers that are the evidence.

Of course, you may need to consider the question to know what the witness means by his or her answer.  So for example, if a witness answered yes to a question, you'll have to consider what the question was to understand what the witness is saying yes to.

Objections by lawyers, including objections in which the lawyers state facts, are not evidence.

Any testimony I strike, or tell you to disregard, is not evidence.

And anything you may see or hear about this case outside of the courtroom is not evidence.

You should use your common sense in weighing the evidence.  Consider it in light of your everyday experiences

Preliminary Instructions

with people and events and give it whatever weight you believe it deserves.

If your experience and common sense tell you that certain evidence reasonably leads to a conclusion, you may reach that conclusion.

The rules of evidence control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence, and a lawyer on the other side thinks that it's not permitted by the rules of evidence, the lawyer or the party may object. An objection simply means that the one side is asking me to decide whether the evidence should be allowed under the rules.

Attorneys or the parties have -- attorneys have a responsibility to their clients to make objections when they think evidence being offered is improper under the rules of evidence. You should not be influenced by the fact that an objection is made.

You should also not be influenced by my rulings on objections to evidence. If I overrule an objection, the question may be answered, or the exhibit may be received as evidence, and you should treat the testimony, or that exhibit, like any other.

I may allow certain evidence, either testimony or exhibits, only for a limited purpose. If I do so, I will instruct you to consider the evidence only for that limited

Preliminary Instructions

purpose, and you must follow that instruction.

If I sustain an objection, the answer will not be answered or the -- I'm sorry.  If I sustain an objection, the question will not be answered, or the exhibit will not be received as evidence.  Whenever I sustain an objection, you must disregard the question, or the exhibit, entirely.  Do not think about or guess what the witness might have said in answer to the question, and do not think or guess what the exhibit might have shown.

Sometimes a witness may have answered, or begin to answer, before there was an objection, or before I rule on the objection.  If that happens and I sustain the objection, you should disregard the answer, or the portion of the answer, that was given.

Also, it may happen that I order some testimony or other evidence to be stricken, or removed, from the record.  If I do that, I will instruct you to disregard that evidence.  That means when you are deciding this case, you must not consider or be influenced in any way by the testimony or other evidence that I told you to disregard.

Although the parties may call your attention to certain facts or factual conclusions that they think are important, what they say is not evidence.  What the lawyers, or party acting in the capacity of a lawyer, says is not evidence and is not binding on you.  It's your own recollection and

Preliminary Instructions

interpretation of the evidence that controls your decision.

Also, do not assume from anything I do or say during the trial that I have any opinion about the evidence or about any of the issues in the case, or about what your verdict should be.

There are two types of evidence that may be used in this trial. Perhaps you've heard the terms -- direct evidence and circumstantial, or indirect, evidence. You may use both types of evidence in reaching your verdict.

Direct evidence is simply evidence which, if believed, directly proves a fact. An example of direct evidence occurs when a witness testifies about something the witness knows from his or her own senses, something the witness has seen, touched, heard, or smelled.

Circumstantial evidence is evidence which, if believed, indirectly proves a fact. It is evidence that proves one or more facts from which you could find or infer the existence of some other fact or facts.

An inference is simply a deduction or conclusion that reason, experience, and common sense leads you to make from the evidence. An inference is not a suspicion. An inference is not a guess. It is a reasoned, logical decision to find that a disputed fact exists on the basis of another fact or facts.

For example, and this is an old, old example, but it's still appropriate. If someone walked into the courtroom

Preliminary Instructions

wearing a wet raincoat and carrying a wet umbrella, that would be circumstantial or indirect evidence from which you could find or conclude that it was raining.  You would not have to find that it was raining, but you could.

Sometimes different inferences may be drawn from the same set of facts.  The Government may be asking you to draw one inference, and the defendant may be asking you to draw another.  You, and you alone, must decide what inferences you will draw based on all of the evidence.

You should consider all the evidence that's presented in this trial, direct and circumstantial.  The law makes no distinction between the weight that you should give to either direct or circumstantial evidence.  It is for you to decide how much weight to give any evidence.

In deciding what the facts are, you must decide what testimony you believe and what testimony you do not believe.  You are the sole judges of the credibility of the witnesses.  Credibility refers to whether a witness is worthy of belief.  Is the witness truthful?  Is the witness' testimony accurate?

You may believe everything a witness says, or only part of it, or none of it.  You may decide whether to believe a witness based on his or her behavior, or manner of testifying, based on the explanations the witness gives, and based on all the other evidence in the case, just as you would in any important matter where you're trying to decide if a person is

Preliminary Instructions

truthful, straightforward, and accurate in his or her recollection.

In deciding the question of credibility, remember -- use your common sense, your good judgment, and your experience. In deciding what to believe, you may consider a number of factors:  first, the opportunity and ability of the witness to see, or hear, or know the things about which the witness testifies; second, the quality of the witness' knowledge, understanding, and memory; third, the witness' appearance, behavior, and manner while testifying; fourth, whether the witness has an interest in the outcome of the case or any motive, bias or prejudice; fifth, any relation the witness may have with the party in the case and any effect that the verdict will have on the witness; sixth, whether the witness said or wrote anything before trial that is different from the witness' testimony in court; seventh, how believable the witness' testimony is when considered with other evidence that you believe; and eighth, any other factors that bear on whether the witness should be believed.

Inconsistencies or discrepancies in a witness' testimony, or between the testimony of different witnesses, may or may not cause you to disbelieve that witness' testimony. Two or more people witnessing an event may simply see or hear it differently.  Mistaken recollection, like failure to recall, is a common human experience.

Preliminary Instructions

In weighing the effect of inconsistency, you should consider whether it is about a matter of importance or an insignificant detail.  You should also consider whether the inconsistency is innocent or intentional.

You are not required to accept testimony, even if the testimony is not contradicted and the witness is not impeached. You may decide that the testimony is not worthy of belief because of the witness' bearing and demeanor, or because of the inherent improbability of the testimony, or for any other reasons that are sufficient to you.

After you make your own judgment about the believability of a witness, you can then attach to that witness' testimony the importance or weight that you think it deserves.  The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testified. What is more important than numbers is how believable the witnesses are, and how much weight you think their testimony deserves.

The Government has charged the defendant, Mr. Phillip Gillard, with violating federal law, specifically with conspiracy to distribute controlled substances, distribution of controlled substances, distribution of controlled substances within 1,000 feet of a school, possession with intent to distribute controlled substances, and possessing firearms in furtherance of a drug trafficking crime.

Preliminary Instructions

These charges are allegations, and they are contained in the superseding indictment. An indictment, or a superseding indictment, is just a formal way of specifying the exact crime or crimes the defendant is accused of committing. The indictment is simply a description of the charges against the defendant.

Ladies and gentlemen, it is an accusation only. An indictment, or a superseding indictment, is not evidence of anything, and you should not give any weight to the fact that Mr. Gillard has been indicted in making your decision in this case.

Mr. Gillard is charged, again, with various criminal offenses. To help you follow the evidence, I'm going to give you a brief summary of the elements of those offenses, each of which the Government must prove beyond a reasonable doubt in order to convict Mr. Gillard of the offenses charged.

The elements for conspiracy to distribute controlled substance -- the Government must prove, beyond a reasonable doubt, each of these elements.

First, two or more persons agreed to distribute a controlled substance.

Second, that the defendant was a party to, or member of, that agreement.

Third, that the defendant joined the agreement or conspiracy, knowing of its objective to distribute a controlled

Preliminary Instructions

substance, and intending to join together with at least one other alleged conspirator to achieve that objective. That is, the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve that objective.

Fourth, that the controlled substance was the controlled substance listed in the superseding indictment. And we'll discuss this in more detail later in the case, but that is certain quantities of certain controlled substances, including methamphetamine; phencyclidine, or PCP; fentanyl; crack cocaine; cocaine; and heroin.

And each of these elements must be proven by the Government beyond a reasonable doubt.

As to the charge of distribution of a controlled substance, the first element is the defendant distributed a controlled substance, the second element is that the defendant distributed the controlled substance knowingly or intentionally, and the third element is that the controlled substance was a certain amount of phencyclidine, or PCP.

The charge of distribution of a controlled substance within 1,000 feet of a school -- the Government must prove beyond a reasonable doubt, one, that the defendant distributed a mixture of substance containing a controlled substance; two, that the defendant -- that the defendant distributed the controlled substance knowingly or intentionally; three, that the distribution occurred within 1,000 feet of the real

Preliminary Instructions

property comprising of an elementary school; and four, that the controlled substance was an amount of a mixture of substance containing phencyclidine, PCP.  And again we will address more specifically the quantities, where that's appropriate, later in the case.

Each of these last two counts -- distribution of a controlled substance and distribution of a controlled substance within a thousand feet of a school -- you will also be instructed on a theory of aiding and abetting -- aiding and abetting someone to commit these crimes.  And you will have elements on that, as well.

As to the charge of possession with intent to distribute controlled substance, the Government must prove beyond a reasonable doubt, first, that the defendant possessed a mixture of substance containing a controlled substance; two, that the defendant possessed the controlled substance knowingly or intentionally; three, that the defendant intended to distribute the controlled substance; and four, that the controlled substance was a mixture in substance containing phencyclidine, and cocaine, and fentanyl, and crack, and heroin, in quantities we will discuss later in the case.

The defendant is also charged with possessing a firearm in furtherance of a drug trafficking crime, and the Government must prove each of these elements beyond a reasonable doubt, as with all of the elements we've been

Preliminary Instructions

discussing here:  first, that the defendant committed a drug trafficking crime for which he might be prosecuted in a court of the United States; second, in furtherance of the drug trafficking crime, the defendant possessed a firearm; and third, that the defendant acted knowingly.

Folks, this is just a preliminary outline of the elements of the offenses charged.  At the end of the trial, I will give you final instructions on the elements and on other matters of law.  Those final instructions will be more detailed, and they will guide you in reaching your verdict in this case.

Ladies and gentlemen, the defendant, Mr. Gillard, has pled not guilty to the offenses charged.  Mr. Gillard is presumed to be innocent.  He starts the trial with a clean slate, with no evidence against him.  The presumption of evidence (sic) stays with Mr. Gillard unless and until the Government presents evidence that overcomes that presumption by convincing you that he is guilty of the offenses charged beyond a reasonable doubt.

The presumption of innocence requires you to find Mr. Gillard not guilty unless you are satisfied that the Government has proven guilt beyond a reasonable doubt.  The presumption of innocence means that Mr. Gillard has no burden, and no obligation to present any evidence at all, or to prove that he's not guilty.  The burden, or obligation, of proof is on the

Preliminary Instructions

Government to prove that Mr. Gillard is guilty, and this burden stays with the Government throughout the trial.

In order for you to find Mr. Gillard guilty of the offenses charged, the Government must convince you that he is guilty beyond a reasonable doubt.  That means that the Government must prove each and every element of the charges beyond a reasonable doubt.  The defendant may not be convicted based on suspicion or conjecture, but only on evidence proving guilt beyond a reasonable doubt.

Proof beyond a reasonable doubt does not mean proof beyond all possible doubt, or to a mathematical certainty. Possible doubts, or doubts based on conjecture or speculation, are not reasonable doubts.

A reasonable doubt is a fair doubt based on reason, logic, common sense, or experience.  A reasonable doubt means a doubt that would cause an ordinary, reasonable person to hesitate to act in matters of importance in his or her own life; it may arise from the evidence, or from the lack of evidence, or from the nature of the evidence.

If, after hearing all the evidence, you are convinced that the Government has proved Phillip Gillard guilty beyond a reasonable doubt, you should return a verdict of guilty. However, if you have a reasonable doubt as to an element of an offense, then you must return a verdict of not guilty on that offense.

Preliminary Instructions

We discussed, when we met, that the defendant, Mr. Phillip Gillard, has decided to represent himself in this trial and not use the services of an attorney. He has a constitutional right to do that. His decision to do so has no bearing on whether he is guilty or not guilty, and it must not affect your consideration of the case.

Although Mr. Gillard is exercising his right to represent himself in this trial, I'm sure you have noticed Attorney Glennis Clark; he's sitting next to Mr. Gillard. Attorney Clark does not represent Mr. Gillard in this case, but he is available for consultation if Mr. Gillard wishes to speak with him.

Because Mr. Gillard has decided to act as his own lawyer, you will hear him speak at various times during the trial. He may make an opening statement and a closing argument. He may ask questions of witnesses, make objections and argue to the Court. These are all his right.

I want to remind you that when Mr. Gillard speaks in these parts of the trial, he is acting as a lawyer in this case, and his words are not evidence, just as they are not evidence when spoken by counsel for the Government. The only evidence in this case comes from the witnesses who testify under oath on the witness stands, and from the exhibits that are admitted.

Ladies and gentlemen, that concludes my opening

Opening Statement - Government

instructions to you.  We'll next move on to the presentation of evidence.  I note it is -- it looks like it's coming up on 11 o'clock.  We ordinarily have a morning break and an afternoon break, and we have a lunch break, roughly 12:30, sometimes a little after; it's hard to land exactly on the button -- 12:30, 12:45.

We started a little bit later today.  Do you want to have a morning break or should we get started?  If you decide you don't want one and in a half hour you think better of that, you can let me know, but it's up to you.  Do you want to have a morning break, or shall we continue?  Okay to continue?

(No audible response)

THE COURT:  All right.  Thank you very much.

All right.  With that, I'll turn it over to the Government.  Mr. Schopf?

GOVERNMENT'S OPENING STATEMENT

MR. SCHOPF:  Thank you, Your Honor.

Ms. Stein, may I have the screens, please?

Good morning.  You're about to have a front row seat into the inner workings, in this trial, of a drug trafficking organization.  You're about to hear about an organization that was operating, not overseas or across the border, but one that was operating in our own backyard, here in Northeast Philadelphia, just south of where this courthouse is.

This organization was responsible for supplying drug

Opening Statement - Government

dealers with massive quantities of methamphetamine, PCP, commonly referred to as phencyclidine, crack cocaine, cocaine, and fentanyl.  You'll hear that the quantities involved that were supplied by this organization were so massive that they could supply thousands of individuals who were battling addiction.

The evidence is going to show in this case that this was a seven-member organization.  And each member of this organization had a different role, but the goal and the agreement was the same, and that was to supply large amounts of drugs for large amounts of money.

You may be able to see this little green laser pointer over here.  In the top left corner, that's Diane Gillard. That's the defendant, Phillip Gillard's, sister.  And her role in this organization was to actually get out on the street and to meet with individual drug dealers, and to provide those drugs.  She would take the money, and she would give the drugs.

But she didn't necessarily have the drugs to give in the first place, because that wasn't her role, to get the drugs.  So for example, if she needed to meet with a buyer and supply methamphetamine, she would have to contact Sharif Jackson, in the bottom left-hand corner, or Raphael Sanchez, up in the top right-hand corner, because their role in the organization was to provide and supply methamphetamine.

If a buyer wanted crack cocaine, Amin Whitehead was

Opening Statement - Government

the person that was going to stand up and supply that. If the substance that they needed was fentanyl, Cesar Maldonado was the individual that would supply fentanyl. And in the bottom right-hand corner, Terrence Maxwell -- his job was like Diane Gillard's; his was to get out on the street, to actually make contact, and to sell drugs, and to take money.

But today we're here for the defendant; the defendant is Phillip Gillard. And his role in the organization was to supply phencyclidine, PCP. You're going to hear that this is a very powerful drug. It's a hallucinogenic. It can make individuals impervious to pain, and it causes them to disassociate and actually think they're hearing and seeing things that absolutely don't exist, but they truly believe that they do exist. And so that's what he would do. He would supply the organization with PCP.

Now, you're going to hear that this is such a powerful drug that typically it's only used in extremely small quantities and will generally be used to lace another drug. So for example, a cigarette might be dipped a little bit in PCP to have that desired effect. With that in mind, the defendant supplied over seventeen pounds of PCP, gallons of PCP, out on the street.

But that wasn't his only role. What made the defendant a prime member of this organization was that he operated a stash house for this organization. A stash house is

Opening Statement - Government

simply a repository for drugs, guns, and money.  And you'll see photographs -- and you're going to see a lot of evidence in this case, but you're going to -- you're going to be able to visually observe the defendant going in and out of this stash house.

This organization operated three stash houses.  The defendant's stash house is up in the top right-hand corner. And if you notice from the map, this organization controlled this area, controlled this block of space on Tulip Street in northeast Philadelphia.  But what you'll also notice from this map is that this was right across the street from the Memphis Street Academy, which is a local school.

So day in and day out, when this organization was supplying drug dealers with massive quantities of controlled substances, they were doing it right across the street from this school, where every day, every weekday, hundreds of kids would walk down that street and go into that school to try to get an education.

So the FBI investigated this organization for the better part of two years, and they used all sorts of techniques.  They were out on the street undercover.  They were using confidential informants.  They were observing this organization through recording devices on the street.  They even had a plane up at times, recording this organization.

And one of the best ways, or most effective ways, that

Opening Statement - Government

they were able to actually infiltrate this organization was through the use of a paid confidential informant.  That's somebody that the FBI could give money to, that wouldn't be made as law enforcement -- wouldn't be identified as law enforcement -- that could go and meet with members of this organization and buy drugs off, at the behest and control of the FBI.

And this individual, this informant, was wired, so he's got an audio and video recording device on him at all times during these exchanges.  So one of the great things at this trial is you're going to get to see and hear those meetings, just as if you were sitting there in those cars when this is occurring.  You'll hear the language, you'll see how it's done.

And the FBI did this over, and over, and over.  Over fifteen times during that span of investigation, they bought drugs off this organization.  And during that time, they accumulated a lot of evidence, and you're going to get to see that -- their photographs, and their recordings, and their videos.  And they compiled all this evidence, and they took it to a federal court and they applied for search warrants.  And those courts granted the search warrants to search the stash houses involved in this case.

So when they went to execute the search warrant at Cesar Maldonado's stash house -- remember, the individual

Opening Statement - Government

charged with supplying fentanyl for the organization -- guess what they found?  Fentanyl.  They also found three guns, $9,000 in cash, and extended round magazines that can hold more bullets in a gun than a typical magazine.

When they went to Amin Whitehead's residence, right there in the middle -- remember, he was in charge of supplying crack cocaine -- they found crack cocaine.

So when the SWAT team went to the defendant's stash house, they made entry, and inside they found the defendant -- he was the only person in the house -- and they found a number of documents tying him to that location.  His name, his address on there, establishing that he, in fact, resides at that stash house.

And when they began to search, the investigators were not surprised when they found large quantities of PCP -- a half a gallon of the substance.  But as they searched further, they also found two and a half pounds of cocaine in a brick form that you may hear as a kilo.  They found, just feet from where he was sleeping, scales, with white powder cocaine on top of those scales.

And the little blue things and purple things that you're seeing are small flip-top containers.  They found 400 of those in the house.  Each of those contains crack cocaine. They're what are commonly sold on the street -- it's a container for crack cocaine.  They also found bags of powder

Opening Statement - Government

cocaine.  They found over $11,000 in cash in the house.  And they also found 800 packets of fentanyl.

Inside the house, they also located two nine-millimeter handguns, one of which is pictured there with an extended round magazine capable of holding over thirty rounds of ammunition.

And when the investigators completed these search warrants, they now had a lot of evidence.  So they had the recordings from the confidential informants.  They had the videos.  Now they had the drugs.  They had the guns.  They had the cash.  But they didn't stop there; they went further in their investigation.

And so they began to analyze the cell phones through a very specific and technological process, but through digital forensics.  And you'll hear that the defendant had a cell phone when he was arrested in that stash house.  And one of the things that they were able to do is they were able to get into that phone and they were able to extract what was on there, even the things that were deleted.

And so what they found on there were pictures of these exact guns located in his house.  They found text messages of things that he was sending to other people, saying specifically -- and you'll get to see the text messages themselves, but -- I sell wet.  I sell hard.  I sell soft.

And you're going to hear from an expert in drug

investigation who's a task force member of the DEA. He's going to come in here, and he's going to talk to you about coded language that drug dealers use, and all sorts of different things involved in that drug trade. And one of the things he's going to say is, that is very common language to apply to specific types of drugs.

I sell wet -- so "wet" is PCP. "Hard" is crack cocaine, sometimes referred to as popcorn -- popcorn or hard is crack cocaine. And "soft" is powder cocaine. Not rocket science to see how they get the terminology there.

So when they got into the cell phone, they saw those types of things, but they also saw two videos -- a number of videos, but two of which you'll see in this trial, where the defendant is filming things inside of this stash house. And the things that he's filming are making crack cocaine -- there's a process that you'll hear about this, and how they convert powder cocaine into crack. Why do they do it? Because it gets a faster high, and sometimes people want that on the street.

So he's filming this, and he's narrating it, and he's laughing, and he's counting money. This is one of the videos that you're going to see during this trial.

(Begin playback of video)

(End playback of video)

MR. SCHOPF: And this is another video that you're

Opening Statement - Government

going to see.

(Begin playback of video)

(End playback of video)

MR. SCHOPF:  So as you heard just a couple of minutes ago, when the judge explained the crimes that the defendant has been charged with -- you're going to hear that again at the end of this trial, after all the evidence is presented.  You'll hear that he was charged with conspiracy to distribute controlled substances; the actual distribution of those controlled substances, five counts of that; five counts of distributing a controlled substance within 1,000 of a school -- remember, the Memphis Street Charter Academy.

He was also charged with a count of possession with intent to distribute a controlled substance for the items in his home.  And then finally he was charged with one count of possessing a firearm in furtherance of a drug trafficking crime.  And after you've seen all the evidence in this case, the United States is going to ask you to return a verdict of guilty on all charges and hold the defendant responsible for his actions.  Thank you.

THE COURT:  Thank you, Mr. Schopf.

Mr. Gillard?

DEFENDANT'S OPENING STATEMENT

MR. GILLARD:  Good morning.  As you know, I'm not a lawyer, so studying this case, I took down some notes myself,

Opening Statement - Defendant

and I'm just going to read, really, what's going on in this case.

The Government set up a controlled buy, using CI-1 to contact my sister to purchase drugs.  The Government theory is that my sister contacted me to obtain the drugs.  The Government alleges that the brother that my sister contacted is me, Phillip Gillard; however, the brother that my sister contacted is not me.  The individual that met with my sister was another individual.  The word brother was -- is a commonly used slang word for friend.

The Government entire case rests -- it rests on the false allegations that the "my brother" sister talks about is me, her biological brother, when in fact she is using the word brother to mean friend -- someone else entirely.  The Government is prosecuting an innocent man for crimes that did not commit -- that I did not commit, based on their misunderstandings in how language is used by people in my community.

The federal government does not care about anybody.  They only care about themselves, their own agendas.  They don't care about justice.  They just care about punishing people, even when the evidence doesn't support their allegations.  Of course, the federal government being the federal government, they believe that the only solution to any problem is adding another layer or ten of federal regulations.

Opening Statement - Defendant

They don't respect anything, which is why I picked the jury.  I picked the jury so I can be judged fairly by my peers and that all the evidence can be weighed appropriately.  We are talking about the federal government that will lie under oath just to get a conviction -- to convict someone innocent.  And I will prove that their case is based on false allegations and events that didn't happen because I have nothing to hide.

Think about how far they will go to get a conviction.  These people brag about their conviction rate -- ninety percent.  They don't talk about the other ten percent, that -- innocent, go home, get free, whatever the case may be, which -- which by lying, and pursuing, and manipulating an event in circumstances that don't exist, the federal government has access to the most resources and money and will not admit when they are wrong, when they've made mistakes like they have in my case.

It is possible to win against these people, and I'm here at trial representing myself because I refuse to be bullied or scared into taking a plea for crimes I did not commit, and that the Government doesn't have any evidence for.

Now, ladies and gentlemen, that is -- that is -- has to stop somewhere, so today, and for the duration of this trial, you can be a part of history just by listening, and paying attention, and focusing on this case, and making fair judgment in this matter.  This case is not just about my guilt

Opening Statement - Defendant

or my innocence.  It's about a Government that proceeds with prosecuting innocent people.  I know you will take this seriously if you've been chosen to serve on this jury because of your character, and your fairness.

I will promise you that I will prove one -- to you one thing, my innocence.  I can't prove anybody else's, but I can prove mine.  Listen closely.  Watch, because I will prove it to you.  And the United States Government will prove it to you -- my innocence -- with their lack of evidence to my involvement in any criminal conduct.

Remember, the Government case is based only on my house.  So when it comes to my guilt and my innocence, you need to look closely at who testifies, who they call to testify, and why they testify.  I rest, Your Honor.

THE COURT:  Thank you, Mr. Gillard.

That concludes the opening statements of the parties.  Now we'll move on to the Government's presentation of evidence.  Mr. Schopf, or Mr. Witherell?

MR. WITHERELL:  Your Honor, the Government calls S.A. William Becker to the stand.

Your Honor, just for convenience I'm providing William Becker with some folders containing some exhibits we're going to go through, so I don't have to get up and give it to him.  He's going to let us know if he needs to refer to them.

THE COURT:  That's helpful.  Thank you.

William Becker - Direct

THE CLERK:  Please raise your right hand.

GOVERNMENT'S WITNESS, WILLIAM BECKER, SWORN

THE CLERK:  Thank you.  Please state and spell your complete name for the record.

THE WITNESS:  Yes.  Good morning.  FBI S.A. William Becker.  W-I-L-L-I-A-M.  B as in boy, E-C-K-E-R.

MR. WITHERELL:  Your Honor, do you mind if I inquire from a seated position?  It might be easier.

THE COURT:  Sure.  Wherever you're most comfortable --

MR. WITHERELL:  I appreciate it, Your Honor.

THE COURT:  -- that goes for everyone.

DIRECT EXAMINATION

BY MR. WITHERELL:

Q.  S.A. Becker, how are you today?

A.  I'm well, thank you.

Q.  Okay.  Would you mind telling the members of the jury who you are, who you work for?

A.  Yes.  Again, I am a special agent employed by the Federal Bureau of Investigation, more commonly referred to as the FBI.

Q.  Would you mind telling them how long you've worked for the Federal Bureau of Investigation?

A.  Approximately seven years.

Q.  And are you assigned -- well, before we get to that -- prior to working for the FBI, where did you work?

A.  Yes.  I was employed by the Whitpain Township Police

William Becker - Direct

Department in Montgomery County, Pennsylvania.

Q.   And what kind of work did you do for them?

A.   Yes.  I also was a police officer for approximately seven years.  During that time, I served as a patrolman, answering routine 911 calls and emergencies.  In addition to that, I also served as a task force officer with the Montgomery County Drug Task Force and a task force officer with Homeland Security Investigations.

Q.   And now, are you signed to any specific unit or group in the Federal Bureau of Investigation?

A.   Yes.

Q.   Tell us about that.

A.   Yes.  So I'm currently assigned to the Philadelphia field office.  Since my time with the Bureau, I've been assigned to the Safe Streets violent -- excuse me -- violent gang and drug task force.  Our mission and our goal on that task force is to work in conjunction with various state and local law enforcement agencies, particularly the Philadelphia Police Department, to identify and dismantle the city's most violent street gangs and drug trafficking organizations.

Q.   And I think you just told us some of your duties and responsibilities as a member of that task force.  Could you tell me if you became involved in an investigation into a drug trafficking organization that operated primarily in the Port Richmond area of Philadelphia, on Tulip Street?

William Becker - Direct

A.   Yes.

Q.   Could you tell us how the members of the Federal Bureau of Investigation became involved into that investigation?

A.   Yes.  So in approximately March of 2022, we received information that there was large-scale drug trafficking occurring, again, in the -- that Port Richmond section of Philadelphia.

For those of you not familiar with where that would be, Port Richmond is considered in the northeast -- excuse me -- northeast section of Philadelphia, approximately one mile from Kensington.  I'm sure most of you are familiar with where Kensington is in the city of Philadelphia.

Again, we received this information that the drug trafficking was occurring, specifically, on the 2900 block of Tulip Street.  And taking a look at that map that we saw previously, that street runs directly next to the Memphis Street Academy.  Based on that information -- that there was that large-scale drug trafficking occurring that close to a school -- we felt it was our duty to start the investigation.

Q.   I want to talk to you about some investigative techniques used throughout this investigation.  Can you tell us how the Federal Bureau of Investigation began conducting an investigation into this drug trafficking organization that was operating on Tulip Street?

A.   Sure.   There are numerous investigative techniques we used

during this investigation, but the primary one we utilized, that you heard about during the opening statements, was the use of confidential informants to conduct controlled evidence purchase operations from various members of the conspiracy.

Q. Could you just tell members of the jury, what do you mean when you say controlled evidence purchase operations, or controlled buys?

A. Yes. So a control buy is when either a undercover law enforcement officer, or again, a confidential informant, is provided money to purchase evidence from a target of an investigation. In this specific investigation, we purchased narcotics and firearms, and again, used a confidential informant -- a civilian who is not a law enforcement officer.

During these operations, the informant is searched prior to the operation, to make sure they don't have any contraband on their person, or any other currency. They are provided money from the U.S. government, as well as a audio and video recording device, and a transmitting device for their safety. So we're able to monitor the operation live as it occurs, to ensure that the informant is safe.

Q. And after the informant is searched and provided with buy money, what is the -- what is the informant instructed to do and what occurs during the actual controlled buy?

A. Yes. So the informant, again, is searched, provided with money, and is then tasked with contacting their target to

William Becker - Direct

arrange some sort of a transaction -- again, an evidence transaction.  It could be anything -- confidential -- I mean, excuse me -- counterfeit money, stolen goods.  But again, in this case, it was firearms and narcotics.

Q.  Now in this particular case, the controlled purchases.  How many members of this organization was the FBI buying narcotics from?

A.  I would say five or six different members of the organization.

Q.  Primarily, who were you buying narcotics from?

A.  From Diane Gillard, the sister of the defendant.

MR. WITHERELL:  Could we put Exhibit 101 to the witness, please?

THE COURT:  For the witness only at this time?

MR. WITHERELL:  Yes, Your Honor.

BY MR. WITHERELL:

Q.  I'm showing you what's been marked as governing Exhibit 101.  Do you recognize that?

A.  Yes, I do.

Q.  What do you recognize that to be?

A.  That's a picture of Diane Gillard, the sister of the defendant.

MR. WITHERELL:  Your Honor, to the jury?

THE COURT:  It's admitted --

UNIDENTIFIED JUROR:  We don't see anything.

William Becker - Direct

THE COURT:  -- as exhibit -- may -- oops.

UNIDENTIFIED JUROR:  I'm sorry.

THE COURT:  It's not up yet.  It's admitted as an exhibit and may be published for the jury.

MR. WITHERELL:  Show it to the witness, please.  Show it to the jury, please.

BY MR. WITHERELL:

Q.  Who is this?

A.  Again, that's Diane Gillard, the sister of the defendant.

MR. WITHERELL:  Just to be clear, I'm going to show you a bunch of exhibits throughout this presentation of evidence.  And at times, I'm going to show them directly to you.  I'm going to ask you some questions if you recognize them.  After I admit them into evidence, I'm going to show them to the jury.  Okay?

THE WITNESS:  Yes.

MR. WITHERELL:  All right.  Also, I think it's probably a good time to talk about -- we can take that down -- probably a good time to talk about what our intentions are with you as a witness, okay, Special Agent?

THE WITNESS:  Yes.

MR. WITHERELL:  Today, I plan on calling you to give us kind of an overview of the case on what the FBI did and certain search warrants that were conducted.  Is that all right?

William Becker - Direct

THE WITNESS:  Yes.

MR. WITHERELL:  Later on, I'm going to call you back to talk about the specific confidential controlled buys that you did throughout this investigation; is that okay?

THE WITNESS:  Yes.

MR. WITHERELL:  All right.  Thank you.  I just wanted to make that clear.

THE WITNESS:  Thank you.

BY MR. WITHERELL:

Q.  So you mentioned Diane Gillard.  Can you tell us what sort of -- was the FBI buying only one specific type of narcotics from Ms. Gillard or different types of narcotics?

A.  No, we were buying multiple narcotics from Ms. Gillard.

Q.  Can you tell us what type of narcotics the FBI was purchasing?

A.  Yes, from Ms. Gillard, we were purchasing crystal methamphetamine, fentanyl, and phencyclidine, or PCP.

Q.  You were using these controlled purchases, which I think you mentioned were audio videotaped.  Was that the only investigative tool you used?

A.  Absolutely not.

Q.  Why not?  Why not just buy the drugs and arrest Ms. Gillard?

A.  That wasn't the goal of this investigation.  Obviously, we identified relatively quickly that Ms. Gillard was considered a

William Becker - Direct

runner or a -- a middleman.  She was not responsible for supplying any of the narcotics.  We felt it was our due diligence as part of investigating this organization.

MR. GILLARD:  Objection.  Hearsay, Your Honor.

THE COURT:  Overruled.

MR. WITHERELL:  Please continue.

A.  We felt it was our due diligence to identify who was supplying Ms. Gillard with those narcotics and then, in turn, investigate them as well.

BY MR. WITHERELL:

Q.  And what other investigative tools did you use to help identify who was supplying Ms. Gillard with those narcotics?

A.  Yes, the main one we used at -- at the beginning were simply telephone records.  We would send a subpoena to the various telephone companies for Ms. Gillard's telephone records to determine who she was contacting directly prior to and following these controlled buys.

We would have our informant order a specific narcotic, and from there, we would see who Ms. Gillard was calling to be supplied that narcotic.

Q.  Besides subpoenas to phone records, were any surveillance done during these controlled purchases?

A.  Yes.

Q.  Tell us about that.

A.  Yes, so again, we didn't just want to rely on the audio and

video recording device that the informant had in this investigation. Therefore, we also utilized various forms of surveillance to also observe what was going on during these operations.

For example, we had law enforcement officers hiding in vehicles on the street. At times, we had law enforcement officers actually hidden in the Memphis Street Academy school observing surveillance. We had numerous cameras installed at various locations in the area so we could observe remotely. And as you heard previously, we also, at times, utilized an airplane to assist us in our surveillance.

Q. You mentioned something -- cameras that were placed on various locations. I'm going to use the term pole camera. Do you know what that term means?

A. Yes, I do.

Q. Just tell members of the jury what a pole camera is?

A. So a pole camera is pretty much exactly what it sounds like, it's a camera routinely installed on a telephone pole that is covert. It does not -- does not look like a camera. So therefore, we can observe the inner workings of an organization without having to be in the area.

Obviously, the presence of law enforcement would usually deter illegal activity from occurring. And therefore, again, we wanted to be able to review and view what was going on with this organization remotely.

William Becker - Direct

Q. And how many pole cameras were utilized in the course of this investigation?

A. We utilized two.

Q. Can you tell members of the jury approximately where they were?

A. Yes. So again, I don't know if you remember looking on that map. We had one camera on the 2900 block of Tulip Street, again, which is along the side of that school. And we had a second camera installed at the intersections of Memphis and Ann Street, which was approximately one block east of that area, which is also territory routinely utilized by the organization to distribute narcotics.

MR. WITHERELL: You mentioned that map again. It might be a good idea to put that up. To the witness, can we show 410 (sic), please?

THE COURT: What is the number?

MR. WITHERELL: 4010.

BY MR. WITHERELL:

Q. I'm showing you what's been marked as Government Exhibit 4010. Do you know what that is?

A. Yes.

Q. What is it?

A. This is an overhead map of the area -- the 2900 block of Tulip Street, where we investigated this organization.

Q. Does this accurately reflect that area that you did your

William Becker - Direct

investigation on?

A.  Yes.

          MR. WITHERELL:  Your Honor, I'd like to move into evidence what's been marked as Government 0 (sic) Exhibit.

          THE COURT:  It's admitted -- may be published.

          MR. WITHERELL:  Show it to the jury, please.

          BY MR. WITHERELL:

Q.  I'm showing you what's been marked as Governing Exhibit 4010.  It is a map of Tulip Street.  Can you just tell us -- it's pretty obvious where the Memphis Street Academy is on this map?

A.  Yes.  It's, I would say, direct center of this map, with the big Memphis Street Academy stamp on top of it.

Q.  We're going to come to this map later when we discuss search warrants, but just a few things:  could you just give us the general location of those two pole cameras we spoke about?

A.  Yes.  So if you see right above the top of the Memphis Street Academy school there, where the words Tulip Street are located, that block runs directly north.  It's a one-way street.

We placed a camera towards the bottom of that block, which enabled us to be able to observe the entire block up towards Ann Street, again, running on what would be the north side of Memphis Street Academy.

The second camera we installed at the intersection of Ann

William Becker - Direct

Street and Memphis Street.  So if you look at the bottom right-hand corner of this map, where those two streets intersect, is where we installed that second camera.

Q.  We mentioned previously that we did -- that the Federal Bureau of Investigation did numerous controlled purchases. Would you agree with me that was over fifteen controlled purchases in this --

A.  Yeah.

Q.  -- particular case?

A.  Yes.

Q.  The controlled purchases that we're going to speak about throughout the course of this trial, can you give us a general understanding of where they occurred?

A.  Yes, I would say the overwhelming majority of those controlled buys occurred on Tulip Street, pretty much essentially where that Tulip Street stamp is on the map, within a couple feet of that area right there.

Q.  Did you have an opportunity to measure that location and various locations on this map to the Memphis Street Academy?

A.  Yes.

Q.  Okay.  And all of the controlled purchases that we're going to discuss through the course of this trial, did they occur within a thousand feet of that property?

A.  Yes.

Q.  How do you know that?

William Becker - Direct

A.   I actually took a measuring wheel, which measures distance, and measured from where those buys routinely occurred to the school and got an approximate measurement of about 12 feet.

Q.   The defendant -- there's a -- on the top right, it says Phillip Gillard, 3006 Tulip Street.  Do you see that?

A.   Yes.

Q.   We're going to get to that location and what was recovered there later on in this trial.  But is that within a thousand feet of the school?

A.   Yes.

Q.   Okay.  Now you mentioned -- you can take that down.  You mentioned that you had done controlled purchases, subpoenaed phone records, surveillance by federal law enforcement, as well as a pole camera; is that correct?

A.   Yes.

Q.   When doing those various law enforcement techniques, did you determine when purchasing from Diane Gillard, who was meeting with her during controlled purchases?

A.   Yes.

Q.   Did it change depending on the type of narcotic that you ordered?

A.   Yes, it did.

Q.   Who met with Ms. Gillard when you were purchasing methamphetamine, a Schedule II controlled substance?

A.   Yes, Raphael Sanchez or Rich and Sharif Jackson.

William Becker - Direct

MR. WITHERELL:  Can we put Government 103 to the witness, please?

BY MR. WITHERELL:

Q.  I'm showing you what's been marked as Government Exhibit 103.  Do you recognize who that is?

A.  Yes.

Q.  Who is that?

A.  That is Sharif Jackson.

MR. WITHERELL:  Your Honor, please move in Exhibit 103.

THE COURT:  It may be admitted and published.

MR. WITHERELL:  Post to the jury?

THE COURT:  Yes.

BY MR. WITHERELL:

Q.  Tell the members of the jury who this is?

A.  Yeah, this is Sharif Jackson, one of the suppliers of crystal methamphetamine.

MR. WITHERELL:  108 to the witness.  What?  108 to the witness.

BY MR. WITHERELL:

Q.  Who are we looking at here?

A.  This is Raphael Sanchez, who also went by the name Rich.

MR. WITHERELL:  Your Honor, I move 108 into evidence.

THE COURT:  It is admitted and may be published.

BY MR. WITHERELL:

William Becker - Direct

Q.  Who is this?

A.  Again, that's Rich Sanchez, who was the supplier of crystal methamphetamine.

MR. WITHERELL:  104 to the witness.

BY MR. WITHERELL:

Q.  Who is this?

A.  Cesar Maldonado.

MR. WITHERELL:  Your Honor, I move 104 into evidence.

THE COURT:  It is admitted.  May be published.

BY MR. WITHERELL:

Q.  I know I'm asking you twice, but every time it comes up for the jury, I'm just going to re-ask it.  Who are we looking at here?

A.  That's fine.  Again, this is Cesar Maldonado.  He supplied Ms. Gillard with fentanyl.

MR. WITHERELL:  And let's look at Exhibit 106 to the witness.

BY MR. WITHERELL:

Q.  Who are we looking at here?

A.  This is the defendant, Phil Gillard.

MR. WITHERELL:  Move in 106, Your Honor.

THE COURT:  Move -- admitted and published.

BY MR. WITHERELL:

Q.  Do you see Mr. Gillard in the courtroom here today?

A.  Yes, I do.

William Becker - Direct

Q. Could you please point to him and identify an article of clothing he's wearing?

A. Yes, he's seated to my left, wearing the navy blue suit jacket.

MR. WITHERELL: Your Honor, may the record reflect that the witness identified the defendant.

THE COURT: Record so reflects.

BY MR. WITHERELL:

Q. You had talked about some pole camera evidence. I want to talk to you briefly about how that aided in your investigation. Did that help identify another member of this organization by the name of Terrence Maxwell?

A. Yes.

MR. WITHERELL: 105 to the witness, please.

BY MR. WITHERELL:

Q. Who are we looking at here?

A. This is a photograph of Terrence Maxwell.

MR. WITHERELL: Okay. I'll offer that into evidence, Your Honor.

THE COURT: Admit and publish.

BY MR. WITHERELL:

Q. I want to talk to you about you coming to know who Terrence Maxwell was and ultimately, his arrest on June 2nd, 2022; is that okay?

A. Yes.

William Becker - Direct

Q.   All right.  I want to draw your attention to approximately 7 p.m. on June 2nd, 2022.  Do you remember what you or other members of law enforcement were doing in regards to this investigation?

A.   Yes.

Q.   What were you doing?

A.   We were utilizing the pole camera to observe Ms. Gillard and Mr. Maxwell conducting in routine drug trafficking or drug dealing.

Q.   Okay.  We're going to watch some pole cam video.  Can you just tell members of the jury before we watch that what were you looking for at the time during this pole camera and what should they be looking for now?

A.   Yes.  So again, we were utilizing the pole camera at the intersection of Memphis and Ann Street to observe Ms. Gillard supplying Mr. Maxwell with street quantities of narcotics and then observing Mr. Maxwell distribute those narcotics to drug customers.

         MR. WITHERELL:  Let's play -- bring up Exhibit 3301.

      (Begin playback of video)

         BY MR. WITHERELL:

Q.   And so you see a black screen there, but you're familiar with 3301?

A.   Yes.

Q.   Okay.  Is that a snippet of the pole camera and this

William Becker - Direct

particular part shows the portion that you were describing with Terrence Maxwell?

A.   Yes.

Q.   We're also going to get into 3302, which is the second clip.  Are you familiar with that as well?

A.   Yes.

MR. WITHERELL:  Your Honor, I'd like to offer those into evidence.  3301, 3302 is excerpts of the pole camera video.

THE COURT:  Are they self-explanatory as to date or will we get into that separately?

MR. WITHERELL:  No, we're going to get into that during the --

THE COURT:  Okay.  All right.  We will admit subject to connecting that up, but you may publish.

BY MR. WITHERELL:

Q.   Let's start with 3301.  I want to draw your attention to June 2nd, 2022, approximately 7 o'clock.  Do you know what this is going to start us looking at?

A.   Yes.  This will be the intersections of Memphis and Ann Street.

MR. WITHERELL:  Let's hit play.

(Begin playback of video)

A.   So again, you can see the street sign upper left-hand corner.  That's Memphis Street.  If you pause the video right

William Becker - Direct

there, the gentleman in the white shirt with the long braids is Mr. Maxwell, and the gentleman in the red T-shirt is going to be a drug customer.

You're going to observe what we commonly refer -- excuse me, refer to as a hand-to-hand, which is exactly what it sounds like, a drug dealer handing a small object to a drug customer and a drug customer handing something back to the drug dealer.

(Pause playback of video)

MR. WITHERELL:  Let's pause it right there.  I'm going to ask S.A. Walsh if he can just advance the video to three minutes and ten seconds into video.  There you go.

A.  While this video is paused, if you look at the bottom right-hand corner of the pole camera, you see a fence there. That is the corner of the property of the Memphis Street Academy.

(Resume playback of video)

BY MR. WITHERELL:

Q.  S.A. Becker, we can see the camera move.  Does the pole camera do that?

A.  Yes.

Q.  Who's moving it?

A.  Any one of us who's monitoring the camera has the ability to -- to move left, right, up, or down, as well as the ability to zoom in or out.

(Pause playback of video)

William Becker - Direct

MR. WITHERELL:  Pause it right there.  I'm going to attempt to fast forward to nine minutes and twenty seconds there.

(Resume playback of video)

MR. WITHERELL:  Let's pause it right there.

(Pause playback of video)

BY MR. WITHERELL:

Q.  S.A. Becker, do you know who's sitting in the passenger side of that vehicle?

A.  Yes.

Q.  Who is that?

A.  That is Diane Gillard.

Q.  I know this is the first time that we're seeing this -- that the jury is seeing this portion, but just in the time frame of your investigation, had you already done controlled purchases from Diane Gillard prior to this?

A.  Yes.

Q.  Indeed, on June 1st, the day before this, had you purchased narcotics from Diane Gillard using those controlled purchases we've just spoken about?

A.  It was either the day before or that exact same day.  I don't exactly recall when it was.

Q.  Okay.  What are we looking at now?

A.  So again, that's Ms. Gillard sitting in the front passenger seat of that vehicle.  Mr. Maxwell has a black, some sort of

William Becker - Direct

bag across his chest, and is holding a light blue backpack, which he retrieved out of the back of that vehicle.  He's currently reaching into that black bag on his chest.

MR. WITHERELL:  Let's hit play.

(Resume playback of video)

A.   So if you see there, Mr. Maxwell retrieved an orange prescription pill bottle out of that bag and gave it to Ms. Gillard.  In my training and experience, I'm aware that prescription bottles are frequently utilized by drug dealers to store narcotics.

Ms. Gillard now has the black bag from Mr. Maxwell and appears to be doing something with it.

MR. CLARK:  Your Honor, may I have your indulgence for just one moment, please?

THE COURT:  Yes, certainly.  Can we pause a second?

MR. WITHERELL:  Yep.

(Pause playback of video)

MR. CLARK:  Thank you, Judge.

THE COURT:  You bet.

MR. WITHERELL:  Good?

MR. CLARK:  Yeah.

MR. WITHERELL:  Okay.  Thank you.  Let's hit play.

(Resume playback of video)

A.   Mr. Maxwell now has that black bag back from Ms. Gillard.

MR. WITHERELL:  Agt. Becker, there's a couple more

minutes left on this portion, and we can go to the second

portion.  We're just going to play it out.  It's easier than

trying to skip through a missing portion.

THE WITNESS:  Sure.

BY MR. WITHERELL:

Q.  Do you see what Mr. Maxwell is doing at this point?

A.  Yes, so Mr. Maxwell is retrieving items from that blue

backpack and placing them into his black bag across his chest.

Again, he retrieved that blue backpack out of the vehicle that

Ms. Gillard was sitting in.

Q.  Mr. Maxwell has provided the bag to another individual; is

that correct?

A.  Yes.

Q.  Still maintains with him that black backpack.

A.  Correct.

Q.  What are we seeing here?

A.  Mr. Maxwell is handed that individual in the gray t-shirt

some kind of small object, who then does a hand-to-hand

transaction with the gentleman in the white t-shirt and the

black and pink baseball hat.

Q.  In your training and experience, are these type of hand-to-

hand transactions consistent with narcotics trafficking?

A.  Yes.

(End playback of video)

MR. WITHERELL:  That's the end of that one.  We're

William Becker - Direct

going to pick up with 3302.  Again, Special Agent, this clip is approximately seven minutes.  Instead of just clipping, I'm just going to let it play for those seven minutes, and we'll talk about it then.

THE WITNESS:  Yes.

(Begin playback of video )

THE COURT:  Same date?

MR. WITHERELL:  Same date, Judge.  Just a continuation for electronic four-minute purposes.

BY MR. WITHERELL:

Q.  Can you tell us what you saw in Mr. Maxwell's hand at that point?

A.  Yes, I believe he retrieves what looked like U.S. currency or cash out of his pocket.

MR. GILLARD:  Objection, Your Honor.  I'm trying to figure out -- none of this is linking up to me.

THE COURT:  Overruled.  We're going to be here a while.

MR. WITHERELL:  Could we hit pause?

(Pause playback of video)

BY MR. WITHERELL:

Q.  Do you see that vehicle on the left side of the screen coming down the street?

A.  Yes.

Q.  Do you know who's in that vehicle?

William Becker - Direct

A.   Yes.

Q.   Who are they?

A.   Those are Philadelphia police officers.

Q.   Ofc. Donnelly (ph.) and Ofc. Keene (ph.)?

A.   Correct.

Q.   Do you know what brought them to this corner at this time in the video?

A.   Yes.

Q.   What?

A.   So again, as you heard, we determined that Diane Gillard, through our controlled buys, was distributing bulk quantities of narcotics in the vicinity.  As you can see from the previous videos, not only was she supplying bulk quantities, but also, to me, it would appear to be street-level amounts of narcotics. Based on the information that we received through the investigation and based off of the hand-to-hand transactions we observed Mr. Maxwell conducting, as well as information we received from a confidential informant that Mr. Maxwell was possibly armed, we contacted the Philadelphia Police Department in an attempt to identify Mr. Maxwell.

         MR. WITHERELL:  Let's hit play.

      (Resume playback of video)

         MR. WITHERELL:  Hit pause.

      (Pause playback of video)

             BY MR. WITHERELL:

William Becker - Direct

Q. See Mr. Maxwell go right on the screen?

A. Correct.

Q. Following him is what appears to be a police officer. Is that Ofc. Keene?

A. Yes.

Q. Behind him seems to be another officer. Is that Ofc. Donnelly?

A. Yes.

Q. Okay. In this portion -- in this video in the pole camera where are all three of those people going to go?

A. They're all going to head to the right of the view of the camera, which is south on Memphis Street, directly parallel to the Memphis Street Academy.

        MR. WITHERELL: All right. Let's hit play.

    (Resume playback of video)

        MR. WITHERELL: Let's hit pause, and we can take that down.

    (Pause playback of video)

        BY MR. WITHERELL:

Q. So all three of those individuals go right. Mr. Maxwell followed by Ofc. Keene, and it appeared that Ofc. Donnelly got back in his patrol car and followed suit; is that correct?

A. Yes.

Q. Is Ofc. Donnelly scheduled to testify at this trial?

A. Yes.

William Becker - Direct

Q.   Provided it does not snow tomorrow, when will he be testifying?

A.   Probably tomorrow.

Q.   Okay.  Were both those individuals, Ofc. Keene and Ofc. Donnelly, were they equipped with what is known as body camera?

A.   Yes.

Q.   Okay.  And have you seen those body cameras?

A.   I have.

Q.   Okay.  We're going to play those through Ofc. Donnelly when he takes the stand.  But at the end, after this, shortly thereafter, what happens with Mr. Maxwell?

A.   He's arrested.

          MR. WITHERELL:  Okay.

          MR. CLARK:  Your Honor, may I have a brief recess?

          THE COURT:  Certainly.  We're going to take --

          MR. CLARK:  Five minutes.

          THE COURT:  -- five minutes.  Okay.  We're not far from our lunch break, but we're going to take five minutes for everyone to just stretch their legs.  I think that's a good idea.  Okay.  Let's do that, Ms. Stein.

          THE CLERK:  All rise.  Court is in recess for five minutes.

     (Jury exits)

     (Recess at 11:55 a.m., until 12:11 p.m.)

          THE CLERK:  Court is again in session.

William Becker - Direct

THE COURT:  Please make yourself comfortable.  Are we ready to proceed?

MR. WITHERELL:  Government is, Your Honor.

THE COURT:  Okay.  Is Mr. Clark?

MR. CLARK:  I'm ready.

THE COURT:  Mr. Witherell, if you're able to get us to about right around 12:45 for lunch, and then, that would be a good --

MR. WITHERELL:  I ---

THE COURT:  -- point for me.

MR. WITHERELL:  -- certainly can get there, Judge.

THE COURT:  Oh, yeah.

MR. WITHERELL:  I certainly can get there.

THE COURT:  If you could circle that time, that would be so helpful.

MR. WITHERELL:  Will do, Judge.

THE COURT:  All good, Mr. Clark?

MR. CLARK:  Yes, Your Honor.  Thank you.

THE COURT:  Yes, sir.

MR. CLARK:  Um-hum.

THE CLERK:  All rise.

(Jury enters)

THE COURT:  Welcome back, folks.  Please make yourselves comfortable.  We'll go for about 40 minutes or so, and then we'll have a proper break for lunch.

William Becker - Direct

Mr. Witherell.

MR. WITHERELL:  May I inquire, Your Honor?

THE COURT:  Of course.

RESUMED DIRECT EXAMINATION

BY MR. WITHERELL:

Q.  Special Agent, when last we left, we were talking about Mr. Maxwell and he was placed under arrest on June 2nd, 2022, right after that clip in the pole cam finishes.  Am I correct on that?

A.  Yes.

Q.  When he was arrested, are you aware if the bag he was carrying was searched?

A.  Yes.

Q.  And have you seen the contents of that bag?

A.  Yes.

MR. WITHERELL:  Can I have what's been marked as Government Exhibit 703 shown to the witness?

BY MR. WITHERELL:

Q.  I'm showing what's been marked as 703.  It is four pages. I'm just going to ask S.A. Walsh if he could just show you the pages 1, page down, Mr. Walsh; 2, page down, Mr. Walsh; 3 and 4.  Wait.  Go down to 4.  Okay.  Do you know what that is?

A.  Yes.

Q.  What is it?

A.  They're photographs taken, I believe by myself, of the

William Becker - Direct

contents of that black bag after Mr. Maxwell was arrested.

MR. WITHERELL:  Okay.  Your Honor, may I have that offered into evidence as Government Exhibit 703.

THE COURT:  They are admitted and may be published.

MR. WITHERELL:  All right.  I'm going to start on the last page, so let's show 703 to the witness.  S.A. Walsh, can you just do a close-up on the bottom picture -- the whole thing?

BY MR. WITHERELL:

Q.  I'm showing you what's the last page of 703.  Can you tell us what we're looking at?

A.  Yes.  So again, this is on the left-hand side of that picture is the -- the black bag that Mr. Maxwell was carrying. To the right of the bag are all of his contents.  Bottom half of that picture, I believe, packets labeled animal cookies and jet fuel and pink kush.  Those are small packets of marijuana. Directly above those are yellow flip-top containers similar to the blue ones that were located in Mr. Gillard's house.  These yellow ones here contained crack cocaine.  They were located in that orange prescription bottle that we saw in the previous video, being handed back and forth between Ms. Gillard and Mr. Maxwell.

Top center of the photograph is a green and black Taurus firearm and its accompanying magazine and ammunition.  And then next also to the black bag is, I forget the denominations, but

William Becker - Direct

a small amount of U.S. currency.

MR. WITHERELL:  Okay.  Let's just get out of the zoom, Mr. Walsh -- S.A. Walsh.  Just double-click it.  703.

BY MR. WITHERELL:

Q.  And what are we looking at here?  Oops.

SA WALSH:  Here you go.

MR. WITHERELL:  Yep.  You can start from the top.

BY MR. WITHERELL:

Q.  What are we looking at here, Special Agent?

A.  Yes, this is a photograph of the serial number of the firearm recovered from Mr. Maxwell.

Q.  Page down, please.

A.  Just a zoomed-out photograph of the firearm.

Q.  And page down.

A.  And the opposite side of that firearm.  It was a Taurus. That's the brand of the firearm.

MR. WITHERELL:  Your Honor, with this Court's permission, I'm going to ask S.A. Walsh to take what's been marked as Government P1, Physical Exhibit 1, to the witness at this time.

THE COURT:  All right.  And everything is been squared away with the marshal?

MR. WITHERELL:  Yes, Your Honor.  Just to be clear, I've been informed by members of the Federal Bureau of Investigation as well as the United States Marshal Service this

William Becker - Direct

firearm has been made safe and is in no way capable of firing.

THE COURT:  Thank you.

MR. WITHERELL:  Thank you.

BY MR. WITHERELL:

Q.  S.A. Becker, I'm handing you what's been marked as Government Exhibit P1, Physical Exhibit 1.  Can you just tell members of the grand jury if you recognize that?

A.  Yes, I do.

Q.  What do you recognize that to be?

A.  This is the firearm that was recovered from Mr. Maxwell.

Q.  Minus the red tag, that I'm sure you're going to explain to us what that is in a second, does it accurately reflect the way you saw that firearm when it came into your presence on June 2nd, 2022?

A.  Yes.

MR. WITHERELL:  Your Honor, at this time, I'd like to move in Government P1 into evidence.

THE COURT:  All right.  The foundation has been established.  It may be -- it's submitted and may be published.

BY MR. WITHERELL:

Q.  Just if you wouldn't mind, Special Agent, just tell us what we're looking at.  If you hold it up to the jury and tell what that red tag is so we know?

A.  Yes.  So again, this is the green and black firearm that was recovered from Mr. Maxwell.  As part of evidence intake

William Becker - Direct

process, each firearm we recovered is rendered safe by a certified firearms instructor.

I, myself, am actually a certified firearms instructor.  I personally rendered this firearm safe.  As well as for purposes for this trial, these firearms were also all inspected by members of the U.S. Marshal Service and applied these red tags to confirm that this firearm is no longer operable.

Q.  So just so the jury should know, the red tag obviously wasn't there when you took possession of this firearm during the course of this investigation?

A.  Correct.

MR. WITHERELL:  Okay.  I'm going to ask S.A. Colin, with the Court's permission, just to publish that to the jury. He can bring it back to counsel table.

THE COURT:  Very well.

MR. WITHERELL:  S.A. Walsh, if you wouldn't mind just showing that to the jury.  I don't think they need to handle it, but if you could just pass -- exactly.

BY MR. WITHERELL:

Q.  Special Agent, I don't know if I'm stating the obvious here, but that does not appear to have a magazine in it; is that correct?

A.  Correct.

Q.  At the time that the firearm was found by members of the Philadelphia Police Department, it was loaded?

A.  Yes.

Q.  And obviously for purposes of safety here in this courtroom, we have unloaded it and made it safe?

A.  Correct.

Q.  Okay.  We just spent some time talking about the pole camera and talking about one day of incident, June 2nd, 2022. Let me ask you just a few more questions about the pole camera before we move on to some other of the investigative techniques you used.  How often was the pole camera running?

A.  The pole camera was running 24/7 from when we -- it was installed until when it was taken down.  I don't know the exact dates, but sometime around the late spring of 2022 until January of 2023.

Q.  And what we just saw there was just a portion of one day of one of the pole cameras?

A.  Yes.

Q.  Okay.  Now we're going to hear a little more about this June 2nd, 2022, arrest of Terrence Maxwell when we speak to Ofc. Donnelly.  But now I'd like to draw your attention to a different day of incident.  And first, I want to put back 4010 to the jury, please.  It's already admitted into evidence. Can you just point to us on this map this corner that we were just looking at where Mr. Maxwell was arrested and where we saw the pole camera?  Just where was that?

A.  Yes, so bottom right-hand corner of this map, you see

William Becker - Direct

there's a yellow government exhibit sticker.  I would say approximately where, like, the letter N in government, the first N, is located, is that corner store we saw depicted in the video.  That's about where Mr. Maxwell was standing and conducting those drug transactions.

Q.  I also see on this map that there are four addresses depicted; one depicting Cesar Maldonado, 2268 East Monmouth Street; one with the name Amin Whitehead, 2940 on Tulip Street; and one with Phillip Gillard, 3006 Tulip Street.  Do you see that?

A.  Yes.

Q.  Is there anything significant about those three locations that you determined through the course of your investigation?

A.  Yes.

Q.  What is that?

A.  Those are all stash houses we identified.  A stash house is a residence utilized by drug traffickers to maintain their supply of narcotics.  Oftentimes, they protect those narcotics through the use of firearms.

So again, you see the three on the map here.  Those are three of the organization's stash houses we identified during the investigation.

Q.  As a result of identifying through the course of your investigation, what, if any, steps did members of the Federal Bureau of Investigation do to search these locations?

A.   Yes.   So we authored search warrants and sent those search warrants to a magistrate or a judge to be approved, and once those warrants were approved by a judge, we executed those search warrants at those properties.

Q.   I want to talk about the August 10, 2022, search of 2940 Tulip Street; is that okay?

A.   Yes.

Q.   Now, I'm throwing a lot of dates out here, so let's just orient the jury.  At this point, in August 10th, 2022, had you already done several controlled purchases from Diane Gillard that we spoke about earlier?

A.   Yes, we had.

Q.   In addition, had you done controlled purchases from another individual in this drug trafficking organization?

A.   Yes.

Q.   Who was that?

A.   Mr. Amin Whitehead.

Q.   Could you tell us the name of the confidential -- the code name of the confidential source utilized to make purchases from Mr. Amin Whitehead?

A.   Yes, just to clarify that.  We don't reveal the names of our confidential informants, obviously for their safety. They're given code names.  And in this particular instance, I'm referring to a confidential informant whose code name was Smurf.

William Becker - Direct

Q.  On August 10, 2022, had Smurf purchased crack cocaine under the observation of the Federal Bureau of Investigation from Mr. Amin Whitehead prior to August 10, 2022?

A.  Yes, Smurf had purchased narcotics from Mr. Whitehead on numerous occasions prior to August 10, 2022.

Q.  We're going to talk about those later when I said we'd talk about the other controlled purchases.  But I want to talk about August 10, 2022.  How did the FBI come to search the residence of 2940 Tulip Street belonging to Mr. Amin Whitehead?

A.  Again, we applied for a search warrant.  That approval was granted by a judge, and we executed the search warrant.

Q.  Prior to getting the search warrant, did anything else occur in connection with Mr. Amin Whitehead?

A.  Yes.

Q.  Tell me about it.

A.  I wanted to ensure that Mr. Whitehead was going to be home or in the vicinity when we executed the search warrant, so I utilized an undercover cell phone pretending to be Smurf to contact Mr. Whitehead to arrange a narcotics -- excuse me, a narcotics purchase.

        MR. WITHERELL:  Can I have 1501 shown to the witness?

        BY MR. WITHERELL:

Q.  I'm showing you what's been marked as 1501.  Do you recognize this?

A.  Yes.

William Becker - Direct

Q.   What do you recognize it to be?

A.   This is a screenshot of the text message conversation I had with Mr. Whitehead.  Again, I was pretending to be the informant, Smurf.

Q.   Okay.  So this is actually you pretending to be Smurf talking to Mr. Amin Whitehead, attempting to purchase narcotics?

A.   Yes.

MR. WITHERELL:  Okay.  Your Honor, move that into evidence as 1501.

THE COURT:  It is admitted and may be published.

BY MR. WITHERELL:

Q.   This looks similar to a text message one of us might have on his phone, but just in case, could you just explain to the juror what we're looking at here, who's talking, and what are the responses?

A.   Yeah, so again, if you see at the upper left-hand corner of the image, that's the phone number I was contacting, or Smurf was contacting Mr. Whitehead on.  If you look a little bit further down, you see the date:  Wednesday, August 10th, 2022.  First text message is at 4:37 p.m.

To be clear, all the messages in the green was me pretending to be the informant, Smurf.  I said, it's Smurf.  Can I come through?  Mr. Whitehead responded, what you wanted?  I said, need thirty, be there in five.  To clarify what I meant by I

William Becker - Direct

need thirty, that referred to thirty of those flip-top containers of crack cocaine. We had previously purchased similar narcotics from Mr. Whitehead on various dates prior to this. Mr. Whitehead responds, no, 20 minutes, please. You got 300. I need 20 minutes, picking up my nephews from daycare. I responded, okay, and responded, I got 150, referring to $150. Mr. Whitehead responds, okay, I got the fifty for you, but picking up -- but -- but picking kids up. I respond, okay, and Mr. Whitehead asks if I'm ready approximately 7 or 15 minutes later.

Q. Can we go to page 2?

A. He says, you ready? I respond, be there soon. He says, okay. I say, store? And what I meant by that was I was referring to that corner store you had previously seen on the video of Mr. Maxwell. That's where the informant, Smurf, on the prior control buys, was purchasing narcotics from Mr. Whitehead. Mr. Whitehead then confirms, yup, confirming that the store was a good location to meet to arrange or to participate in the narcotics transaction.

Q. Now, after this text message went back between you and Mr. Whitehead, was Mr. Whitehead ultimately arrested?

A. Yes.

Q. Can you tell us just generally how that occurred?

A. Yes, so a short time after this -- that last text message

of yup was sent, 5:08 p.m., I would guess within 5 to 10

minutes, Mr. Whitehead was observed exiting his residence.  He

was then taken into custody by the Philadelphia Police

Department, and we executed the search warrant at his

residence.

Q.  I want to talk to you a little bit about the search of that

residence.  Were you present for it?

A.  Yes.

Q.  Okay.  Do you remember who else generally was present for

the search of Mr. Whitehead's?

A.  Yes, there was numerous members of law enforcement,

numerous members of my squad, the Safe Streets Task Force I had

spoken with or spoken about, as well as numerous members of a

specialized narcotics unit within the Philadelphia Police

Department.

Q.  And as you're searching the residence at 2940 Tulip Street,

are photographs taken?

A.  Yes.

Q.  Are you taking the photographs, or are other people taking

the photographs?

A.  I don't recall.  There's a good chance it was probably me,

but I can't say for sure that that was me taking those

pictures.

Q.  Regardless if you took the photos, I want you to take a

look, and I believe you have it in front of you, there's going

William Becker - Direct

to be a packet of photos that you have on there.  I know you've seen this prior to entering court here today, but if you wouldn't mind, if you could just peruse those, and I'm going to ask you some questions, but before I do, I'm just going to list out to the Court some photographs I'm going to show to the agent.

I'm going to show you what have been marked as 1502 to 1507, 1509 to 1511, 1515 to 1517, 1519 to 1521, 1524, 1527, 1528, 1530, 1534, 1536, 1544, 1546, 1549, 1551 to 1552 -- sorry, 1551, 1552, 1559 to 1562, 1567, 1568, 1570, 1576, 1577, 1578, 1580, and 1581.

MR. WITHERELL:  One moment, Your Honor.

Q.  Have you had an opportunity to review those prior to coming to court today?

A.  Yes.

Q.  Do those photos accurately reflect the search of what was located in Mr. Amin Whitehead's residence?

A.  Yes.

MR. WITHERELL:  Your Honor, I'm going to move into -- I'm going to offer to evidence those photos.

THE COURT:  They're admitted and may be published.

MR. WITHERELL:  Let's start with 1502 to the jury, please.

BY MR. WITHERELL:

Q.  Just tell us what we're looking at here?

William Becker - Direct

A.   Yes, so this is the front of Mr. Whitehead's residence.  As you can see, the numbers 2940 are affixed to the left of the front door.  Again, just for your -- for geographical purposes, this residence is directly across the street from that Memphis Street Academy on Tulip Street.

One thing of note, that ballistic shield next to the left side of the front door was actually ours.  That was not Mr. Whitehead's.  We utilize ballistic shields in the execution of search warrants for our safety.  Again, that was not there prior to law enforcement executing the warrant.

Q.   1503, what are we looking at here?

A.   Yes, so this is a picture of just inside the front door of that residence.  As you can see, there's numerous trash bags on the floor.  And directly against that front wall, you can see the very top of like a light blue, what I know to be like a cloth shopping bag.

Q.   1504, what are we looking at here?

A.   Yes, so again, that's that light blue cloth shopping bag that was right inside the front door of that residence.  You can see there's at least one firearm on the ground that was recovered from that bag, as well as at least one additional firearm inside of that bag.

Q.   1505?

A.   So that's the remaining contents of that blue bag.  There are three firearms that were recovered from inside that bag.

William Becker - Direct

Q.  We'll discuss those in further detail as we proceed, but I'm just going to go 1506.  What are we looking at here?

A.  Yeah, this picture was taken from inside a bedroom of that residence.  There's a plate, some drug packaging material inside of that shoebox on the bed.

Q.  1509, what are we looking at here?

A.  An additional picture from inside a bedroom, more packaging material inside that shoebox.

Q.  1510.

A.  Just a close-up of that same shoebox with more drug packaging inside of it.

Q.  Just going to do one more close-up of that, so the jury can see it.  1511.

And now let's go to 1515.  What are we looking at here?

A.  Yeah, so I believe this was taken from, like, the living room area in that residence.  You can see it's actually like a fireplace, that all of that stuff is piled in front of.  On that table, you see a black plate with more of those blue flip-top containers we spoke about.  Those each contain one dosage of crack cocaine, as well as various other narcotics, packaging material scattered on that table.

Q.  1516, which I think is just a close-up, but correct me if I'm wrong, Special Agent?

A.  Yes, that's that same plate.  Razor blades on that plate, which are utilized to take a rock or a chunk of crack cocaine

William Becker - Direct

and scrape off little individual dosage from that -- doses from that chunk of crack cocaine.

Q.   1519, what are we looking at here?

A.   This looks like part of the couch from inside that residence.  You open up, there's like a storage container with cup holders.  Inside that storage compartment are various magazines and various pieces of ammunition.

Q.   1520, what are we looking at here?

A.   On the left side of this photograph is the front door of that residence.  This is going to be like the TV and the TV display stands directly next to the front door.  Behind that TV display stands appears to be a small amount of crack cocaine.

Q.   1521, what are we looking at here?

A.   Yep, that's a close-up of the crack cocaine behind the TV.

Q.   1524?

A.   More of those blue flip-top containers.  I don't recall if those had crack cocaine in them or not.  If not, they were ready to be packaged and sold.

Q.   1527?

A.   A couple boxes of ammunition on top of the mantel above the fireplace.

Q.   1528?

A.   An additional photograph of that -- that ammunition.

Q.   1534, what are we looking at here?

A.   Yes, so this is a black Nike backpack that we had seen

previously during a controlled purchase operation.  That was important to us at the time.

Q.  So when you saw that on August 10, 2022, you had previously seen that bag?

A.  We had previouly seen, excuse me, previously seen Mr. Whitehead carrying a black Nike backpack, the exact same model as that, on the street during a controlled purchase operation and then brought back into the house at the conclusion of that purchase.

Q.  Okay.  We're going to discuss that controlled purchase later on in this trial, but let's go to 1536.  And this one is tough because it's dark on dark, but can you see what's being held there?

A.  Yes, so that's an extended magazine like Mr. Schopf said during his opening arguments -- opening statement.  That magazine can hold probably up to 30 or 40 rounds of ammunition that can go into a pistol and that was recovered from inside that black Nike backpack.

Q.  1544, what are we looking at here?

A.  One of the firearms recovered from Mr. Whitehead's residence.

Q.  1546?

A.  Ammunition accompanying that firearm and the magazine.

Q.  1547, what are we looking at here?

A.  A second firearm recovered from that residence with its

William Becker - Direct

accompanying magazine and ammunition.

Q.   1551?

A.   A third firearm recovered from that residence.  What's particular about this firearm is if you look at the direct center of it below the chamber, that's usually where a serial number should go, but as you can see in this picture, that serial number has been obliterated or destroyed.

That's something commonly done by individuals who are not legally allowed to possess firearms.  They obliterate or destroy that serial number on the firearm so it cannot be traced.

Q.   1559, what do we got here?

A.   It's a picture of some of the crack cocaine that was recovered from Mr. Whitehead's residence on a scale.

Q.   Just to be clear, is this Mr. Whitehead's scale or this is the FBI's scale?

A.   No, this is one of our scales.

Q.   So this was obviously taken after the search of the residence?

A.   Correct.

Q.   Okay.  1561?

A.   Just more of the crack cocaine we recovered from inside that residence.

Q.   1568?

A.   And again, this is a close-up of those blue flip-top

William Becker - Direct

containers, which you can see each contain like one dosage or a small amount of crack cocaine.

Q.   1570?

A.   Some U.S. currency recovered, as well as a debit card with Mr. Whitehead's name on it.

Q.   1578?

A.   This is a box that normally a firearm is sold in.  I don't see a firearm in this picture, but there is a magazine containing some ammunition.

Q.   1580?

A.   It's a digital scale, found what looks like to be on a bed in the residence.

         MR. WITHERELL:  Your Honor, with the Court's permission, I'm going to have S.A. Walsh take what's been marked as P2 and show it to the witness.

         THE COURT:  Certainly.  Government's P2?

         MR. WITHERELL:  Yes.

         THE WITNESS:  Thank you.

         SA WALSH:  Um-hum.

         BY MR. WITHERELL:

Q.   Special Agent, I'm showing you what's been marked as Government P2.  Do you recognize that?

A.   Yes, I do.

Q.   What do you recognize that to be?

A.   This is one of the firearms recovered from Mr. Whitehead's

residence.

Q.   Same caveats that we talked about with the first firearm, with the red tag?

A.   Yes.

MR. WITHERELL:  Okay.  Your Honor, I'd like to offer what's been marked as Government P2 into evidence.

THE COURT:  Government P2 is admitted and may be published.

BY MR. WITHERELL:

Q.   Could you just tell us where this gun was recovered from?

A.   Yes, so this is one of the firearms recovered from inside that blue bag inside the residence.  What's particular about this firearm, this is what is referred to as a ghost gun or a privately manufactured firearm.  This is a gun that's actually sold in parts that can be put together to form a functioning firearm.  However, there's no serial number attached to this firearm, so it cannot be traced.

Q.   It's an untraceable firearm?

A.   Correct.

MR. WITHERELL:  Your Honor, with the Court's permission, may I have S.A. Walsh present it to the jury?

THE COURT:  Yes.

MR. WITHERELL:  Special Agent, you can bring it back to counsel table when you're done.

THE WITNESS:  So again, this firearm fully functions

William Becker - Direct

as a firearm.  Again, it just cannot be traced.

MR. WITHERELL:  With the Court's permission, may I have P3 shown to the Agent?

THE COURT:  Yes, sir.

THE WITNESS:  Thank you.

BY MR. WITHERELL:

Q.  I'm showing you what's been marked as Government P3.  You recognize that?

A.  Yes.

Q.  What do you recognize that to be?

A.  Another one of the firearms recovered from his residence.

MR. WITHERELL:  Offered into evidence as P3, Your Honor.

THE COURT:  It's admitted.  May be published.

BY MR. WITHERELL:

Q.  I'm just going to ask, these all are not loaded; is that correct?

A.  Correct.  And again, they have the red tag affixed by the U.S. Marshals, rendered safe, inoperable.

Q.  At the time that they were found in Mr. Amin Whitehead, was that their condition?

A.  Could you rephrase, please?

Q.  That's a horrible question.  I'm sorry.  When they were found in Mr. Amin Whitehead's house, were they loaded?

A.  Yes.

William Becker - Direct

Q.   Thank you.

A.   This firearm is obviously been unloaded, but at the time we recovered it, it was loaded with ammunition.

MR. WITHERELL:  S.A. Walsh, if you wouldn't mind showing that to the jury?

THE WITNESS:  Again, if you look on this side of the firearm, the serial numbers have attempted to be obliterated, so they cannot be traced.

MR. WITHERELL:  And S.A. Walsh, would you be so kind to take P4 to the witness?

THE WITNESS:  Thank you.

SA WALSH:  Um-hum.

BY MR. WITHERELL:

Q.   Special Agent, I'm showing you what's been marked as Government Exhibit P4.  Do you recognize that?

A.   Yes.

Q.   What do you recognize it to be?

A.   Another firearm recovered from Mr. Whitehead's residence.

MR. WITHERELL:  Your Honor, I'd like to move that into evidence as Government Exhibit P4.

THE COURT:  It's admitted.  You may publish.

BY MR. WITHERELL:

Q.   Anything in particular about that firearm?

A.   No, I mean, again, it was loaded when we recovered it. It's been rendered safe, and the red tag is been affixed by the

William Becker - Direct

U.S. Marshals.

MR. WITHERELL:  Appreciate it.  S.A. Colin?  That's only four, right?

THE WITNESS:  You only showed three.

MR. WITHERELL:  Huh?

THE WITNESS:  You only showed three.

MR. WITHERELL:  Oh, there's one more.  I'm sorry.  Oh, no, no, that's right.

THE WITNESS:  I think we might've skipped P2.

MR. WITHERELL:  P2, P3, P4.  P5 we have to show now.

THE WITNESS:  P5?  Gotcha.  I'm sorry, yeah, P5.  Yeah.

MR. WITHERELL:  Sorry.  Judge, let's show P5.  Yeah, thank you.

THE WITNESS:  Yeah, P5.  Yes.

BY MR. WITHERELL:

Q.  I'm showing you what's been marked as P5.  Can you just tell the members of the jury what that is?

A.  Yes, this is the fourth firearm recovered from Mr. Whitehead's residence.

MR. WITHERELL:  Your Honor, I'd like to move that into evidence as P5.

THE COURT:  Admitted and may publish.

MR. WITHERELL:  S.A. Walsh, if you wouldn't mind showing it to the jury?

William Becker - Direct

BY MR. WITHERELL:

Q.   Special Agent, just so I don't get confused, P1 was the Terrence Maxwell firearm, P2, P3, P4, P5 are the four firearms found in Amin Whitehead's house?

A.   Yes, if anything, I was confused.  So thank you for clearing that up.

Q.   No, I just want to make sure we're on the same track.

MR. WITHERELL:  Your Honor, I see the time is 12:45. I was about to get into property receipts.  It might be an appropriate time to stop for our lunch break.

THE COURT:  Good natural break?

MR. WITHERELL:  Yes, Your Honor.

THE COURT:  All right.  Terrific.  Then that's what we'll do.

All right, ladies and gentlemen, when we took our morning break this morning for 5 minutes I neglected to give this recess -- it's the same recess instruction I gave you last week, so I think you're familiar with the rules.

After I read this to you, if you forgot and broke any of these, just raise your hand and we'll talk about it.  Okay?

We're about to take a break.  I want to remind you of the instructions.  And again, we've already -- we've only met a couple of days and we've already had these instructions multiple times and you'll know them by heart by the time we're done.

William Becker - Direct

During this recess and all other recesses, do not discuss the case with anyone, including your fellow jurors, anyone involved in the trial, members of your family, friends, nobody.

Don't speak with the parties, the witnesses, or the attorneys.  Don't let anyone speak to you about the case.  And if anyone tries, don't tell any of your fellow jurors, just let Ms. Stein know.

Remember, as jurors, you will decide this case solely on the evidence presented in this courtroom.  I don't think there's any media coverage, but if there is, don't watch, don't listen.  You must not communicate with anyone about this case, either verbally or electronically or any other way.

Do not conduct any independent research about the case, the management case, the legal issues, the parties, anything about the case.  Do not use the internet to search for information about any of these things.  The only information you're to consider in deciding this case is what you learn in this courtroom.

Remember, you must keep an open mind.  Do not make your mind up about the verdict until you have heard all the evidence and I've given you the final instructions about the law at the end of the trial and you've had the opportunity to discuss the case with your fellow jurors during your deliberations.

Again, this instruction applies to every recess we take, whether it's long or short, and if there comes a time that you

William Becker - Direct

even accidentally or in any way get any information outside of these instructions, please let me know through Ms. Stein so we can take the steps necessary for the trial to proceed in complete fairness to all parties.

Having just heard that instruction this moment, was there any issues related to these from our break a short time ago? Seeing no hands, all right, we'll take a break and come back in an hour. Ms. Stein, that'll be roughly 1:45?

THE CLERK: Correct.

THE COURT: Okay. All right. Thank you very much, folks. See you in a bit.

THE CLERK: Court is in recess for one hour.

(Jury exits)

THE COURT: Talk to me, Counsel.

MR. WITHERELL: I'm just wondering, Judge, if the Court is determined what our plan is for tomorrow. It's easier for the Government to start making arrangements if we know quicker.

THE COURT: I asked them to consider it over lunch.

MR. WITHERELL: Okay.

THE COURT: I don't think they've gotten to that yet.

MR. WITHERELL: No, I understand, Judge. Okay.

THE COURT: Okay?

MR. WITHERELL: All right.

THE COURT: See you in an hour?

William Becker - Direct

MR. WITHERELL:  See you in an hour, Judge.

THE COURT:  All right.  Thank you, everybody.

THE WITNESS:  Thank you.

THE COURT:  Thank you.  Remember, you can't discuss your testimony with anybody while you're on a break.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You bet.

(Recess at 12:47 p.m., until 1:55 p.m.)

THE CLERK:  Court is again in session.

THE COURT:  Thank you.  Please make yourselves comfortable.  All right.  Let's see what's up.  I'll ask the jury if they want to discuss weather issues.

MR. WITHERELL:  Okay.

THE COURT:  Okay.

THE CLERK:  Ready for the jury, Judge?

THE COURT:  I am.  We are.

(Pause)

THE CLERK:  All rise.

(Jury enters)

THE COURT:  Welcome back.  I hope your first Allentown lunch was a delightful one.  Please make yourselves comfortable.  Did you discuss the weather?  It's not looking good, is it?

UNIDENTIFIED JUROR:  Huh-uh.

THE COURT:  So do you have any ideas or any

William Becker - Direct

preferences?  Please feel free to speak.  I know we have several who are staying in town and that wouldn't change if we don't have court tomorrow.  You'd still be welcome to stay, and Uncle Sam would pick that up.

So I mean, what we looked at over lunch didn't look good.  Did you see anything sunnier than we did?  No?  Want to talk about it now or do you want to talk about it at the afternoon break?  Or Neither?  Or both?

UNIDENTIFIED JUROR:  Afternoon.

THE COURT:  Afternoon.  All right.  Thank you.  Thank you for someone saying something.  I thought this microphone was broken.  All right.  We'll speak about it in the afternoon. We'll see maybe if some miraculous wind blows it all out to Jersey or wherever.

All right.  We good?

MR. WITHERELL:  We are, Your Honor.

THE COURT:  All right.  Then we're going to pick up with Agt. Becker.  Okay?

MR. WITHERELL:  Okay.

THE COURT:  Thank you.

MR. WITHERELL:  May I inquire, Your Honor?

THE COURT:  Please.

RESUMED DIRECT EXAMINATION

BY MR. WITHERELL:

Q.  Special Agent, when last we left, we were talking about the

search of Amin Whitehead's residence.  You remember talking about that?

A.  Yes.

Q.  You had showed us some photographs and talked about some narcotics and firearms that were found there.

MR. WITHERELL:  I want to bring up what's been marked as Government Exhibit 1584 to the witness, please.

THE COURT:  1584?

MR. WITHERELL:  Yes.  I don't have it in front of me.

THE CLERK:  Sorry.

MR. WITHERELL:  That's okay.  And we can show the first page.  And can we show the second page; and the third page; the fourth page; and the fifth page.  Well, I think there's one more.  Maybe one more?

BY MR. WITHERELL:

Q.  All right.  Can you tell us what we're looking at in these pictures?

A.  Excuse me.  Yes.  So this is going to be, I believe, the first page was the actual search warrant we obtained for 2940 Tulip Street.  The remaining pages are Philadelphia Police Department property receipts, which is how we log and inventory all of the evidence we've recovered.

MR. WITHERELL:  Okay.  Your Honor, I'd like to move that into evidence as 1584.

THE COURT:  Each of the documents?

MR. WITHERELL:  Yes.

THE COURT:  And Agt. Becker, you're familiar with these documents?

THE WITNESS:  Yes, Your Honor.

THE COURT:  And these are all fair and accurate reproductions of the originals?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  They're admissible and may be published.

BY MR. WITHERELL:

Q.  Let's start on the second page.  Could you just tell members of the jury, what are we looking at here?

A.  So again, this is a Philadelphia Police Department property receipt.  This is commonly how members of the Philadelphia Police Department inventory evidence they seize during the course of any investigation.

Q.  And we're going to see several of these throughout the course of this trial.  We're also going to see some different type of property receipts done by the Federal Bureau of Investigation; is that correct?

A.  Correct.

Q.  Could you just tell us the difference why one would go to the Philadelphia Police Department, and one go to FBI?

A.  Yes, so as I testified to previously the task force that I'm on is comprised of not only FBI special agents but other

members of law enforcement, including members of the Philadelphia Police Department.  Therefore, we have both of the department's assets to our disposal.

And we've determined what works best is for most of the time, we will submit the majority of our narcotics evidence and firearms evidence to the Philadelphia Police Department's laboratories with the exception of crystal methamphetamine, which we will submit to FBI evidence and then send to the Drug Enforcement Agency or the DEA, their laboratory, because they can actually test for the purity of that substance.

Q.   So most property is sent in connection with Philadelphia Police Department law enforcement; is that correct?

A.   Yes.

Q.   And then there may be times when the FBI is conducting a search, or if a certain particular type of narcotic is seized, and which is sent to federal authorities?

A.   Correct.

Q.   And just tell us one more time, what was the reason for sending methamphetamine?  That's the one drug that you parsed out that is sent to the DEA laboratory as opposed to the Philadelphia Police Department laboratory.

A.   Yes, so again, the DEA laboratory will test for the purity of that substance, whereas the Philadelphia Police Department's chemical laboratory does not test for purity.

Q.   Okay.  So I want to just draw your attention now back to

this property receipt. It says 35683878 in the top right corner. Is that known as a property receipt number?

A. Correct.

Q. And what is denoted out of this property receipt?

A. So again, this is the specific property receipt for the firearms evidence recovered from 2940 Tulip Street. Taking a look at the -- the top center portion from whom taken, it's taken from inside that address. The address on Tulip Street, the owner, Amin Whitehead. The date and time is noted on that. The district. The unit is the FBI Task Force. Towards the upper right-hand corner, you'll see DC number, which is 22-24-22374. That is the specific Philadelphia Police Department investigation number for the investigation into Amin Whitehead. A bit further down you'll see the description of evidence and from there it breaks down the various firearms and its accompanying ammunition magazines we seized from that residence.

Q. Let's go to I think it's three down to 3563884. Down one. One more. Tell us what we're looking at here?

A. So this is property receipt number 3563884. Same DC number from the same investigation into Amin Whitehead. Depicted on here are the items taken, some of the narcotics -- I'm sorry, some of the various other items seized during that search warrant.

New and unused blue flip top containers, some drug

paraphernalia, various firearms, holsters we recovered, cellular telephones, digital scales, gun boxes, things of that nature.

Q. One down to ending in 85. This is 3563885. Can you tell us what's contained on this property receipt?

A. Yeah. So this is the majority of the narcotics we seized from that residence.

Q. And that's what you described earlier, those the crack cocaine and other narcotics found?

A. Correct.

Q. One more down, ending in 86. What do we got here?

A. This is the cash, the U.S. currency recovered from the residence.

Q. And 87, last one. What are we looking at here?

A. And this was the blue Apple iPhone recovered from Mr. Whitehead.

Q. I see a name of Det. Schlosser on several of these property receipts. It also appears to be signed by him. Do you know who that is?

A. Yes.

Q. Could you tell us?

A. So Det. Schlosser is a Philadelphia Police Department detective who is assigned to our task force and is also one of my investigatory partners.

Q. Okay. Now, we talked a little bit about a search warrant

that was conducted on 8/10/22, the search of Amin Whitehead's. Where was this in regards to the larger investigation, the beginning, the middle, the end of it?

A.  I would say in the middle.  Again, we started in March of 2022 and finished in January of '23, so a couple of months into the investigation.

Q.  Now, you mentioned January of 2023.  Did there come a time when the Federal Bureau of Investigation did searches on several houses at the time of individual arrests?

A.  Yes.

Q.  Okay.  And was that January 25th of 2023?

A.  Yes.

Q.  Can you tell us whose residences were searched on January 25th, 2023?

A.  Yes, so Cesar Maldonado's residence was searched on Monmouth Street, as well as the defendant, Mr. Gillard's residence was also searched, 3006 Tulip Street.

Q.  Now, you were present for any of those searches?

A.  Yes.

Q.  Who were you -- where were you present for?

A.  I was located on Monmouth Street for the search and arrest of Cesar Maldonado's residence.

MR. WITHERELL:  Could we put Exhibit 104 to the jury? It's already in evidence.

BY MR. WITHERELL:

Q.  Who are we looking at in Exhibit 104?

A.  This is co-conspirator Cesar Maldonado.

Q.  Now, you explained to us his role in the drug trafficking organization.  Would you mind telling us again what that was?

A.  Yes, he was the main fentanyl supplier, supplying Diane Gillard with the fentanyl.

MR. WITHERELL:  Take that down, please.

BY MR. WITHERELL:

Q.  I want to draw your attention now to January 25th of 2023, around 6 o'clock in the morning.  Could you tell us how the members of the Federal Bureau of Investigation conducted a search of 2268 East Monmouth Street?

A.  Yes, so again, at approximately 6 a.m. in marked -- law enforcement markings, we arrived at Mr. Maldonado's residence. We knocked on the front door of the residence, announcing our presence and our intention to execute a search warrant. After a short period of time, I believe it was Mr. Maldonado's mother answered the door.  We made entry into the house, secured the residence, and began executing the search.

Q.  Prior to searching Mr. Maldonado's house, did you or other members of the Federal Bureau of Investigation seek a search warrant from a federal judge?

A.  Yes.

Q.  And was one acquired?

A.  Yes.

Q.   Okay.  All right.  I want to go over some photographs taken from this.  So if you look, I think you also, again, have a packet of photographs concerning 2268 East Monmouth Street.  I know you've looked at this before, but if you wouldn't mind just perusing those in a moment while I let the Court know, I plan on introducing Exhibits 2806, 2817, 2825, 2826, 2827, 2828, 2830, 2831, 2832, 2833, 2836, 2838, 2839, 2841, 2842, 2843, 2844, 2845, and 2846.

THE COURT:  And these photos that are in the package that Agt. Becker is looking at now?

MR. WITHERELL:  They are, Judge.

THE COURT:  Okay.  Thank you.

BY MR. WITHERELL:

Q.   Have you had an opportunity to look at those photographs?

A.   Yes.

Q.   Do they accurately reflect the scene as you saw it on January 25th, 2023?

A.   Yes.

Q.   When you first --

MR. WITHERELL:  I'd like to move those into evidence at this time, Judge.

THE COURT:  They shall be admitted and may be published as you see fit.

BY MR. WITHERELL:

Q.   So tell us what happened when you executed?  Was Mr.

Maldonado home?

A.   Yes, he was.

Q.   Tell us how it went?

A.   So again, we knocked and announced the front door.  We were greeted by his mom, who unlocked the door for us.  For her safety, we asked the mom to exit the residence, which she did.  The remaining occupants were Mr. Maldonado's sister, who I believe was severely autistic.  So we spent a couple minutes being able to coerce her to come down the stairs and come outside for her safety.

At this time, Mr. Maldonado was upstairs in his bedroom, which we called down to him as well, and he exited the residence and was taken into custody.

Q.   Let's show 2806 to the jury, please.  What are we looking at here?

A.   Yes, this is the front door of Mr. Maldonado's residence, 2268 East Monmouth Street.

Q.   2817, what are we looking at here?

A.   So this is a picture of Mr. Maldonado's bedroom and how it was left.  So again, this picture was taken after he had left the bedroom.  We had not begun our search, so that drawer that's on the ground is how Mr. Maldonado had left it when he left his bedroom.

Q.   2825, what are we looking at here?

A.   So this is just a close-up of that drawer that's been

emptied and dumped onto the ground. We can see here there's a firearm with an extended magazine in it. There's an additional magazine in front of that. There's also U.S. currency wrapped in rubber bands, which is common for those that participate in drug dealing.

Q. 2826?

A. An additional photograph of that firearm.

Q. 2828?

A. So this is a photograph of actually what's going to be the drawer directly below the one that was taken out of the dresser. From there we can see another firearm on top of clothing, as well as a glass, I would say similar to a mason jar to the left, that has baggies in it containing an off-white, almost purplish powder.

Q. 2831, what are we looking at here?

A. So that's just going to be the left side of that same drawer. Again, you can see it's like a glass jar containing a purple powder. That's all fentanyl, as well as a firearm.

Q. 2832?

A. That's just an additional photograph of that same firearm and the fentanyl. Of note, in that jar, that sandwich bag containing that large, large quantity of fentanyl, that's thousands of doses of fentanyl in that bag in that jar.

Q. 2836?

A. Additional items that are located on the ground. We'll

start in the center in that sandwich bag wrapped in rubber bands.  Those are each blue glassine insert bags, each which contain a very small amount of fentanyl.  Each one of those bags is one dosage of fentanyl.  Additionally, to the right, we see money again wrapped in rubber bands, indicative of drug trafficking.

Additionally, we see rubber band or dollar bills rolled up into little rolls there, which is a common way that users ingest fentanyl, is they snort it using a rolled-up dollar bill.

Upper left-hand corner, a box of sandwich-style bags, which is common drug trafficking or drug packaging material.

Q.  2839?

A.  Yes, so this is a black, like, plastic grocery bag that was located -- if you were looking in that photograph, it had the dresser straight ahead, to the left was his closet, tucked back behind a bunch of shoeboxes is where this bag was located.

And inside of that are all those prepackaged blue glassine inserts that each contain a dosage of fentanyl.

And again, there's hundreds of those packets already containing fentanyl ready for sale at the user level in that black plastic bag.  So again, we had in the glass jar, in the dresser drawers, had the bulk fentanyl that hadn't been packaged yet.

This is now the street value or the street level here, already in those blue little bags, ready to be sold to users.

Q.  2841, what do we have here?

A.   Three cell phones recovered from the bedroom for Mr. Maldonado.

Q.   2842?

A.   This is another drawer, either in the dresser or the closet.  I believe maybe there's a firearm in that picture. I can't be too sure.

Q.   Let's get a little closer.  2843?

A.   Okay.  So no, do you know what, that's just a box that a firearm would cumin -- come in, as well as additional straps that can go on the grip and additional magazines that would accompany a firearm.

Q.   2846?

A.   That is a black -- a black bag, as well as some firearms magazines.  On the right-hand side of that is a -- another firearms box.

Q.   You mentioned before that they were both filled up -- police department property receipts as well as FBI property receipts.  I want to show you what's marked as 2880.  Do you know what we're looking at here?

A.   Yes.  So this is an FBI collected item log which is similar to a Philadelphia property receipt.  This is just the FBI's version of a property receipt.

Q.   Could we just go down the pages?  Does this accurately reflect the items taken from Cesar Maldonado's house on 1/25/2023 by Federal Bureau of Investigation?

A.   Yes.

MR. WITHERELL:  Your Honor, I'd like to move this into evidence at this time.

THE COURT:  The property receipts and 2880?

MR. WITHERELL:  So 2880 is the FBI property receipt.

THE COURT:  Okay.  Very good.  Yep.  That foundation is been established.  It is admitted and may be shared with the jury.

BY MR. WITHERELL:

Q.   Can you just tell us what other items were taken if it may differ from the pictures we've already looked at?

A.   Yes, so what's depicted on this property receipt, other items taken were U.S. currency.  So again commonly as part of the task force the FBI will take any cash that's seized from an investigation or a search warrant as well as any digital evidence, so cell phones, laptops, computers, things of that nature.

MR. WITHERELL:  And let's go to 2881 to the witness please.

BY MR. WITHERELL:

Q.   I'm showing what's marked as 2881.  Do you recognize what this is?

A.   Yes.

Q.   What is it?

A.   This is the Philadelphia Police Department property receipt

related to that same search.

MR. WITHERELL:  Your Honor, I offer what's marked as 2881 into evidence.

THE COURT:  It is admitted, and it may be published.

BY MR. WITHERELL:

Q.  So just, I know we've looked at one of these already but just tell us what we're looking at here?

A.  Again, this is the property receipt -- the Philadelphia Police Department property receipt for that search.

Q.  Okay.  So the first part over here it talks about the bundles totaling 800 small, clear, Ziplock baggies with blue inner stamped with a symbol of a skull in black each filled with alleged fentanyl.  These are the items you were referring to in the photographs?

A.  Yes.

Q.  Okay.  So this one contains the narcotics that were found?

A.  Yes.

Q.  Let's go down one page.  What is this property receipt in reference to?

A.  We seized a digital scale.  It was also recovered from his bedroom.

Q.  Down one.  I see three items here, am I correct in that?

A.  Yes.

Q.  What were these items?

A.  These were the three firearms we seized from his residence

as well.

Q.  It seems as additional magazines and firearm rounds as well?

A.  Correct.

MR. WITHERELL:  Let's go down one more.  Go down one more.  One more.  Okay.  Let's go there.  Leave it right there.  Okay.  With the Court's permission I'm going to have S.A. Walsh take what's been marked as P6 to the witness.

THE COURT:  You may.

BY MR. WITHERELL:

Q.  I'm showing you what's been marked as P6, do you recognize that?

A.  Yes.

Q.  What do you recognize that to be?

A.  This is one of the three firearms recovered from Mr. Maldonado's residence.

MR. WITHERELL:  Your Honor, I'd like to move that into evidence as P6.

THE COURT:  It is admitted.  It may be published.

MR. WITHERELL:  If we can have Agt. Walsh show it to the jury.  Can we have P7 shown to the witness, Judge?

THE COURT:  Yes.

BY MR. WITHERELL:

Q.  I'm showing you what's marked as P7.  Do you recognize that?

A.   Yes.

Q.   What do you recognize it to be?

A.   One of the three firearms recovered from Mr. Maldonado's residence.

MR. WITHERELL:  I offer P7 into evidence, Your Honor.

THE COURT:  It is admitted and may be published.

MR. WITHERELL:  S.A. Walsh, if you wouldn't mind showing it to the members of the jury.  And P8 to the witness, Your Honor?

THE COURT:  Yes, sir.

BY MR. WITHERELL:

Q.   What are you looking at there, Special Agent?

A.   Again, one of the three firearms recovered from Mr. Maldonado's residence.

MR. WITHERELL:  I offer into evidence, Your Honor.

THE COURT:  It is admitted.  May be published.

BY MR. WITHERELL:

Q.   Now, on January 25th, 2023, was Mr. Gillard's house also searched?

A.   Yes, it was.

Q.   Were you present for that?

A.   No, I was not.  Again, I was at Mr. Maldonado's house right down the street.

Q.   And do you know if any members -- no, who if any was present for that search?

A.  Yes.

Q.  Who was there?

A.  S.A. Walsh, who's seated at the table here, was present, as well as Detective Task Force Ofc. Bill Schlosser, who I referenced previously.  They were both present at Mr. Gillard's search of his house.

Q.  And we do plan to hear from S.A. Walsh, as well as Task Force Ofc. Schlosser throughout this trial?

A.  Yes.

Q.  Okay.  At the time that -- was Mr. Gillard placed under -- to your knowledge, Mr. Gillard placed under arrest at the time of the search of his residence?

A.  Yes, he was.

Q.  Did you have an opportunity to speak to Mr. Gillard after he was arrested on January 25th, 2023, at approximately 10 a.m.?

A.  Yes, I did.

Q.  Just tell us the facts and circumstances that brought him into your company?

A.  Yes, so again, we'd obtained search warrants and arrest warrants for numerous individuals on that day.  Mr. Maldonado was arrested.  Mr. Gillard was arrested.  His sister was arrested, as well as a handful of other of the co-conspirators. They were all brought back to FBI field office headquarters, where they had their standard booking and intake steps taken.

They had their fingerprints taken, their photographs taken.  A DNA swab is generally collected for comparison purposes. They were each provided something -- or offered something to drink, something to eat.  They were given a copy of their warrant.  They were advised of their Miranda rights, and they were provided with a brief overview of the charges they're facing.

Q.  And you said provide -- and we've all seen TV, but did you provide them with what are commonly known as Miranda rights?

A.  Yes.

Q.  How do you go about doing that?

A.  So again, they're each -- they're separated in their own room.  Myself and either Agt. Walsh or Det. Schlosser would go in, introduce ourselves, explain to them again kind of what some of the next steps are in the process, and then read them their Miranda rights, which is on an FBI form that we read verbatim to each individual we arrest.

MR. WITHERELL:  Okay.  To the witness, can I show what's marked as 2681?

BY MR. WITHERELL:

Q.  Showing you what's been marked as 2681.  Do you recognize that?

A.  Yes.

Q.  What do you recognize it to be?

A.  This is the FBI's FD-395, which is our advice of rights

form.  This one has -- it's filled out and is completed.

Q.  Okay.  I see some signatures in the middle and at the bottom.  Do you recognize who those signatures are?

A.  Yes, Mr. Gillard's signature is in the middle, my signature as well as Det. Schlosser's signature at the bottom.

Q.  And does this accurately reflect the rights you read, Mr. Gillard, on January 25th, 2023, and all of your signatures on it?

A.  Yes.

        MR. WITHERELL:  Your Honor, I'd like to move it to evidence what's been it's marked as 2681?

        THE COURT:  It's admitted.  May be published.

        MR. WITHERELL:  Let's show it to the jury.

        BY MR. WITHERELL:

Q.  Special Agent, would you just mind letting the jury know how you go about reading this?  Let us know how you read it to them on January 25th, 2023, and indicate any responses he may have given you.

A.  Yeah, so as you can see at the top, the place is annotated there, the date and the time.  Below that is your rights.  We read that section verbatim.  Below that, we -- we ask Mr. Gillard, or anyone else that we arrest, if they're willing to continue speaking with us without a lawyer present.
On this particular incidence -- incident, Mr. Gillard advised that he was comfortable speaking with us without a lawyer,

signed the form there.  You can see his signature, which was then witnessed by myself and Det. Schlosser.  Our signatures are directly below that, as well as that time, which was 10:11 a.m.

Q.  During the conversation you had with him, did you have an opportunity to speak to him about the cell phone that was recovered with him or at his residence on January 25th, 2023?

A.  Yes.

Q.  And did you ask Mr. Gillard, you, as members of the FBI, could download that phone?

A.  Yes.

Q.  Do you do that from the top of your head, or does the FBI have yet another form?

A.  We have a second form where we can mark that down.

MR. WITHERELL:  If I can show what's been marked as 2682 to the witness.

THE COURT:  Could you repeat the number, please?

MR. WITHERELL:  2682, Your Honor.

THE COURT:  Thank you.

BY MR. WITHERELL:

Q.  I'm showing what's been marked as 2682.  Do you recognize that?

A.  Yes.

Q.  What do you recognize that to be?

A.  So this is the FBI's FD-26, or our consent to search form.

Q.  And how do you recognize it to be such?

A.  It's marked on there.  In this particular instance, there's an iPhone 6 with a cell phone number attached to it, a passcode, the date, Mr. Gillard's signature, as well as my signature.

            MR. GILLARD:  Objection.

            THE COURT:  Grounds?

            MR. GILLARD:  Your Honor, I didn't sign that.

            THE COURT:  You'll have an opportunity to question the witness.

            MR. GILLARD:  All right.

            THE COURT:  Okay.  Is there a question before the witness?

            MR. WITHERELL:  I'm going to move it into evidence, first then I'll have more questions.

            THE COURT:  Okay.  Can I move into evidence 2682, Your Honor?

            THE COURT:  You may, and it may be published.

            BY MR. WITHERELL:

Q.  I'm showing you what's been marked as 2682.  Do you see that X that has a signature line it that says Philip Gillard?

A.  Yes.

Q.  Who signed that?

A.  Mr. Gillard.

            MR. GILLARD:  Objection.

MR. CLARK:  Okay.

THE COURT:  Same objection?

MR. GILLARD:  Yes.

THE COURT:  Overruled.

BY MR. WITHERELL:

Q.  Did he do it in your presence?

A.  Yes.

Q.  Let's go to the top.  It says iPhone 6, 267-298-9733.

Okay.  Whose handwriting is this in?

A.  Det. Schlosser's.

Q.  There's a passcode written under, 062918.  Who wrote that?

A.  Det. Schlosser.

Q.  Okay.  Where did that passcode come from?

A.  Mr. Gillard provided the passcode to his iPhone to us.

Q.  And he did that when he signed this document?

A.  Yes.

Q.  Would you have any other idea what that passcode was if Mr.

Gillard had not provided it to you?

A.  No, we would not.

Q.  Just a cut later, we're going to hear from S.A. Walsh who

downloaded the phone.  Was that passcode used in downloading

the phone?

A.  Yes.

Q.  Did it work?

A.  Yes.  That passcode was able to unlock the iPhone.

Q.  This brings us to a good spot talking about iPhones.  In this particular case, as part of your investigation, were you able to download at least 12 cellular phones of various individuals in this organization?

A.  Yes, we were.

MR. WITHERELL:  I want to show you what's been marked as 3201 to the witness.

BY MR. WITHERELL:

Q.  I'm showing you what's been marked as 3201.  Do you recognize what that is?

A.  Yes.

Q.  What is it?

A.  This is a -- just a chart that we made indicating the various devices, cellular phone devices, that we -- we seized as part of this investigation.

Q.  Does this correctly summarize the individual that it was seized from, the phone that was seized, the IMEI number, which I'll ask you what that is in a moment, as well as the associated phone numbers with those cell phones?

A.  Yes.

MR. WITHERELL:  Okay.  Your Honor, I'd like to move this into evidence at this time.

THE COURT:  Is this a single page?

MR. WITHERELL:  This is a single page.

THE COURT:  It is admitted and may be published.  As a

summary?

MR. WITHERELL:  Your Honor, this contains voluminous -- this is part of those charts that would otherwise contain voluminous records, so I believe this one actually goes into evidence not as a summary, but as the evidence of the voluminous records that it represents.  When we get to the summary chart, I'll let you know, Judge.

THE COURT:  Okay.  Thank you.  It's admitted.

BY MR. WITHERELL:

Q.  I'm showing you what's marked as 3201.  Could you just briefly go over this with the jurors and what this is and what it represents?

A.  Yes.  So again, this is the chart that we made that indicates the majority, or if not all of the cellular telephones that we seized and downloaded as part of the investigation.  If you look at the very top, it says frozen flower, physical, mobile devices.

To show the -- the lack of creativity the FBI has, we have to come up with like a -- an investigative name for each case we investigate, and after too much time trying to come up with a creative name, we landed on frozen flower.

Frozen comes from the fact that we were buying crystal methamphetamine, which is also referred to as ice, and flower based on the fact that the majority of it was on Tulip Street. So again, it speaks to a lack of our creativity.

Either way, left-hand side, the device, phone 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, those are each individual device. The evidence number in the next column either has a 1B number or a PPD number next to it.  Now, the 1B number is, for example, 1B25 is the FBI evidence number that was provided to that piece of evidence, whereas towards the bottom of the chart you see PPD3563887.

Those are the phones taken from Mr. Whitehead and Mr. Maxwell that I testified to previously that were inventoried on Philadelphia Police Department property receipts.  So they would not be given an FBI evidence number.

Moving on, next column just dictates who each device was seized from, the description of each phone, the IMEI number, which I'm not sure what IMEI stands for, but it's a unique number given to each physical device or each cell phone, different than the cell phone number.  That can be changed from device to device.

And then again, that last column, the associated phone numbers, would be the phone numbers associated with that physical device or that physical phone.

Q.  When you say associated phone number, when the phone is downloaded, it gives you what phone numbers are attached to that phone?

A.  Correct.

Q.  And sometimes it could be one, sometimes it could be more

than one?

A.  Correct.

Q.  Okay.  I also now want to show you 3202.  What is this?

A.  So this is just a chart that we made that shows each phone number and how we can associate it or attribute it to each one of the co-conspirator defendants we arrested.

Q.  A phone attribution chart?

A.  Correct.

Q.  And using this chart, would I be correct in determining that you had subpoenaed certain phone records?

A.  Yes.

Q.  From T-Mobile and AT&T?

A.  Correct.

Q.  As well as records from Apple iCloud; is that correct?

A.  Correct.

Q.  There's also some references to Cash App as well, correct?

A.  Correct.

        MR. WITHERELL:  Thank you.  Your Honor, just to be clear, the Court has already ruled for the admissibility of certain phone records and Apple records that could be entered into evidence as a business record.

     There's one additional record, a Cash App record, that the Government plans on calling a representative for later in this trial.  So at the moment in time, I'd move this in subject to connection.

THE COURT:  Subject to that connection, it's admitted and may be published.

BY MR. WITHERELL:

Q.  Could you just walk us through this and how you attributed certain phone numbers to certain individuals involved in this drug trafficking organization?

A.  Yes.  So we'll jump down to the -- the row for Mr. Gillard, the defendant here.  You see his name is on the left-hand side. That's the phone number we attributed to him.  And then all the reasons how we can -- or the reasons why we can attribute that phone number to him are found in the next column there. So for example, that number ending in 9733 was a number included on the extraction report for the phone we physically seized from Mr. Gillard on the day of his arrest. Additionally, a subpoena we sent to Cash App returns the fact that that phone number is also attributed to an account held by Mr. Gillard.  Additionally, the subscriber information to that actual phone number ending in 9733 is subscribed to Doo Gotti, which is a known alias or nickname for the defendant, Mr. Gillard.

MR. WITHERELL:  Let's stop right there.  The known nickname, Doo Gotti.  Let me put 3102 to the witness, please.

BY MR. WITHERELL:

Q.  I'm showing you what's been marked as 3102.  It is a three-page screenshot.  Can you tell me what we're looking at here?

A.   Yes.   These are images taken from the Instagram account associated with Mr. Gillard.

Q.   And what is the handle or the moniker for that Instagram account?

A.   Doo Gottierr.

Q.   And how did you come to get these Instagram accounts?

A.   They're --

Q.   Who took these screenshots?

A.   I took these screenshots.

        MR. WITHERELL:  Your Honor, I'd like to move this into evidence as 3102.

        THE COURT:  They're admitted and may be published.

        BY MR. WITHERELL:

Q.   I don't have Instagram.  Could you just tell us what it is and what we're looking at here?

A.   I don't have Instagram either, but I'll do my best. Instagram is a social media platform where users can share various photographs and videos.

So again, this is taken from the defendant, Mr. Gillard's, Instagram.  Top middle portion of the screenshot is the username.  Again, Doo Gottierr.  And then below that will just be a bunch of pictures that he posted to his -- his account, his profile.  Again, this is a picture he posted very clearly depicting the defendant, Mr. Gillard.  As well as an additional picture posted January 1st, 2022.

Q.   And just to be clear, the purpose of this was to show that associated with the name of Doo Gotti?

A.   Correct.

Q.   Okay.  Let's go back to 3202.  And so we're looking at the Phillip Gillard, which is in the middle.  Can we just -- so 267-298-9733.  The number is included in the extraction report for the phone seized from Phillip Gillard.  Am I correct in saying that when the phone that was found with him at the time of his arrest was downloaded, that's the phone number associated with the phone?

A.   Yes, that's correct.

Q.   Cash App subpoena returned associates Phil Gillard with that number.  We're going to hear from Cash App later in this trial.

A.   Yes.

Q.   And subscribe to Doo Gotti a known alias for Phillip Gillard.  When you say subscribe to, are we looking at phone records for the number 267-298-9733?

A.   Yes.

Q.   Just let the jury know, when we're saying subscribe to, what are we talking about?

A.   When you sign up to get a cell phone and get a cell phone number associated with you, you have to provide subscriber information, a name and address of who is the holder of that account.  Again, for this instance here Mr. Gillard decided to

use the name Doo Gotti instead of his actual name, Philip Gillard.

Q.  Let's back out for a second.  I just briefly want to talk about some of the other numbers, just in case we come back to this and people know what we're talking about.  We go to the first three for Diane Gillard.  We see three phone numbers associated with Diane Gillard.  Was that significant in your investigation for any reason?

A.  Yes.

Q.  Tell me about it.

A.  So at one point or another, during the investigation Diane Gillard utilized one of these cell phone numbers to contact an informant to arrange narcotics transactions.  Starting with the top number there ending in 4663, again, our informant contacted Diane on that number on numerous occasions.  Additionally, that was the number associated with the phone we seized from Diane on the day she was arrested.

Moving down to the next row again, a number Diane utilized the contact one of our informants to arrange narcotics transactions.  The subscriber information on that number was subscribed to Diane Gillard.  And lastly, the number ending in 5033 was just another number that Diane utilized to contact our informant to arrange narcotics transactions.

Q.  And just so the jury is clear, I see markings of CHS.  Could you just tell members of the jury what we mean when we

say C-H-S?

A.   Yes.  So there's numerous terms and abbreviations given to confidential informants.  Informants are also known as CIs, confidential informant.  On this chart here, they're noted as CHS or confidential human source.  Just another name for an informant.

(Counsel confer)

Q.   So S.A. Becker, just to describe how I think the rest of your testimony is going to go.  Later today, I believe we have some witnesses from DEA to talk about some laboratory analysis they've done on some of the narcotics seized.  But I plan on calling you back to discuss those individual, controlled purchases you discussed as part of today's testimony.  Okay?

A.   Yes.

Q.   All right.

MR. WITHERELL:  Your Honor, at this time, I have no further questions for the agent right now.

THE COURT:  Very well.

Mr. Gillard, you have the opportunity now to cross-examine this witness as to his testimony.  Just I want to make sure you and the jury and everyone heard; this witness will testify again during the trial.  This is his first time up.

MR. GILLARD:  Okay.

THE COURT:  Okay?  So everyone knows that.

CROSS-EXAMINATION

William Becker - Cross

BY MR. GILLARD:

Q.  Good afternoon.

A.  Good afternoon, sir.

Q.  Mr. Becker, when you took me down to the federal building, in the room to investigate and I was in there.  It's camera's in there, right?

A.  Yes.

Q.  And it was cameras in all the rooms, correct?

A.  Yes.

Q.  And these cameras record?

A.  They do.

Q.  So for you to say that I signed and gave signature, do you got any video of that?

A.  We do not.

Q.  Why not?

A.  So shortly before the date of Mr. Gillard's arrest in January of 2023, the FBI was in the middle of renovations of our office space.  We had just moved into a bunch of different floors in the Federal Building, one of those floors being the floor where we take all of our arrestees, our prisoners back for that booking process I spoke about previously. I believe there's three or four different holding rooms on that floor, each equipped with audio and video recording devices. To the best of my knowledge, those recording devices were functioning properly and videos of all interactions were

William Becker - Cross

recorded.

For whatever reason, the hard drive some of the videos were stored on did not record all of those videos.  So there's no video recording of our interaction with Mr. Gillard.

Q.  Was it like that with all the rooms or just the room I was in?

A.  Just the room you were in.

Q.  Is it still broke?

A.  No.  We got it fixed once it came to our attention.

Q.  Do you got the work order for it?

A.  I'm sorry?

Q.  Do you got the work order for it, the work order form for it?

A.  I do not.

Q.  How did I come into this investigation?

A.  Could you explain that a little further, please?

Q.  How did I come into this investigation?

A.  Yes.  We identified you as the supplier of PCP to Diane Gillard.

Q.  Did anybody see me give Diane Gillard any PCP?

A.  No.

Q.  Did anybody see me on any transactions give Diane Gillard any PCP?

A.  When you say "give", no one specifically saw you hand Ms. Gillard any PCP.  Correct.

William Becker - Cross

Q.  So how did I become a suspect to giving her PCP?

A.  So as I testified to you previously, we conducted over 15 controlled narcotics purchases from Ms. Gillard with the goal being of identifying the suppliers of those narcotics.  I testified to the fact that Mr. Sanchez and Mr. Jackson supplied crystal methamphetamine.  Mr. Maldonado supplied fentanyl.  Mr. Gillard supplied the PCP.  On the purchases we did where we were purchasing crystal methamphetamine, either Mr. Sanchez or Mr. Jackson in their vehicle would drive to the block, Ms. Gillard would walk to their vehicle, retrieve a bag or something, walk back to our informant's vehicle, and then sell the narcotics there.

Mr. Sanchez and Mr. Jackson both do not live in the vicinity of the area on that map where you saw.  However, when we purchased fentanyl from Mr. Maldonado, as you saw on that map, his house is within ten steps of that 2900 block of Tulip Street.  So we would observe Mr. Maldonado exit his residence, hand Diane Gillard a small item who then would meet with our informant and sell that item, which was fentanyl.

On the PCP purchased, Ms. Gillard would walk to Mr. Gillard's residence.  She would wait for Mr. Gillard to arrive.  He would let her into the residence, and shortly thereafter, she would return with the PCP and sell it to our informant.

Q.  But she is my sister, correct?

A.  Yes, she is.

William Becker - Cross

Q.   So she is allowed in my house, correct?

A.   It didn't appear that way to me.

Q.   Oh, it didn't?

A.   No, it did not.

Q.   I mean, if she need to get in my house and she call me, is something wrong with that.

A.   On every single occasion where we observed -- where we ordered PCP from Diane Gillard, she had to wait for her brother to arrive to let her --

Q.   Was --

A.   -- into the residence.

Q.   Was you there every day?  Did your investigation take place there every day?

A.   Could you be more specific, please?

Q.   Did your investigation take place there every day.

A.   I'm not sure what you're asking.

Q.   Were you there every day?  Was it drug activity right there every day, like, Ms. Diane Gillard in and out my house?

A.    I was not watching Mr. Gillard's house every day.  No, I was not.

Q.   Did I ever interact with Jeff, your CI?

A.   No, you did not?

Q.   Did you ever see me near a school selling any drugs?

A.   Yes.

Q.   You seen me near a school selling some drugs?

William Becker - Cross

A.  Yes.  So again, on those controlled buys of PCP, Ms. Gillard would wait for her brother, the Defendant to arrive. He would let her into his house.  She would return with the PCP and then sell it to the informant right out in front of the school.

Q.  How did you know she got it from me?  You're not in there. That's beyond the scope.

A.  She told our informant she got it from her brother.

Q.  She got more than one brother, though. And actually, she also told y'all she had to go to North Philly before to get it.

A.  Yes.

Q.  I live on Tulip.  So why would she have to go to North Philly?

A.  On one occasion, yes, she did go to North Philadelphia to get the PCP.  But again, she stated it was coming from her brother.

Q.  Which brother?

A.  She stated it was coming from her brother.

Q.  She used brother as a slang so which brother?

A.  She stated it was coming from her brother.

Q.  Do you have any video or footage of me interacting with anybody else besides my sister in this investigation?

A.  We have hours and hours and hours of video for this investigation.  Yes, I've seen you interact with numerous individuals.  I can't recall specifics --

William Becker - Cross

Q.  Can you --

A.  -- on who else it was, but I know he did interact with his sister in the process of selling PCP to our informant.

Q.  You keep saying my sister.  I asked you about everybody else now that you showed -- you testified today to -- I want to know what's my link to everybody else, because I see that a lot of stuff has been shown.  So what's my link to Maldonado, Amin Whitehead, Jackson; what's my link to them?

A.  So that cell phone number I testified to, I believe ending in 9733, was located and stored in multiple devices taken off of co-conspirators on their phones.

Q.  How did you know I lived at 3006 Tulip Street?

A.  I've seen mail in your name at that residence.

Q.  That's --

A.  I've seen you use a key to unlock the front door.  I've seen cell phone records and GPS tracking information that indicates you reside at the residence.

Q.  I'm not the only one with access to 3006 either, am I?

A.  I know you have access.  That's all I can speak to.

Q.  But I'm not the only one with access either, am I?  You're recording.  You under oath.  I'm not the only one with access to 3006, correct?

A.  You're the only person I ever saw use a key to unlock the door to the residence.

Q.  So you've seen nobody else with keys go in 3006?

William Becker - Cross

A.  Not that I can recall.

MR. GILLARD:  Now, how am I supposed to play this?

MR. WITHERELL:  What do you want to play?

MR. GILLARD:  This 7 and 8, production 7 and 8.

MR. WITHERELL:  Judge, can I just have a moment to discuss with Mr. GILLARD so we --

THE COURT:  Yes.  Certainly.  Certainly.

(Defendant confer with Government counsel)

THE COURT:  Ladies and gentlemen, we're making arrangement for a video to be pulled up.  It's going to be played through the Government's computer.  So that's what we're coordinating right now.  So if you'd bear with us a moment.

MR. WITHERELL:  Your Honor, may I request just a brief recess?  I would like to make sure that Mr. Gillard has access to the things he would like?

THE COURT:  Folks, it's a little early for our afternoon break.  We ordinarily do it at 3:30.  Can we do it now and come back and then we'll have a two-hour runway until the end?  If you'd indulge us.  Thank you.  We just want to make sure we're showing you the right evidence.

All right, Ms. Stein.

THE CLERK:  Court is in recess for --

THE COURT:  Fifteen minutes.

THE CLERK:  Fifteen minutes.

THE COURT:  Thank you, folks.  We'll see you in a few.

William Becker - Cross

(Jury exits)

(Recess at 2:47 p.m., until 3:12 p.m.)

THE CLERK:  Court is again in session.

THE COURT:  All right.  We're back, folks.  Ms. Stein spot to the juror (sic).  They are in agreement that they want to resume on Wednesday.  The most recent, just in recent minutes update for this area, literally in minutes is 8 to 10 inches.  So I mean you know what happens.  We'll tell them they don't have to be here until Wednesday and bring your umbrella tomorrow because it will probably rain all day.  You know?

But that's what the weatherman says.  I know the weatherman usually can't tell us what the weather was yesterday, but I think we have to -- we just have to roll with it.

I don't think we have another choice, Mr. Gillard.  So we'll have to be back Wednesday, not tomorrow, okay?

MR. GILLARD:  All right.

THE COURT:  We've still got today and you're still up. Okay?

MR. GILLARD:  All right.  Thank you.

MR. WITHERELL:  Your Honor, I've tried to make sure Mr. Gillard has access to what he wants so --

THE COURT:  Um-hum.

MR. WITHERELL:  -- we're working on that.  If we could just have a couple more minutes?

William Becker - Cross

THE COURT:  All right, sure.  We'll stand by.  I'll just --

Christine, we'll just stand down for a few minutes.

THE CLERK:  Absolutely.  Would you like to go off the record?

THE COURT:  Yeah.  And just be prepared to jump back on.  We don't want to pick up anything inadvertently.

(Recess at 3:14 p.m., until 3:25 p.m.)

THE CLERK:  Court is again in session.

THE COURT:  We're back in court.  Not with the jury. They're still on their afternoon break.  And it's been explained to me by the parties that they've had some discussions during this most recent break intended to streamline some of the testimony regarding expert chemist testifying to the quantities and the substances of various controlled substances seized in this case.

There's already been testimony admitting a number of property receipts that I anticipate were offered in more significant detail because without a stipulation, the Government was going to then tie those to the work of the expert chemist.  But it sounds, and please either side, Mr. Gillard or Government, correct me if I'm wrong.  It sounds like you -- prior stipulations as to the testimony of chemists that was withdrawn may be back in play.  And if the parties did agree on that, the one thing that would do is reduce the number

William Becker - Cross

of witnesses, specifically as it regards to whether the substances were tested and what those substances were.

The Government already has, I saw about a half-dozen witnesses out in the hallway who look like scientists. I could be wrong. And I understand they have literally busload of others coming. So generally speaking, devil's always in the details, but generally speaking, is that what the parties have been discussing, Mr. Gillard?

MR. GILLARD: Yes.

THE COURT: Mr. Witherell?

MR. WITHERELL: Yes, Judge.

THE COURT: Okay. And then Agt. Becker is still on cross-exam. He's being examined by Mr. Gillard. And while we're doing that, the Government is going to do their best to multitask and find the best way to put that on the record, perhaps resurrecting the original stipulations that the parties had come to an agreement on or in some other fashion. I understand the dilemma of the Government doing this while the car is speeding around the track. I mean, it's the nature of trial.

So I'll leave it to the parties to determine how best to memorialize that and at the same time, we'll resume with the cross-exam of Agt. Becker. And I guess at the same time, the Government will determine how we fill whatever gap there might be in today's testimony that I think we rightly expected was

William Becker - Cross

going to be filled by the chemist.  So there's a lot to do.

MR. WITHERELL:  There's a lot to do, Judge.

THE COURT:  Yeah.

MR. WITHERELL:  Could I just have ten more minutes to do it?

THE COURT:  Right now ten minutes?  All right.  We'll go off the record and I'm going to ask Ms. Stein to let them know that we haven't forgotten about them.  And -- oh by the way, so the jury did ask to be off tomorrow.  I forget if we said -- I know we discussed that.  I forget if it was on the record.  But perhaps, if no one objects, we can tell them that there's some logistics we're working through as a result of the schedule changes that we're facing right now.  We can keep it like that.  What do you think?

MR. WITHERELL:  I think it's a good idea.

THE COURT:  Would that work, Mr. Gillard?

MR. WITHERELL:  Yes, sir.

THE COURT:  We don't have to give them too many specifics.  It's really we're just telling them they have to wait a little more and that we are working hard in here.  Okay?  All right.

MR. WITHERELL:  Thank you, Judge.

THE COURT:  So we'll do that.

MR. WITHERELL:  Yep.

THE COURT:  See you in ten minutes?

William Becker - Cross

MR. WITHERELL:  I mean, I think you said fifteen, Judge, but -- Thank you, Judge.

THE COURT:  Court is in recess for ten to fifteen minutes.

(Recess at 3:29 p.m., until 3:42 p.m.)

THE CLERK: Court is again in session.

THE COURT:  All right.  We're back.  Please make yourself comfortable.

All right.  Talk to me.

MR. WITHERELL:  So Your Honor, we have, at very quick speed, we have created two stipulations that are being signed by counsel.  I think that will resolve all our problems as to that.

I've also developed two witnesses.  Task Force Ofc. Victor Rodriquez, whose testimony would be short.  He would follow Special Agent --

THE COURT:  And who would that be?

MR. WITHERELL:  Task Force Ofc. Victor Rodriquez.

THE COURT:  Okay.

MR. WITHERELL:  He did one of our surveillance videos. He'd be short.  I also have, getting here now, is S.A. Hallowell, whose testimony can't end, but I can certainly start it, if we need --

THE COURT:  Okay.  No.  That's good.

Q.  -- If we need the --

William Becker - Cross

THE COURT:  I think it's important that we -- and I think the stipulations are important too. But I think it's important that we leave the jurors, since they're not going to be here for another day, feeling that they --

MR. WITHERELL:  Accomplished something.

THE COURT:  -- they've accomplished something because again, it will be Wednesday --

MR. WITHERELL:  I agree.

THE COURT:  -- before they're back.  So --

MR. WITHERELL:  We will be --

THE COURT:  And they don't see all -- there's been no waste of time today.

MR. WITHERELL:  No.

THE COURT:  They don't see that.

MR. WITHERELL:  We will be prepared to move forward, Judge.

THE COURT:  They don't see all the work, so.

All right.  So --

MR. WITHERELL:  We'd like to read the stipulations that have been signed into the record at this time.

THE COURT:  Okay.  At what point do you want to do them?

MR. WITHERELL:  So Judge, I hadn't read the first two stipulations, so I would like to read those.  I'll do it on my redirect.  And then after the -- after the agent, I can read

William Becker - Cross

the other two.

THE COURT:  Okay.  Okay.  And then I'll give the instruction, it's brief, on stipulations.

MR. WITHERELL:  Sure.

THE COURT:  Okay?  All right.

Mr. Gillard, are you ready to resume?

MR. GILLARD:  Yes.

THE COURT:  We'll bring the jury back in.  Thank you.

(Pause)

THE CLERK:  All rise.

(Jury enters)

THE COURT:  Welcome.  And thank you for your patience. Thank you again.

Thanks Christine.

THE CLERK:  Sure.

THE COURT:  Thank you.  Make yourselves comfortable. We will resume.  You recall S.A. Becker is on the stand and we're in cross-examination of his testimony.

Okay.  Mr. Gillard, whenever you're ready, sir.

RESUMED CROSS-EXAMINATION

BY MR. GILLIARD:

Q.  Ofc. Beckham (ph.) (sic), is it a fact that I'm not the only -- is it fact that I'm not the only person with access to my house?

A.  During the controlled buys where we were purchasing PCP

William Becker - Cross

from Diane Gillard, the Defendant, Mr. Gillard, was the one who was allowing Diane to enter the property.

Q.  Also, does she uses (sic) the word "bro" as a slang?

A.  I don't know that.

Q.  Am I the only brother that she has?

A.  I don't know that either.

Q.  But you said she talking about me when she states her brother.

A.  I stated that she said that the PCP comes from her brother.

Q.  And that's why I asked you which brother.

A.  And again, I stated that she stated the PCP comes from her brother.

(Counsel confer)

MR. WITHERELL:  Your Honor, I believe Mr. Gillard would like us to play what's been marked as 123, which is -- I'm going to cue it to the portion that Mr. Gillard wants it. The Government has no objection to its admission.

THE COURT:  And is it already in evidence?

MR. WITHERELL:  It has not been placed in evidence yet.

THE COURT:  So it's from Government's Exhibit 123, and perhaps, Mr. Gillard, can we refer to it as Defendant's Exhibit 1?

MR. GILLIARD:  Yes.

THE COURT:  Okay.  All right.  Then that's how we'll

William Becker - Cross

identify it.

(Counsel confer)

MR. WITHERELL:  Your Honor, I have no objection to its admission so we can have it to the jury.

THE COURT:  Defendant's Exhibit 1 is admitted as an exhibit in this case and it may be published and shown to the jury at this time it's shown to the witness.

(Begin playback of video)

(End playback of video)

BY MR. GILLIARD:

Q.  Ofc. Beckham (sic), you heard him?

A.  Yes.

Q.  Your brother.

A.  Yes.

Q.  Is a term for like, slang?  You see how they use it, like, a slang?

A.  Yes.

Q.  So I'm not her only brother.

Q.  I don't know that.

THE COURT:  May I ask.  It sounded like there was a voice on the telephone in the video.  Did you recognize whose voice that was?

THE WITNESS:  To give this a little bit of context, I believe it was Diane Gillard calling the informant.  So the video you're watching is from a controlled purchase dated

August 16th, 2022.  That was just a few days, I forget the exact date.  Actually, I have it here.  Yeah, so we search and arrested Amin Whitehead on August 10th, 2022.  So this is less than a week later.  It was the next time we were going to purchase narcotics from Diane Gillard.

Mr. Gillard and Mr. Whitehead were very close.  And based on Mr. Whitehead getting arrested, Ms. Gillard was skeptical about getting arrested as well and instead sent this gentleman depicted in the video to sell the narcotics on her behalf.  I believe at some point, he -- he -- what did he say?  It's my brother or his bro or something like that?

MR. GILLIARD:  Right.

THE WITNESS:  And I believe, not seeing the video, and I could be wrong.  But I believe he said his name is E (ph.). on a separate PCP transaction that the same informant conducted where she said she got it from her brother, she said his name was G.

BY MR. GILLIARD:

Q.  But remember, she went to North Philly too for PCP.

A.  Yes.

Q.  It was an unknown male.  It wasn't me.

A.  On at least four or five occasions, I believe, when we purchased PCP, we contacted Diane Gillard telephonically, the informant did.  We placed an order for PCP.  Based on extensive phone records, almost immediately after we placed that order,

she would contact her brother, Mr. Gillard, the Defendant, telephonically.

Approximately ten minutes to an hour later, we would watch Mr. Gillard arrive at his house, unlock the door, let Diane, his sister, into the house.  She would return a minute or two later and sell PCP to our informant.

Q.  Now, do I have to know what's going on with that when I let her in my house?  Do I know what's going on?

A.  Yes, I believe you do know what's going on.

Q.  How.  How do you know that?

A.  So again, we would place the order for PCP through the informant to Ms. Gillard.

Q.  Mr. Beckam (sic) you saying the same thing over and over. I'm saying how do you know that?  Beyond the scope.  You cannot see in that house.  So you don't know if I gave her nothing, correct?

A.  That was multiple questions.  I'll try to answer them one by one. Could I see into the house?  No, I could not.  But based on the totality of the circumstances, again, the fact that she was saying the PCP comes from her brother, she said his name was G.  The fact that she could not enter the house until he arrived to unlock it.  The fact that immediately after we would order the PCP, her next action was to contact the Defendant, Mr. Gillard, yes, I believe that you were supplying her the PCP.

William Becker - Cross

Q.  Okay.  Even if she told you she was waiting for her brother, G, did you hear what you said that she told you after that?  He has to unlock the door to let me in.  You just said -- you said it under oath.

A.  I'm sorry, what --

Q.  She unlocked -- you said she unlocked -- she waiting for G, her brother, for me to unlock the door to let her in, not to give her no PCP.

A.  No, I never said that.  I said we waited for her, to wait for Diane, waited until you showed up to unlock the door to let her in.

Q.  To unlock the door to let her in, not to give her no PCP though?

A.  But let me -- I don't know if my statements were confusing there.  And again, this is going to be repetitive, so I apologize.

     Our informant would order the PCP through Diane Gillard.  Her next action, based on the phone records, was to contact her brother, the Defendant.  We then waited until Mr. Gillard arrived to let her in through his residence where she retrieved narcotics.  Again, the same residence where he was arrested on January 25th, the only occupant of that residence where we recovered an extensive amount of PCP and firearms.

Q.  In a locked cabinet?

A.  Which was unlocked.  The cabinet was unlocked.

William Becker - Cross

Q.   It was unlocked?

A.   I was not there at that search, but from speaking to other investigators it was unlocked.

Q.   Then how do you know it's unlocked?  You speaking right now, but you're saying it was unlocked.  But you wasn't there. But first thing come out your mouth, it was unlocked.  How do you know it was unlocked?

A.   Well like I stated.  Again, I spoke to other investigators. And I believe that the PCP was on top of that cabinet.

Q.   I wasn't there during the search so I wouldn't know.

A.   But you were there when you were arrested, correct?

Q.   Yes, sir.

A.   Yes.  Okay.

Q.   Now again, am I the only one with access to this house?

A.   During the buys of PCP where again, we would order it and wait for Mr. Gillard to show up to unlock the door, yes, I believe you had access to the residence.

Q.   The first time, you said I was the only one with access to the house.  You was sure.  Before I come with a little evidence, you was sure that I was the only one with access to the house.

A.   I don't believe I ever used the words sure.

Q.   Okay.

A.   I said I believe you were the only one that had access. Yes.

William Becker - Cross

(Counsel confer)

MR. WITHERELL:  1007.

THE COURT:  Is that already in evidence?

MR. WITHERELL:  No, Judge it's not.  But again, I have a stipulation that might be appropriate at this time, Judge.  I don't know if I want to do it on my redirect.

THE COURT:  Yeah, please do.  I don't want to interrupt Mr. --

MR. WITHERELL:  Okay.  So --

THE COURT:  -- Gillard.  So this is a portion of one of the videos?

MR. GILLIARD:  Yes.

THE COURT:  Could we refer --

MR. GILLIARD:  Exhibit --

THE COURT:  Defendant's Exhibit --

MR. GILLIARD:  Yeah, 2.

THE COURT:  2.

MR. GILLIARD:  Yeah.

THE COURT:  Okay.  And then just for cross-referencing so we can find it later if you need it or if --

MR. GILLIARD:  Okay.

THE COURT:  -- anyone needs it.  It's part of Government's 100 --

MR. WITHERELL:  It's Exhibit 1007.

THE COURT:  -- 7.  Okay.

William Becker - Cross

(Begin playback of video)

(End playback of video)

BY MR. GILLIARD:

Q.   Now, Mr. Beckham (ph.), again, am I the only one with access to the house?

A.   No.   It appears that whoever that female was had keys.   Was a little unsure which key it probably was to the door, but eventually, did use keys to gain access to that residence.

Q.   Another question.   During this investigation, if you hear that I'm supposed to be giving, my sister -- alleged giving her PCP, and -- why not investigate me?   Why not just follow me like you was following her?

A.   Well, we --

Q.   Wouldn't that been easier?

A.   We did in investigate Mr. Gillard.   Again by placing the orders of PCP through Diane, we then conducted surveillance of Mr. Gillard's residence.   We observed him arrive to unlock the residence for his sister on numerous occasions.   We also applied for and obtained the search warrant for his residence, which we testified to previously.

So on the day that Mr. Gillard was arrested.   Again, we executed that search warrant where we recovered an extensive amount of numerous narcotics and two firearms.   So in -- in my opinion, I believe we didn't investigate you.

Q.   You didn't investigate me.   You didn't -- I don't -- you

William Becker - Cross

didn't follow me around.  You didn't have no -- no plane over me or nothing like that.  It --

A.  Was there a question there?  I'm sorry.

Q.  Yeah.  You didn't have no plane or nothing following me, right?

A.  We utilized the plane numerous occasions.

Q.  And again, beyond the scope.  What proof do you have that she got anything out my hand?

A.  I believe I testified to this a couple times.

Q.  Yeah.  But it's inside.  Can you see inside?

A.  No, we could not see inside the residence, correct.

Q.  Right.  Again, can you see inside?

A.  I just answered that question, sir.

Q.  Okay.  So how do you know I gave her anything?

A.  Again, this is based on the totality of the investigation. I believe now, I've testified numerous times that when we would order PCP through Diane Gillard, her next move was to contact her brother.  Her brother would arrive, would unlock the door. Diane would get in -- sorry, would go into the residence. Within three to five minutes later, she would exit the residence and sell the PCP to our informant. She stated she got the PCP from her brother, whose name is G. When we executed our search warrant at the Defendant's residence, we recovered an extensive amount of PCP, firearms, and other narcotics.  So again, based on the totality of all

William Becker - Cross

those circumstances, yes, I believe that you supplied the PCP on those occasions.

THE COURT: Can I just ask a follow-up question for my own clarity?

So when you said Diane Gillard said she was getting PCP from her brother, was that something that she said in one of these controlled purchases?

THE WITNESS: On numerous controlled purchases.

THE COURT: Okay. All right.

BY MR. GILLIARD:

Q. Is it on recordings?

A. Yes.

Q. Never seen it. Again, did I meet with anybody else on this case, in this investigation, anybody else?

A. That's a broad statement. I'm sure I've seen you meet with numerous people. And again, there's -- there's --

Q. Wouldn't it --

A. -- hundreds of thousands of hours of surveillance we conducted. I can't say off the top of my head, if I recall you meeting with other individuals.

Q. Officer, you the one -- you told me that I'm not on pole cameras.

A. I'm sorry. Was there a question there?

Q. You told me I wasn't on pole cameras. I'm not on the pole cameras. You said I'm not on there. So I'm on there today?

William Becker - Cross

(Counsel confer)

BY MR. GILLIARD:

Q.   Mr. Beckham (sic), did you see me with Mr. Whitehall, Whitehead, Whitehall?  Did you ever see me with him?

A.   Again, I don't recall, but there's hundreds of thousands of hours of surveillance so it's very possible. But I don't recall independently seeing you meet with him.

Q.   Did you see me with Mr. Jackson ever?

A.   Again, I don't think so, but it's possible.

Q.   How about Richard?

A.   I'm sorry?

Q.   How about Richard Sanchez?

A.   Oh, Mr. Sanchez?  No, I don't believe -- I definitely don't think I believe we saw you with Mr. Sanchez.

Q.   Maldonado?

A.   Again, no, I don't think so, but it's -- it's possible.

Q.   Now, you say two or more to -- is conspiracy to conspire to do things together, but you seen me with none of them?

A.   Well, yes.  On numerous occasions, I've seen you with your sister, Ms. Diane Gillard.

Q.   That's my sister.  I can't associate with my sister?

A.   You cannot supply her PCP.

Q.   What proof do you have of that?  That's what I'm saying.

         MR. GILLIARD:  I'm going to rest, Your Honor.

         THE COURT:  You're finished with this witness for now?

William Becker - Redirect

MR. GILLIARD:  Yes.  Yes.

THE COURT:  Okay.  All right.  So that's the end of cross-exam.  Is there any redirect?

MR. WITHERELL:  There is, Judge.

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MR. WITHERELL:

Q.  Lets start with 123.  I just want to clarify for the jury because they haven't seen any of this yet.  What are we looking at here, just so we're clear as to what it is?

THE COURT:  And that's Government's Exhibit 123, a portion of which became Mr. Gillard's Exhibit 1.

MR. WITHERELL:  Your Honor, may I at this time just read some stipulations?  It might make things easier for --

THE COURT:  If there's a stipulation, whenever you think it's appropriate.

MR. WITHERELL:  Just so it's clear.  This is a stipulation that's been entered into by both sides.  It reads as follows:  "It is hereby stipulated by and between the United States by its Attorney, Jacqueline C. Romero, United States Attorney in a for Eastern District of Pennsylvania, and Edward R. Witherell and Robert Shoaf, Assistant United States Attorneys for the District, the following facts are true and correct, and may be entered into the record of trial of this case without further proof.  The video surveillance evidence

William Becker - Redirect

and photograph evidence previously provided in discovery are authentic and therefore admissible under Federal Rule of Criminal Procedure 901(a)."  It is signed by Mr. Gillard as well as Government counsel.

THE COURT:  Okay.  Ladies and gentlemen, as you've heard, the Government and Mr. Gillard have agreed that certain facts are true in this instance, with regard to the authenticity of video evidence that's been presented in this case.  So you should therefore treat this fact as having been proven. You're not required to do so, however, because you are the sole judge of the facts.  Okay?

A copy of any stipulations will be available to you as well as the time of deliberations.  Okay?

BY MR. WITHERELL:

Q.  Let's just go to 123.  Let's just play the beginning.  Just so we get an idea of what a controlled purchase looks like.  I know we're going to hear about this more through the course of the trial, but just to get a sense of it.

A.  Sure.

(Begin playback of video)

(End playback of video)

BY MR. WITHERELL:

Q.  Just to orient the jury.  We explained in some detail in your original testimony that a controlled purchase was the outfitting of a confidential source with audio and video

equipment, providing buy money, and sending them to meet the individual you planned on purchasing; is that correct?

A.  Correct.

Q.  Did we just see the beginning parts of that?

A.  Yes.

Q.  Okay.  And so the course of this trial, we plan on seeing many videos such as this?

A.  Yes.

Q.  Now, in this particular time, just talking about this particular one, 8/16/2022, you said it was less than a week after Amin Whitehead's house was searched by federal law enforcement; is that correct?

A.  Correct.

Q.  You also mentioned that prior to that, Amin Whitehead did two controlled purchases -- several controlled purchases with a CI by the name of Smurf (ph.); is that correct?

A.  Yes.

Q.  Besides the controlled purchase that's done by Smurf from Amin Whitehead, the vast majority of controlled purchases was done by a CI with the code name what?

A.  Vanilla Ice.

Q.  And Vanilla Ice, did the majority of those controlled purchases from which member of the drug traffic organization?

A.  From Diane Gillard, the Defendant's sister.

Q.  Was it odd that another individual came, as we saw later

William Becker - Redirect

on, in this particular controlled purchase?

A. Yes.

Q. Can you explain to the jury why another individual came instead of Ms. Diane Gillard?

A. Yes. So as I testified to previously. Again, we had just arrested Amin Whitehead. Ms. Gillard was skeptical and was nervous about getting arrested. She was very close with Mr. Whithead. So to distance herself for the time being from hand-to-hand transactions, she sent this gentleman instead who we saw on the video, claimed to be her bro or brother or something like that.

Q. And this individual's name, do you know what it is?

A. Yes.

Q. Who is it?

A. Arron Preno.

Q. Did Mr. Preno show up to any other of the controlled purchases done by the Federal Bureau of Investigation?

A. No. In fact, we never saw him again until we arrested him months later.

Q. And he was arrested solely for the charge on this distribution count?

A. Correct.

Q. By the way, what were you attempting to buy on 8/16/2022? What type of narcotic?

A. Fentanyl.

William Becker - Redirect

Q.   And since you were buying fentanyl, at this point, had you identified Cesar Maldonado as a supplier of fentanyl?

A.   I believe so.  I'm not sure.

Q.   And was Cesar Maldonado at least surveilled, which we can talk about at another time, during this purchase?

A.   I believe so.  I'm not sure.  This was the first buy we did for fentanyl.

Q.   Okay.  But it wasn't PCP in this particular buy?

A.   Correct, no.  It was fentanyl we purchased.

Q.   Now Mr. Gillard talked to you about a few other things.  He talked to you about -- I think he pulled 1007, which is a surveillance video concerning a purchase on 7/14/2022; is that correct?

A.   Yes.

Q.   And I want to apologize to the jury because I know we've thrown a lot of dates.  At some point later in this trial, we'll go through the different controlled purchases.  But I want to bring you to 7/14/2022.  Okay?

A.   Yes

Q.   What type of narcotic were you attempting to buy on 7/14/2022?

A.   Phencyclidine or PCP?

Q.   And when you ordered PCP, where did Diane Gillard go?

A.   To the Defendant's house, 3006 Tulip Street.

Q.   1003 to the witness.  Can we just start very shortly so he

William Becker - Redirect

can see what it is and -- hit play.  Pause it.  First off, you mentioned that while you're doing these controlled purchases, surveillance is also something you do; is that correct?

A.  Correct.

Q.  And are you the only person doing surveillance?

A.  No.

Q.  Who else is out there doing surveillance?

A.  It varies depending on the day, but generally we like to have between eight to ten other law enforcement officers with us staged in various locations in order to conduct the necessary surveillance to complete the operation.

     (Counsel confer)

BY MR. WITHERELL:

Q.  Do you know who's conducting the surveillance you're watching now?

A.  I don't.  I'm sorry there were so many.

Q.  If I say it's Agt. Hallowell who we're going to hear from later, does that make sense?

A.  Yes.

Q.  Okay.

     MR. WITHERELL:  Your Honor, at this time, I'd like to put.  Exhibits 1002, 1003, 1006 into evidence pursuant to the stipulation.

     THE COURT:  They're admitted.  They may be used and published.

William Becker - Redirect

MR. WITHERELL:  Could we have it shown to the jury?

BY MR. WITHERELL:

Q.  I'm playing you what's 1002, which is -- obviously, you didn't take this surveillance?

A.  Correct.  I did not.

Q.  Another agent.  Just orient the jury.  What are we looking at here?

A.  So as you see, the gentleman in the white T-shirt is the defendant, Mr. Guillard, entering in his residence, 3006 Tulip Street during one of the control purchase operations.

MR. WITHERELL:  Hit play.

(Begin playback of video)

(End playback of video)

BY MR. WITHERELL:

Q.  During those controlled purchase operation, when we called -- when we called Diane Gillard, she immediately -- she called her brother; is that correct?

A.  Correct.

Q.  And she went to the location depicted in 1002?

A.  Correct.

MR. WITHERELL:  Can I put 1003 to the jury, please.

(Begin playback of video)

(End playback of video)

BY MR. WITHERELL:

Q.  Who did we see enter that residence?

William Becker - Redirect

A.   So that was Diane Gillard walking up to the residence, her knocking on the door, and waiting to be let in.  It appeared that she was carrying keys in her hands, but yet, did not use a key to unlock that door.

Q.   She didn't use a key to unlock that door?

A.   She did not.  Correct.

Q.   Mr. --

          THE COURT:  I'm sorry, do we have a date for this?

          MR. WITHERELL:  This is the -- if I didn't put it on already, July 14, 2022.

          May I inquire, Your Honor?

          THE COURT:  Yeah.  I'm sorry.

          MR. WITHERELL:  I apologize, Judge.  I didn't know if you needed it.

          THE COURT:  Well, while I have you, 1002, 1003, 1006, are they all July 14 as was 1007?

          MR. WITHERELL:  These are all July 14th.

          THE COURT:  Okay.  Thank you.

BY MR. WITHERELL:

Q.   So we just saw 1002.  Phil had entered prior to Diane Gillard entering; is that correct?

A.   Correct.

Q.   When I say "Phil", I mean the Defendant.

A.   Yes.

Q.   Diane Gillard then entered the residence?

William Becker - Redirect

A.  Yes.

MR. WITHERELL:  Please show 1006.

(Begin playback of video)

(End playback of video)

BY MR. WITHERELL:

Q.  Before the purchase was made to the confidential informant, and we're going to watch those videos later, where did Ms. Gillard go?

A.  I'm sorry.  Say this again.

Q.  It's a poorly worded question.  Prior to actually selling the narcotics to Vanilla Ice, the confidential source.  Where does Ms. Gillard go?

A.  Ms. Gillard goes, again, to the Defendant's residence, 3006 Tulip Street.

Q.  Who's there prior to her entering?

A.  The Defendant, Mr. Gillard.

Q.  And after Ms. Gillard, Diane Gillard leaves 3006 Tulip Street, where does she go?

A.  To meet with the informant to sell the narcotics.

Q.  And this happens on the PCP sales?

A.  Correct.

Q.  Mr. Gillard asked you on numerous occasions about evidence -- about evidence you have that he sold or gave PCP to his sister.  You would agree with me you cannot see inside the walls of various houses?

William Becker - Redirect

A.  No, I cannot.

Q.  And simply because PCP is given within the confines of someone's house doesn't stop the FBI from investigating. Correct?

A.  Correct.

Q.  I know you weren't present, and we're going to hear more testimony concerning the search of Mr. Gillard's house.  But the vast majority of the narcotics found there, what were they?

A.  Yes.  So there was, I believe it was approximately half a gallon of PCP, which I believe was on a cabinet -- on top of a cabinet.  There was also a -- above a kilogram quantity of powder cocaine.  There was a couple hundred grams of crack cocaine, a couple hundred packets of fentanyl and heroin, and I believe two firearms.

Q.  I want to talk to you a little bit just about the narcotics found during this investigation.  How long have you been working narcotics for the Federal Bureau of Investigation?

A.  Seven years.

Q.  Could you just tell me a little bit about cocaine and the difference between cocaine and crack cocaine?

A.  Yes.  So cocaine is a white powder.  It is generally ingested by snorting.  When powder cocaine is cooked with various other cutting agents and ingredients, it can be cooked into crack cocaine, which is a -- a hard, almost like a rock-

William Becker - Redirect

like substance.  You saw in numerous pictures those small little, like blue and yellow, like flip top containers.  You use a razor blade to scratch off a tiny little -- tiny little piece of a -- of a crack cocaine rock into those flip top containers, which is then smoked, which gives a -- a -- a -- the user a different experience than when a user snorts powder cocaine.

From my understanding and my -- my training and experience, I believe that it is a more euphoric, intense high.  But it is not as long lasting as if -- when someone snorts the powder cocaine. .

Q.  And methamphetamine.  What does that look like and how is that sold?

A.  So like I testified to you previously, crystal methamphetamine, one of the street names is ice.  And that's kind of what it looks like.  It looks like shards of glass or shards of ice that come in -- in -- in large chunks.  In this investigation, we were purchasing pounds upon pounds of crystal methamphetamine, which again covers thousands and thousands of dosage units.  Again, training and experience, users who ingest crystal methamphetamine either snort it or can cook it on a spoon and ingest it through a needle into their veins.  I believe it can also be commonly smoked, which is the most popular way it is used, where just small, tiny, tenths of a gram increments are placed into a pipe and are smoked that way.

William Becker - Redirect

Q.   And fentanyl.  What does that look like and how is that used?

A.   Generally, fentanyl is a powder.  It comes in various colors.  I believe the most common color I've seen is brown. In this investigation, we were purchasing purple fentanyl, which is simply a -- a -- a dye is added to the fentanyl mix so distributors can determine this is my product.  This is my purple fentanyl.  Again, we -- we -- we seized hundreds of -- of grams of fentanyl, when in reality one dose is less than a tenth of a gram.

Q.   PCP.  What does that look like?

A.   Yeah.  So PCP or phencyclidine is a liquid.  It is a brown liquid that has an overpowering distinct smell that to me smells like nothing else.  I believe AUSA Schopf mentioned it in his opening arguments that it is generally mixed with another substance to be ingested.  From my training and experience, usually it is a cigarette that is simply dipped into the liquid, which is then smoked to -- to give the user that high that experience.

I've also seen marijuana soaked -- marijuana leaves soaked in PCP and then smoked in like a marijuana joint or a marijuana cigarette.  Again, the dosages are -- are extremely small compared to the massive quantities we seized from Mr. Gillard.

MR. GILLIARD:  Objection.

THE COURT:  On what grounds, sir?

William Becker - Redirect

MR. GILLIARD:  He said he received it from me.

THE COURT:  Well, you'll have the opportunity to --

MR. GILLIARD:  Okay.

THE COURT:  -- reexamine.

BY MR. WITHERELL:

Q.  Did you bring any of the PCP seized in the court of the investigation to court here today?

A.  To court here today?

Q.  Yes.

A.  No, I did not.

Q.  Why not?

A.  In an overabundance of caution, we elected to not bring any of the PCP to Court today.  As I stated, the odor is so overpowering and so strong that I believe even sitting ten to fifteen feet away from any of the jurors or anyone else in the courtroom, and with the evidence being sealed in numerous baggies, that the smell is so strong it could potentially cause adverse effects to those smelling it.

Q.  Mr. Gillard asked you on several occasions what evidence you had asserting that he sold PCP.  Did you or any other member of law enforcement have the opportunity to download Mr. Gillard's phone?

A.  Yes.  I -- I knew I was neglecting something.  Again, on the day that Mr. Gillard was arrested, we recovered his cell phone.  He provided written and oral consent for us to download

William Becker - Redirect

that phone, and again, provided his passcode to that phone. Without that passcode, there's no way we as the FBI with all of our technology and capability, would have been able to get into that phone, but he did. So we were able to unlock that phone and extract all of the data.

During that time, we analyzed tens of thousands of pages of data recovered from his phone, including numerous pictures, videos and text messages. And upon reviewing those thousands of text messages, we discovered numerous text messages revealing the fact that Mr. Gillard was indeed selling PCP. Again, I believe AUSA Shoaf mentioned it in his opening arguments that on one specific text message, he's conversing back and forth with a female and flat out says, I sell wet, hard and soft, which again, wet is PCP. It's a liquid. Hard is crack cocaine because it's the powder cocaine that's then cooked and becomes hard, and soft is simply powder cocaine.

And again, we recovered extensive amounts of PCP, powder cocaine and crack cocaine from his residence where he was arrested, where he was the only occupant of that residence.

Q. And the agent who actually downloaded the phone, is that S.A. Walsh sitting to my left?

A. Yes, it is.

Q Okay. We're going to hear from Agt. Walsh later on in this trial?

A. Yes.

William Becker - Recross

MR. WITHERELL: Okay, Judge. At this time, I have no further questions for S.A. Becker.

THE COURT: Okay. Let me ask, Mr. Gillard, do you have any redirect (sic) for this witness?

MR. GILLIARD: Yes.

THE COURT: Please, as you wish.

RECROSS-EXAMINATION

BY MR. GILLIARD:

Q. Ofc. Beckham (sic), the day of the investigation when you had me in that room, you asked me did I want to use my phone, correct? Did I -- did I have to get numbers out my phone?

A. Yes. So that's a general practice during the arrest and booking process. Normally, our defendants and prisoners are arrested at 6 a.m., first thing in the morning just to make sure that they're home. Usually, there's not a whole lot of time for them to make the proper notifications to let loved ones, family members, those people that would probably want to know if they were arrested, but to know they were arrested. So it's common practice for us to allow those we arrest to make certain phone calls to notify the people they have to notify that they were arrested. Child care issues, employment, things of that nature.

Additionally, as I'm sure you can imagine, prisoners are not permitted to take cell phones into prison. That's an extreme safety -- matter. So as a matter of practice and as a

William Becker - Recross

courtesy, something we don't have to do, we generally allow our defendants to take certain cell phone numbers out of their cell phone that they can then make calls to when they're in prison. I think maybe besides my wife's cell phone number, I don't have numbers memorized.

So again, in my training and experience most people don't either, so again, we allow them the opportunity to retrieve numbers from their cell phone so they can make certain calls when they're incarcerated in prison.

Q.   During the course of me saying yes, I had to punch my code in too, correct; in front of you?

A.   I don't recall if we let you enter your code or if you gave it to us and we unlocked it for you.

Q.   No.  No.

A.   Generally, in order to preserve evidence and maintain its integrity, we don't allow the defendants to handle their phone at the risk of them deleting potentially incriminating evidence.  So generally, we maintain their phone, we ask for their passcode, we then enter it and then ask for the names and numbers they want and we extract and write it down for them.

Q.   You're sticking to that?  You said --

A.   I'm sorry.

Q.   -- you said you don't let people handle the phone, correct?

A.   I said that's generally the practice.  It -- it varies. But for the most part, yes, I'd say that we usually handle the

William Becker - Recross

phone for them.

Q.  But you got it on video, all my co-defendants at the time, they was handling the phone.  They was punching it in theyself (sic).

A.  I don't recall.

Q.  Can we get the videos since you don't recall?

A.  Here's what I can say.  I'm sure there might be videos of defendants handling their phones.  Like I said --

Q.  But you just said that it -- it ain't --

    (Counsel confer)

A.  I believe what I said was generally, commonly, we handle the phone.  And I believe I clarified that I'm sure on some occasions we do it --

BY MR. GILLIARD:

Q.  And the same -- that's the same way you let me handle my phone.  You let me punch the code in and another officer was on the side writing my code down.  Correct?

A.  Again, I don't recall the specifics.  That is possible, or it's possible you provided it to us and we wrote it down from there.

Q.  Yes.  So then that mean I never gave you consent to even go in my phone.  You -- you --

A.  No.  I -- so to clarify this.  Again, we explained the process to Mr. Gillard very plainly that we were going to go on to obtain a search warrant for his phone, or he could save us

William Becker - Recross

some paperwork and provide consent.  Mr. Gillard elected to
provide his consent and signed the form, the FD-26, I believe
it is, providing his consent to search his phone.

Q.  Well, without the video, that's my word against yours,
correct?  Fair to say?

A.  Well no, because again, his signature is on that -- that
form.

Q.  If I'm saying it ain't my signature, then it's my word
against yours.

A.  I'm saying that that is his signature on that form.

Q.  What proof do you have?

A.  Of the signature being yours?

Q.  Yes.

A.  I have no proof.

Q.  Okay then.  So it's my word against yours.

A.  Your word against mine as well as the Det. Schlosser, who
was also in the room.

Q.  The signature, it's my word against yours.  I mean, y'all
are together so of course, he's going to agree to what you say.

A.  I -- I misunderstood.  I thought mine specifically.  You
mean us as the Government?

Q.  Right.

A.  Yes.  Yep.

Q.  Yeah.

A.  Yes.

William Becker - Recross

Q.   Also when the Government went into 3006, the drugs was in a cabinet, correct?

A.   Not all of the drugs.

MR. GILLIARD:  I rest, Your Honor.

THE COURT:  Okay.  Any follow-up?

MR. WITHERELL:  No, Your Honor.

THE COURT:  All right.  All right.

Thank you, Agt. Becker.

THE WITNESS:  Thank you.

THE COURT:  Ready for your next witness?

MR. WITHERELL:  I am Judge.  There are several other stipulations, but I can read them at the end of the witness's testimony.

THE COURT:  Whenever you think's best.

MR. WITHERELL:  I would call S.A. Victor -- Task Force Ofc. Victor Rodriguez to the stand.

THE COURT:  Welcome, Officer.

THE CLERK:  Can you raise your right hand.

GOVERNMENT'S WITNESS, VICTOR RODRIGUEZ, SWORN

THE CLERK:  Thank you.  Please state and spell your complete name for the record.

THE WITNESS:  Sure.  Victor Rodriguez, V-I-C-T-O-R R-O-D-R-I-G-U-E-Z.

THE CLERK:  Thank you.

MR. WITHERELL:  May I inquire, Your Honor?

Victor Rodriguez - Direct

THE COURT:  Of course.

DIRECT EXAMINATION

BY MR. WITHERELL:

Q.  Good afternoon, Task Force Ofc. Rodriguez, how are you today?

A.  Not too bad, and yourself?

Q.  I'm very well.  Thank you.  If you wouldn't mind, please tell the members of the jury who you are and who you work for.

A.  My name is, as I stated, Victor Rodriguez.  I'm a police officer with the Philadelphia Police Department, assigned to the FBI Task Force as a task force officer.

Q.  Mr. Rodriguez, how long have you worked for the Philadelphia Police Department?

A.  Thirteen years.

Q.  And long have you been assigned as a task force officer with the Federal Bureau of Investigation?

A.  Since 2019, so five years now.

Q.  I want to draw your attention to June 15th of 2022.  Did there come a time when you assisted fellow members of the Federal Bureau of Investigation concerning surveillance done at 3006 Tulip Street?

A.  Correct.

Q.  And what was your role as part of this investigation?

A.  I was conducting surveillance on the property of 3006 North Tulip.

Victor Rodriguez - Direct

Q.  Did there come a time when you became aware the Federal Bureau of Investigation had, for lack of a better term, ordered PCP from an individual you know as Diane Gillard?

A.  Correct.

Q.  What was the purpose of your surveillance on 3006 Tulip Street?

A.  Basically, observe where Diane Gillard was going to go to basically get the PCP to return back to our confidential informant.

Q.  Have you had an opportunity to review surveillance video 828 and 830 prior to your attendance here today in Court?

A.  Yes.

Q.  Are they surveillance videos you took on that date, June 15, 2022 on Tulip Street?

A.  Correct.

Q.  All right.

        MR. WITHERELL:  I believe they start at approximately 4 p.m., so let's, if we wouldn't mind, show 828 to the jury Judge, with the stipulation, I believe we can go right to them.

        THE COURT:  I agree.  828 is admitted and may be published.  G-828.

    (Begin playback of video)

    (End playback of video)

        THE COURT:  I'm sorry.

        MR. WITHERELL:  Just.

Victor Rodriguez - Direct

THE COURT:  G-828, correct?

MR. WITHERELL:  Thank you, Your Honor.

THE COURT:  Thank you.  No, I'm just making sure.

BY MR. WITHERELL:

Q.  If you wouldn't mind, just tell us, where are you, what are you looking at, and what we're about to see?

A.  So I'm just slightly north on the opposite side of the street of 3006 North Tulip.  3006 North Tulip will be the white house that you see on the video.

Q.  Okay.

MR. WITHERELL:  Let's hit play.

(Begin playback of video)

Q.  Let's pause it one second.

(Pause playback of video)

BY MR. WITHERELL:

Q.  This is prior to Ms. Gillard selling PCP to the confidential informant; is that correct?

A.  Correct.

Q.  Correct.  Before?

A.  Yes.

Q.  Okay.

MR. WITHERELL:  Hit play.

(Resume playback of video)

MR. WITHERELL:  Okay.  Pause it for a second.

(Pause playback of video)

Victor Rodriguez - Direct

BY MR. WITHERELL:

Q.  We just saw someone wearing a red shirt enter that house.
Do you know who that person is?

A.  Yes.  That would be Diane Gillard.

Q.  Okay.  How did she get into the house?

A.  The male that we seen in the defense side, Mr. Phil
Gillard, opened the door.  He was wearing a white T-shirt and a
blue hat that day.

Q.  Okay.

        MR. WITHERELL:  Let's hit play.

    (Resume playback of video)

    (End playback of video)

BY MR. WITHERELL:

Q.  What did we just see at the end of that video?

A.  Diane Gillard exited 3006 North Tulip Street and went
towards the location where the confidential informant was
waiting for Diane.

Q.  Now, Officer, did you stay at the location where we see you
taking this video after this?

A.  I did.

Q.  What was the purpose of you staying there?

A.  I wanted to stay there to observe who was coming out of
3006 North Tulip Street.

Q.  Did there come a time when you -- you had mentioned earlier
that an individual who you identified as the defendant let me

Victor Rodriguez - Direct

Gillard into that residence; is that correct?

A.  Yes.

Q.  Did you have an opportunity to film the defendant that day to capture what he was wearing in order so the jury can see it's the same person?

A.  I did.

MR. WITHERELL:  Can we play what's been marked as 830 to the jury, please?

THE COURT:  Yes.  It's admitted.  It may be played.

MR. WITHERELL:  Judge, if it hasn't can I admit it as 830?

THE COURT:  830, you're offering it?

MR. WITHERELL:  Yes, Judge.

THE COURT:  Yes.  It's admitted and may be published. I'm sorry, I said that poorly.  It's admitted now.

MR. WITHERELL:  It's all right.  Thank you.

Let's hit play.

(Begin playback of video)

(End playback of video)

BY MR. WITHERELL:

Q.  I see an individual there wearing a white T-shirt and a blue hat.  Do you know who that individual is?

A.  That's correct, Mr. Phil Gillard, the defendant.

Q.  And where did that individual come prior to you taking the video?

Victor Rodriguez - Cross

A. From inside 3006 North Tulip Street.

Q. And this was taken approximately one hour after we saw Diane Gillard leave that location?

A. That's correct.

MR. WITHERELL: Your Honor, I had no further questions for this witness.

THE COURT: Mr. Gillard, do you have any questions for this witness?

MR. GILLIARD: Yes.

CROSS-EXAMINATION

BY MR. GILLIARD:

Q. Officer, when she came in, did you -- you seen me open the door?

A. Correct.

Q. You could see me open the door?

A. Yes.

Q. And you waited for me to come out?

A. Correct.

Q. Any more video of that?

A. No, sir.

Q. Is there any more video of her going wherever she going with that bag?

A. Not from my location. No.

Q. But it is more video of where she going with that bag?

A. I can't answer because I do not know.

Victor Rodriguez - Cross

Q. Do you see the part where she came with that bag?

A. When she came into the property?

Q. Yeah.

A. Yes.

Q. Oh, okay.

          MR. GILLIARD:  Nothing else, Your Honor.

          THE COURT:  Nothing further for the officer?

          MR. WITHERELL:  Not for this witness, Judge.

          THE COURT:  Thank you, Officer.

          THE WITNESS:  Thank you.

          MR. WITHERELL:  Judge, I have S.A. Benjamin Hallowell. He's here ready to go forward.

          THE COURT:  All right.  If you're ready, we're ready.

          MR. WITHERELL:  We're ready, Judge.

          THE CLERK:  Please raise your right hand.

       GOVERNMENT'S WITNESS, BENJAMIN HALLOWELL, SWORN

          THE CLERK:  Thank you.  Please state and spell your complete name for the record.

          THE WITNESS:  Benjamin Hallowell, B-E-N-J-A-M-I-N H-A-L-L-O-W-E-L-L.

          THE CLERK:  Thank you.

                         DIRECT EXAMINATION

BY MR. WITHERELL:

Q. Good afternoon, Agt. Hallowell.  How are you today?

A. Good.

Benjamin Hallowell - Direct

Q.   Special Agent, would you mind telling members of the jury who you are, who you work for?

A.   Ben Hallowell.  I'm a special agent, and I work for the FBI.  I was in the Philadelphia division, and now I'm in the Allentown office.

Q.   And how long have you been with the Allentown office here?

A.   Since about May.  And I was in the Philadelphia office for five year -- about five years prior to that.

Q.   In the Philadelphia office, were you assigned to any particular group or unit?

A.   Yes.  Squad C2, the Safe Streets Task Force.

Q.   And prior to your work at the FBI, can you just tell members of the jury what you did?

A.   I was a geospatial intelligence analyst for the National Geospatial Intelligence Agency, working with geospatial products and satellite imagery supporting the military.

Q.   Did there come a time when you assisted other members of law enforcement during investigation of a drug trafficking organization that primarily operated on Tulip Street?

A.   Yes.

Q.   Did those individuals involved Diane Gillard, Amin Whitehead, Mr. Jackson Sanchez, and the defendant, Phil Gillard?

A.   Yes.

Q.   As part of your investigation into that group, did you do

Benjamin Hallowell - Direct

surveillance in the vicinity of a charter school located on Tulip Street?

A.   Yes.

Q.   I want to talk to you about several of those surveillance videos.  I'm going to bounce through a few of them.  I'm going to start with the purchase of methamphetamine, if that's okay with you.

A.   Yes.

Q.   Could you tell us when the FBI was purchasing methamphetamine through a confidential informant, who were they purchasing from?

A.   The -- there were multiple people involved for each buy.  I believe Diane Gillard was involved.  Jackson was involved.  Sanchez was involved.  Phil Gillard was involved.  Maldonado was involved.  Multiple different people.

Q.   Let's talk about now specifically the purchase of methamphetamine.  We'll start with a purchase made on 4/6.  I'm going to ask if you can look at what's been marked as Government 312.

     (Counsel confer)

          MR. WITHERELL:  Oh, Your Honor, I'm going to admit 312, 313, 315, 316, and 317.  I believe the stipulation allows them to come into evidence.  So I'll --

          THE COURT:  Is that 313 through 317?

          MR. WITHERELL:  312, 313, 315, 316, and 317.

Benjamin Hallowell - Direct

THE COURT:  And this is pursuant to the stipulation?

MR. WITHERELL:  Yes, Your Honor.

THE COURT:  These exhibits are admitted and they may be published, as you see, necessary.

BY MR. WITHERELL:

Q.  So on 4/6, did the FBI do a controlled purchase from Diane Gillard of methamphetamine?

A.  Yes.

Q.  Did you help with surveillance concerning that?

A.  Yes.

Q.  I'm playing right now what's been marked as 312.  Could you just tell the jury where you are when you're taking this surveillance and what we're looking at?

A.  I was actually inside of the charter school and this is me taking a video through the windows of the school out onto Tulip Street.

Q.  I'm going to hit play right now and I want you to identify anybody that you recognize.  Okay?

(Begin playback of video)

A.  We have Amin Whitehead, the male, and we have Diane Gillard in black on the right.

BY MR. WITHERELL:

Q.  This is pre-sale of Diane Gillard of the narcotics to the confidential informant; is that correct?

A.  That is correct.

Benjamin Hallowell - Direct

(Continued playback of video)

(End playback of video)

BY MR. WITHERELL:

Q.   Looking as you sit here now, are you able to identify the person on the right as Diane Gillard?

A.   Correct, yes.

Q.   And you mentioned a friendly in the vehicle.  Who are you speaking about?

A.   That was the informant that was working with us.

Q.   Okay.

        MR. WITHERELL:  Let's do 313.

(Begin playback of video)

A.   That's Diane Gillard on the right that just got out.

BY MR. WITHERELL:

Q.   You were going to say something, Special Agent.  Tell me what we just saw.

A.   So you saw Diane Gillard at the front passenger door of that Acura, that -- that black Acura.

Q.   And do you know who was driving that vehicle?

A.   I believe subsequent surveillance revealed it to be Sanchez.

        MR. WITHERELL:  Let's hit plan.

(Begin playback of video)

        MR. WITHERELL:  Hit pause.  Thank you.

(Pause playback of video)

Benjamin Hallowell - Direct

BY MR. WITHERELL:

Q.   Black Acura, you said, was ultimately determined to be driven by Sanchez; is that correct?

A.   Correct.

Q.   Who's next to the car at the moment in time?

A.   Amin Whitehead.

Q.   All the way on the right, you can't see right here, but there's going to be a white car that I think just came out of view.   Whose white car is that?   I'm pointing on the same --

        MR. WITHERELL:   Let's back up just a little bit.

Q.   See the white car on the right on the same side of the street as the black Acura?

A.   Yes.

Q.   Do you know whose vehicle that is?

A.   That was our informant.

Q.   You mentioned -- I could hear you on the video.   That's your voice saying that Diane had just taken the bag from the black Acura?

A.   Yes, and I -- I believe at the very beginning of this clip you could see a yellow bag that she's carrying.

Q.   And ultimately, that's the bag that's provided to the CI that has the narcotics?

A.   Yes.

Q.   Just to be clear.   And I want to make sure it's clear.   You can't see inside the car, right?

Benjamin Hallowell - Direct

A.   No.

Q.   You don't exactly what's going on in that car?

A.   No.

Q.   But those narcotics came out of that car driven by Mr. Sanchez, correct?

A.   Yes.

Q.   Okay.

        MR. WITHERELL:  Let's hit play.  Let's go to 315.

    (Begin playback of video)

    (End playback of video)

BY MR. WITHERELL:

Q.   Just to be clear, red shoes.  You're referring to Diane Gillard?

A.   Correct.

Q.   This is after the purchase of narcotics made by the confidential informant?

A.   Yes.  She had taken the yellow bag from the Acura to the white SUV and then went back to the Acura.

        MR. WITHERELL:  And let's do 317.

    (Begin playback of video)

    (End playback of video) do

BY MR. WITHERELL:

Q.   This is after the controlled purchase. Diane Gillard leaves the Acura and speaks to Mr. Whitehead; is that correct?

A.   Correct.

Benjamin Hallowell - Direct

Q.  Mr. Whitehead previously had a Nike bag with him on the other video.  Do you see it in this video we just saw here.  Let's play it again.

(Begin playback of video)

A.  No.  No -- no Nike bag right here.

BY MR. WITHERELL:

Q.  So after the controlled purchase, Mr. Whitehead no longer has that Nike bag?

A.  Correct.

Q.  Just to be clear.  You can't see inside the Nike bag from your position up in the school, correct?

A.  Correct.

Q.  Okay.  And now I want to take you to a purchase of narcotics on 8/1 of 2022.  Okay?

A.  1 or the 9th?

Q.  Excuse me?

A.  Is that the correct date?

(Counsel confer)

BY MR. WITHERELL:

Q.  I'm talking about 1, 8/1.  The purchase of methamphetamine 8/1.

A.  Okay.

Q.  Give me one second.  Let me confirm.

(Counsel confer)

BY MR. WITHERELL:

Benjamin Hallowell - Direct

Q.   8/1/2022.  I'm going to show you what's been marked as 1112 to the jury, please.

MR. WITHERELL:  Your Honor, for this controlled purchase on 8/1, I plan on admitting 1112, 1114, 1115, and 1126.

THE COURT:  And these are all subject to the stipulation between the parties?

MR. WITHERELL:  That is, Your Honor.

THE COURT:  These are admitted and may be shown to the jury.

BY MR. WITHERELL:

Q.   I'm showing you what's been marked as 1112.  Just let us know what we're looking at here.

A.   This is another controlled drug buy on Tulip Street.  And once again, I'm filming from within the school.

Q.   And can you tell us what we're looking at now on the screen?

A.   The red hat is Sanchez.  And the person on the left with the black hat is Diane Gillard.

MR. WITHERELL:  Let's play.

   (Begin playback of video)

   (End playback of video)

BY MR. WITHERELL:

Q.   Is this prior to the controlled purchase with the confidential informant?

Benjamin Hallowell - Direct

A.   Yes.

Q.   How do you know that?

A.   The sequence of events, reviewing the video, and also reviewing the report.

Q.   What did Ms. Gillard just get out of the vehicle?

A.   A brown paper bag.

        MR. WITHERELL:   1114.

Q.   After the controlled was made by Ms. Gillard, did she return back to the vehicle?

A.   Yes.

Q.   And were you able to capture that on video?

A.   Yes.

        MR. WITHERELL:   Okay.   Play.

   (Begin playback of video)

   (End playback of video)

BY MR. WITHERELL:

Q.   What did we just see there?

A.   We just saw Diane Gillard come back with the money that was the Government-provided buy money and it was given to Sanchez and another portion was given to the driver.

Q.   At this moment in time, had the FBI been able to identify the driver; as you're taking the video at that moment?

A.   I'm sorry.   Identified --

Q.   At that moment in time when you're taking the video, had you been able to identify the driver?

Benjamin Hallowell - Direct

A.   At that moment, no.

Q.   Did there come a time when you and others went to a different location so you could see who was driving this vehicle?

A.   Correct.  We did follow on surveillance.

Q.   1126.  This is the same day you bought -- were you one of the members that followed that vehicle to learn who the drive was?

A.   Yes.

          MR. WITHERELL:  Hit play.

     (Begin playback of video)

          MR. WITHERELL:  Can you pause it for a second?

     (Pause playback of video)

BY MR. WITHERELL:

Q.   Can you identify the individuals seen in this video?

A.   Yes, the red hat is Sanchez.  And then the individual with the primarily black shirt with orange lettering, I may be messing up the name, I believe it was Dreher, but there were multiple subjects in the investigation.

Q.   [Dray-er] is the correct pronunciation.  You're correct.

          MR. WITHERELL:  Hit play.

     (Continue playback of video)

     (End playback of video)

          MR. WITHERELL:  Your Honor, with this witness, we're going to go into some PCP buys and fentanyl buys.  But at this

Benjamin Hallowell - Direct

time, it's not queued up.  We weren't expecting him to get to him today.  So I think it's a convenient time to stop if the Court's so inclined.

THE COURT:  To end the testimony for today and then we'll resume with Agt. Hallowell on Wednesday morning?

MR. WITHERELL:  We can do that, Judge.  I also have some stipulations to read into the record and so I don't know if you want to do it prior to him getting off the stand or however you want.

THE COURT:  Either way.

MR. WITHERELL:  Judge, I would like to read these stipulations into the record.

"It's hereby stipulated by and between the United States by its Attorneys, Jacqueline Romero, United States Attorney in and for the Eastern District of Pennsylvania, and Everett R. Witherell and Robert Schopf, Assistant United States attorney for the District and the defendant.  The following facts are true and correct, and may be entered into the record of the trial of this case without further proof.

The substance seized and purchased during this investigation by the Federal Bureau of Investigation were submitted to the DEA Northeast Laboratory or the Philadelphia Police Department Office of Forensic Science for analysis.  The respective lab identified the type, weight, and purity of controlled substance in the items submitted for analysis.  The

Benjamin Hallowell - Direct

various DEA laboratory reports and Philadelphia Police Department Office of Forensic Science lab reports, including the results and conclusions therein, are accurate and shall be admitted into evidence without the testimony of the individuals who conducted the testing.

Additionally, it's hereby stipulated by and between the United States by its attorneys, Jacqueline Romero, United States Attorney in and for the Eastern District of Pennsylvania, and Edward R. Witherell and Robert Schopf, Assistant United States Attorney for the District and the defendant.  The following facts are true and correct, and may be entered into the record of the trial of this case without further proof.

The firearms seized during this investigation by the Federal Bureau of Investigation were submitted to the Philadelphia Police Department Office of Forensic Science for analysis.  The various lab reports, including the results and conclusions therein, are accurate and shall be admitted into evidence without the testimony of the individuals who conducted the testing.  The firearms seized meet the legal definition of a firearm and were determined to be operable.  All firearms and ammunition seized during the investigation were manufactured outside the Commonwealth of Pennsylvania; and therefore, have an interstate or foreign nexus."

THE COURT:  And is that a signed stipulation?

Benjamin Hallowell - Direct

MR. WITHERELL:  It is a signed stipulation, Judge. While we're here, there's one more I can read and we can be done with stipulations, I believe.

"It is hereby stipulated by and between the United States by its attorneys, Jacqueline C Romero, United States Attorney in and for the Eastern District of Pennsylvania and Everett R. Witherell and Robert W. Schopf, Assistant United States attorney for the District and the defendant, that the following facts are true and correct and may be entered into the record of the trial of this case without further proof.

From the time that each of Government's exhibits came into the Government's possession to the time of their introduction in evidence, a proper and acceptable chain of custody was maintained and exhibits were not altered, tampered with, or modified in any way."

Thank you, Your Honor.

THE COURT:  And again, that's signed by the parties?

MR. WITHERELL:  It is, Your Honor.

THE COURT:  Okay.  So Mr. Gillard, do you agree again that the stipulations offered this afternoon in your name and that of counsel for the Government as to facts related to authenticity of videotapes, drug and firearms analysis, and chain of custody, the things that were represented by the Government, that is a stipulation entered into by both parties, correct?

Benjamin Hallowell - Direct

MR. CLARK:  If we may we have your indulgence for a second?

THE COURT:  Sure.

(Counsel and defendant confer)

MR. GILLIARD:  Yes, Your Honor.

THE COURT:  Okay.  So we're all in agreement.  So again, ladies and gentlemen, the Government and Mr. Gillard have agreed that certain facts, as have been represented by counsel for the Government and agreed to by Mr. Gillard, are true.  And again, you'll have access or a copy of these stipulations at the time of deliberations and you should treat these facts as having been proved.  You're not required to do so, however; since again, you are the sole judges of the facts.

All right.  That's it for stipulations?

MR. WITHERELL:  Yes, Your Honor.

THE COURT:  All right.  We will continue with testimony on Wednesday.  Again, I'm confident we're starting to get some traction.  No pun intended, given the weather.  But Wednesday we'll be here at 9 o'clock.  Does that work?  If you have any questions, if you have any concerns, just reach out to Ms. Stein.  She'll be extremely responsive.  She always is.

We're going to stop with this witness on the stand, but we will resume with him on the stand on Wednesday.

MR. WITHERELL:  That's correct, Your Honor.

THE COURT:  Is that correct?

Benjamin Hallowell - Direct

MR. WITHERELL: Yes. All right. So folks, since we are releasing you, those of you who are going home, I know some of you may be staying at the hotel here in Allentown. If any of you felt that you're already concerned about driving back, you can still, as I mentioned earlier, stay this evening. So let us know if that's the case. We're about to break for a recess until Wednesday morning, given the weather. So I want to remind you of the recess instruction I gave you several times, including earlier today.

During this recess and all other recesses, do not discuss this case with anyone, including your fellow jurors, or with other people involved in the trial, or members of your family, friends, or anybody else. Do not speak at all with any of the parties, the witnesses, or the attorneys. Do not permit anyone to discuss the case with you. If anyone approaches you and tries to talk about the case, do not mention that fact to the other jurors, but please report that to me and let Ms. Stein know immediately.

As I indicated before the trial started, you as jurors will decide this case based solely on the evidence that presented in this courtroom. I don't know of any media or news coverage of the case, but if there were, please do not watch or listen to any such reports. Do not read any news accounts. If anyone attempts to communicate with you in any way, again, let us know right away and you yourself should not communicate with

Benjamin Hallowell - Direct

anyone, whether that's verbally or online or in any way.  If you do come across any information about the case, please ignore it and also let us know about that as well.

Do not conduct any independent research about the case, not the matters in the case, not the legal issues, not about the individuals or any of the entities involved in the case.  Okay?  No research. That means don't use the internet to research.  Do not do any sort of research on the issues in this case or parties or associated with the trial.  Again, the only information that's appropriate for you to consider in deciding the case is what you learn here in this courtroom during the course of the trial.

Please, you must, as you know, keep an open mind.  Do not make up your mind about the verdict until you have heard all the evidence and I have given you final instructions about the law at the end of the trial, and you have discussed the case with one another during your deliberations.

Again, this instruction applies to every recess we take, whether or not I even say it again before our breaks.  If in any way, accidentally or otherwise, you do come about some information or you share some information about the case outside the courtroom, please let us know through Ms. Stein, and we'll make sure -- we'll do whatever we have to do to make sure that the case proceeds in a fair manner and fair to everybody.  All right?

Benjamin Hallowell - Direct

Thank you for your patience, and thank you for your attention. I was sneaking peeks throughout the case, and you were all paying attention to everything that was going on today. We need that. We need that. It's what you promised all of us here in the courtroom. And so far, so good. So thank you for that. Be safe. We look forward to seeing you on Wednesday. And we'll keep moving along. All right. Thank you, friends.

Ms. Stein.

THE CLERK: Court is adjourned.

(Jury exits)

THE COURT: Good night, everybody.

(Recess at 5:03 p.m., until 5:03 p.m.)

THE COURT: All right. Please be seated. And you can stay. How are you doing?

UNIDENTIFIED SPEAKER: Good.

THE COURT: Good.

UNIDENTIFIED SPEAKER: So I can stay or leave?

THE COURT: It's your choice. If I was you, I'd run. No. Thank you.

UNIDENTIFIED SPEAKER: All right. Thank you.

THE COURT: Yeah. Be safe. Okay?

Mr. Clark, just thinking back to this morning. I think you were going to continue to assist Mr. Gillard in --

MR. CLARK: Yes.

Benjamin Hallowell - Direct

THE COURT: -- obtaining certain information or reviewing certain information.

MR. CLARK: Yes, Judge.

THE COURT: Not mentioned today, there was some mention by Mr. Gillard in recent days or weeks that there was information that he was trying to track down regarding investigators and things like that. And I know you were working on that too. So having not heard anything further on that, and that's fine, I'm assuming you've had some success. Is --

MR. CLARK: Judge, yes. I spoke to Steven Furlong, who was engaged by Attorney Chestnut.

THE COURT: Yes.

MR. CLARK: And the scope of his inquiry was the information with respect to the post office information --

THE COURT: I recall.

MR. CLARK: -- that Mr. Gillard had sought to get.

THE COURT: Understood.

MR. CLARK: He advised me that he was not able to obtain information specifically regarding the mail that was delivered to 3006 as was hopeful by the defense.

THE COURT: And you shared that information with Mr. Gillard?

MR. CLARK: Yes.

THE COURT: Okay. Very good.

Benjamin Hallowell - Direct

THE COURT:  And so that was the last, the one thing that he had going on.  He did send me, which Mr. Gillard hasn't had, he did send me a printout of some information, I --

THE COURT:  Okay.  And you don't have to be specific.

MR. CLARK:  Right.  But I'll give that information to Mr. Gillard, but there was nothing on there that would help us with his inquiry.

THE COURT:  Okay.

MR. CLARK:  And the other thing, well, I'll discuss it with Mr. Gillard --

THE COURT:  Okay.  Very well.

MR. CLARK:  -- and that sort of thing.

THE COURT:  And thank you for, again, your willingness and  your continued assistance in the coming days.

MR. CLARK:  Okay.

THE COURT:  Okay.

MR. CLARK:  No problem, Judge.

THE COURT:  Mr. Gillard?

MR. GILLIARD:  Yeah, he -- he told me about the mail record thing and I have to send somebody specifically to that district Port Richmond District.  I plan on doing that, so.

THE COURT:  Very well.

MR. GILLIARD:  I just didn't get around to it, but I'm quite sure being that we get a day break, I could get it done.

MR. CLARK:  Okay.

Benjamin Hallowell - Direct

THE COURT:  All right.  Very well.

And the Government, I know you had a couple of tasks as well including jury instructions, both generally and several specific requests we discussed early on too.

MR. WITHERELL:  Mr. Schopf has informed me that he's on it.

THE COURT:  I'm not surprised.  Thank you very much.

MR. WITHERELL:  Your Honor, if I may, I just would want to inform the Court that based on some stipulations signed that we are well ahead of schedule.  And so --

THE COURT:  I was going to ask that.  That's good news.  And --

MR. WITHERELL:  So --

THE COURT:  Okay.  All right.

MR. WITHERELL:  -- significant days of trial have now been not necessary.  In fact, yesterday, which is now our snow day, was primarily going to be chemists.  So I just want the Court to know that the indulgence that you granted the Government so that we can run around was not in vain.  And it did serve a larger purpose.  We are moving along now at quite a fast clip.  I anticipate moving quickly now that the stipulations have been signed.

THE COURT:  Okay. You heard that too, Mr. Gillard?

MR. GILLIARD:  Yes.

THE COURT:  And I thank both sides for -- it's been

obvious to me, and this isn't the first time that I've brought it up.  Obviously, there's major disagreements between the sides as to what the evidence is and what the evidence shows here.  But I've just observed from a distance that you've maintained open lines of communication with one another and that's very important.  And both sides have acted professionally.

So again, I know there's a lot that's in disagreement, and I know the case is super important and stakes are high for both sides.  But again, I'm grateful for working through what you can and when you can't, that's what trials are for.  So anyway.  Thank you.

Yes, Mr. Gillard?

MR. GILLIARD:  Your Honor, do you think I need a subpoena for that -- them records?

THE COURT:  Well, I'm not -- please discuss it with Mr. Clark.

MR. GILLIARD:  All right.

THE COURT:  I don't know if that's something that goes to the post office.  I just don't know how what you're looking for is obtained.  And maybe he has some ideas.  And if he felt a subpoena was necessary, I'd be open to it.  I just caution you that times moving along.

MR. GILLIARD:  I -- I'll find out first.

THE COURT:  All right.  And talk to Mr. Clark --

Benjamin Hallowell - Direct

MR. GILLIARD:  Yeah.

THE COURT:  -- okay?

MR. GILLIARD:  Yep.  Yep.

THE COURT:  All right.  So do you know yet or is it unfair to ask what witnesses are upcoming on Wednesday?

MR. WITHERELL:  Your Honor, I will tell who I believe will be.

THE COURT:  Okay.

MR. WITHERELL:  We are obviously, still, as you can see, Agt. Becker is furiously trying to make witnesses available.

THE COURT:  I get it.  I get it.  And tell others not to come in.

MR. WITHERELL:  And tell others not to come.

THE COURT:  Yes.

MR. WITHERELL:  My anticipation is that we will hear from Special Agent Hallowell, who is going to continue in this matter.  He does surveillance for multiple, multiple controlled purchases including several PCP buys, which are very germane to this case.  Followed by that, Task Officer Schlosser should testify.  He also does some surveillance.  He's also present for search of the defendant's residence.  So we do plan on hearing from him on Wednesday.  We also hope to hear from a member of the FBI CAST team, Jeffrey Guagliardo.  He will talk about the defendant's cellular phone records and cell site

Benjamin Hallowell - Direct

analysis, placing him at the location of 30 --

THE COURT:  Where he's placing his telephone --

MR. WITHERELL:  His telephone.

THE COURT:  -- at certain locations.

MR. WITHERELL:  Yes, Judge.

THE COURT:  Yes.

MR. WITHERELL:  He'll be placing his telephone on 3006, 30 days prior -- the 30 days leading up to his arrest. We also are attempting to get someone from Cash App to come in. Obviously, it's a business record so I mean it should be very quick.  And also the principal from the elementary school will be present on Wednesday.

THE COURT:  Okay.

MR. WITHERELL:  Should that all fail and we get through all the witnesses, we do plan on hearing from Special Agent Becker several times through the course of this trial, and we will not waste any of the jury's time and be prepared to move forward.

THE COURT:  I appreciate that, and I appreciate you sharing the, at least your prospective plan for Wednesday.

And Mr. Gillard, you heard that.  That's the witnesses that the Government expects they'll be calling when we get back Wednesday, just so -- so if we want to, we can focus on who's coming up.  But I --

MR. GILLIARD:  Okay.

Benjamin Hallowell - Direct

THE COURT:  -- leave that to you.  All right?

MR. GILLIARD:  All right.

THE COURT:  All right.  Last thing.  I know the chemists and some of the ballistic folks would have been qualified as experts.  What experts would remain?  Is there a drug distribution expert?

MR. WITHERELL:  The two experts would be the individual from CAST.  I'm sorry I'm not standing, Judge.  I'm just used to sitting for this.

THE COURT:  No, no, no.  Please, make yourself comfortable.

MR. WITHERELL:  The individual from CAST.  We also have a narcotics trafficking expert who will testify either Thursday or Friday, depending on when we get to him.  I believe that's the entirety of the experts.  Let me just -- yeah, I think that's it, Judge.

THE COURT:  Okay.  All right.  All right.  And any expert testimony related to things like drug trafficking practices and those sorts of things, that's going to come through  an expert?

MR. WITHERELL:  Correct.

THE COURT:  Okay.  All right.  Let's maintain that separation.

MR. WITHERELL:  We'll do.

THE COURT:  All right?  Al right.  It's been a long

Benjamin Hallowell - Direct

day.  So shall we call it a day?

UNIDENTIFIED SPEAKER:  Let's call it a day, Judge.

MR. WITHERELL:  Nothing further from the Government, Your Honor.

THE COURT:  Okay.  All right.

Mr. Clark, again, I don't want to give you any more work than we've already been giving you, but I don't know if you're going to have the opportunity to share some of these exhibits, the exhibits the Government has indicated were in discovery, but have been culled from discovery so Mr. Gillard will have an opportunity to see them.  And I don't know how best to suggest that, but I'm just trying to remember the things we discussed eight or so hours ago.

MR. CLARK:  Well, we did discuss that a few moments ago.

THE COURT:  Okay.

MR. CLARK:  Mr. Gillard wants the Exhibit 1, the 1 of 3.  I don't know how he's going to get it, because I'm not lugging this down to the prison.  But anyway, I'll see what I can do for now.

So Judge, now tomorrow, I know we're going to have a blizzard and all that good stuff, but I'll call Chris if I have something that maybe I can --

THE COURT:  Okay.

MR. CLARK:  Now, we're not going to look at this

Benjamin Hallowell - Direct

today, but tomorrow I'll --

THE COURT:  Understood.

MR. CLARK:  -- put time aside to get these to you. But I don't have enough -- come on guys.  You know, I had some people from my staff here, but of course, when it's time to work, they leave.  But I could have had them take the volumes with them if he'd gotten to do that, but --

THE COURT:  Well, I'll leave it to you, but --

MR. CLARK:  Yeah.  I'll figure something out.

THE COURT:  -- just trying to remember just so it's all fresh.

MR. CLARK:  I don't like this guy, but I will take this one with me.

THE COURT:  All right.  That's what we have, friends.

MR. CLARK:  All right.

MR. WITHERELL:  Thank you, Your Honor.

MR. CLARK:  All right.

THE COURT:  And until Wednesday, stay safe, okay?

MR. WITHERELL:  Thank you, Judge.

THE COURT:  Thank you, everybody.

Thank you, Mr. Gillard.

MR. CLARK:  Thank you, Judge.

THE COURT:  Court is adjourned.

(Proceedings concluded at 5:14 o'clock, p.m.)

William Becker - Direct

C E R T I F I C A T I O N

I, Nikki Pavlides, court-approved transcriber, do hereby certify the foregoing is a true and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

*Nikki Pavlides*                    January 29, 2025
_____        _____
Nikki Pavlides                          DATE